UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

APRIL DEBOER, individually and as parent
and next friend of N.D.-R, R.D.-R., and J.D.-R,
minors, and JAYNE ROWSE, individually and as parent
and next friend of N.D.-R., R.D.-R., and J.D.-R.,
minors,

       Plaintiffs,                               ED Mi No. 12-10285
                                                Honorable Bernard A. Friedman
                                                United States District Judge

-vs-                                                    Honorable Michael J. Hluchaniuk
                                                United States Magistrate Judge

RICHARD SNYDER, in his official capacity as
Governor of the State of Michigan, and
BILL SCHUETTE, in his official capacity as
Michigan Attorney General,

       Defendant.

_____/

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56**

      NOW COME THE PLAINTIFFS, April DeBoer, individually and as parent

and next friend of N.D.-R, R.D.-R., and J.D.-R, minors, and Jayne Rowse, individually and as

parent and next friend of N.D.-R, R.D.-R., and J.D.-R, minors, by and through their attorneys,

Dana Nessel and Carole Stanyar, and hereby move the Court for summary judgment pursuant to

Federal Rule of Civil Procedure 56. In support of the motion, Plaintiffs submit separately

affidavits and a Memorandum in Support.

Respectfully submitted,

/s/ Dana Nessel
DANA M. NESSEL P51346
645 Griswold Street, Suite 3060
Detroit, MI 48226
(313) 556-2300
dananessel@hotmail.com


*s/Carole M. Stanyar*
CAROLE M. STANYAR P34830
682 Deer Street
Plymouth, MI 48170
(313) 963-7222
*cstanyar@wowway.com*

Attorneys for Plaintiffs


Of counsel:

*s/Robert A. Sedler*
ROBERT A. SEDLER  P31003
Wayne State University Law School
 471 W. Palmer Street
Detroit, MI 48202
(313) 577-3968
rsedler@wayne.edu


Dated: March 13, 2012

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

APRIL DEBOER, individually and as parent
and next friend of N.D.-R, R.D.-R., and J.D.-R,
minors, and JAYNE ROWSE, individually and as parent
and next friend of N.D.-R, R.D.-R., and J.D.-R,
minors,

       Plaintiffs,                          ED Mi No. 12-10285
                                         Honorable Bernard A. Friedman
                                         United States District Judge

-vs-                                     Honorable Michael J. Hluchaniuk
                                         United States Magistrate Judge

RICHARD SNYDER, in his official capacity as
Governor of the State of Michigan, and
BILL SCHUETTE, in his official capacity as
Michigan Attorney General,

       Defendant.

_____/

**PLAINTIFFS' COMBINED BRIEF IN RESPONSE
TO DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

      APRIL DEBOER, individually and as parent and next friend of N.D.-R, R.D.-R., and

J.D.-R, minors, and JAYNE ROWSE, individually and as parent and next friend of N.D.-R,

R.D.-R., and J.D.-R, minors, submit the following combined brief in response to the Defendants'

Motion to Dismiss, and in Support of their Motion for Summary Judgment.

**I. INTRODUCTION**:

      The Plaintiffs in this case have sued Richard Snyder, the Governor of the State of

Michigan, and Bill Schuette, the Michigan Attorney General, in this Court because Defendants'

implementation, enforcement and defense of Michigan's so-called "second parent adoption"

1

statute,  MCL 710.24, deprives Plaintiffs of equal protection of the laws as protected by the

Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C.

§1983.

As set forth in their complaint (R. 1), and in their affidavits filed in connection with this

motion for summary judgment, April DeBoer and Jayne Rowse have been in a committed, long-

term domestic partnership, they have resided together for six years, they own a home together,

and they are the parents of the different minor plaintiffs in this case.  April DeBoer is the

adoptive parent of a minor daughter, "R", a minor, and Jayne Rowse, is the adoptive parent of

minor sons, "J" and "N".   Rowse and DeBoer enjoy a close and loving relationship with each

other, and they have created a stable, loving household for these three children.  They share

finances, they make decisions jointly regarding their own lives and the lives of their children,

they both cook and care for the children, they both attend to the children's medical needs and

both are involved in taking the children to their many doctor and therapy visits, and they

coordinate their work schedules so that at least one parent is generally home with the children.

Prior to their adoption of the children, the couple expressed their vows at a commitment

ceremony in February of 2007 which was attended by both of their families and friends.  They

each enjoy a close relationship with their respective family of origin, they were and are supported

by their families in their decision to adopt the children, and they are supported by their families

when needed in caring for the children.  DeBoer and Rowse enjoy an extremely high functioning,

low-conflict, domestic relationship despite the enormous challenges involved in raising three

young, special needs children. See Affidavits of April DeBoer, Jayne Rowse, and Wendy

DeBoer, filed as Exhibits in Support of Plaintiffs' Statement of Undisputed Material Facts in

Support of Motion for Summary Judgment..

If permitted under Michigan law, DeBoer and Rowse would legally marry.  But for the Defendants' actions in this case, DeBoer would legally adopt J and N, and Rowse would consent to that adoption,  and Rowse would legally adopt R, and DeBoer would consent to that adoption.  For the reasons set forth below, they have determined that any attempt adopting the children would be futile in Michigan.

## II. LEGAL ANALYSIS:

### A. Standards applicable to the instant motions:

Plaintiffs contend that they are entitled to summary judgment because  "... the pleadings ... and ... affidavits [on file in this case] show that there is no genuine issue as to any material fact and that [Plaintiffs are] entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  In making its determination, the Court should view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Ciminillo* v *Streicher*, 434 F3d 461, 464 (6th Cir 2006).

In their motion to dismiss, the Defendants attack the instant claim based upon a lack of jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1). For the reasons set forth at §II C, Plaintiffs have standing to sue under 42 USC §1983, and consequently, the Court has jurisdiction over the complaint.  In addition, for the reasons expressed at §§II E and F, Plaintiffs' complaint does state a claim upon which relief can be granted under Rule 12(b)(6).   For the reasons expressed at §II D, the Court should decline the Defendants' invitation to abstain from deciding this case.

### B. Michigan's Second Parent Adoption Statute:

Michigan law relating to adoption and second parent adoption[1] is governed by MCL

710.24 which provides as follows:

> If a person desires to adopt a child or an adult and to bestow upon the adoptee his
> or her family name, or to adopt a child or an adult without a name change with the
> intent to make the adoptee his or her heir, that person, together with his wife or
> her husband, if married, shall file a petition with the court of the county in which
> the petitioner resides or where the adoptee is found[.]

MCL 710.24.  On its face, the statute allows a married couple to adopt a child, and it allows a

single person to adopt a child.   It is not in dispute in this case that Michigan forbids a joint

adoption by two unmarried persons, or a second parent adoption by an unmarried person.[2]  In this

case, Plaintiffs maintain that on its face, the statute expressly discriminates against the unmarried

couple.   As applied, it discriminates against Plaintiff parents and children.

**C. Plaintiffs have standing to sue under 42 USC §1983:**

"The irreducible constitutional minimum of standing contains three requirements. First and

_____

[1]  A "second-parent adoption" has been defined as an adoption in which an individual
who is raising children together with a non-spousal legal parent, either adoptive or biological,
adopts the children.  See *Sharon S* v *Superior Court*, 31 Cal 4th 417, 422, n2; 73 P3d 554 (2003).

[2]  The State of Michigan, through both the executive and judicial branches of government,
has construed this statute as prohibiting adoption by an unmarried couple.  The Michigan
Attorney General has issued an opinion that same sex couples are not allowed to adopt a child as
second parent in Michigan regardless whether or not they are legally married in a state that
permits same-sex marriages. See OAG, 2004, No 7160 (September 14, 2004).  See also *In re
Adams*, 189 Mich. App. 540, 543-544 (1991)("... it has been held inconsistent with the general
scope and purpose of adoption statutes to allow two unmarried persons to make a joint
adoption", citing *Adoption of Meaux*, 417 So.2d 522 (La Ct App 1982) .  In 2002, following
instruction from "members of the [Michigan] Supreme Court", petitions for adoption filed by
unmarried second parents are not processed by county clerks. See C. Jones, "The Rise and Fall of
Second Parent Adoption in Washtenaw County, Michigan", Michigan Child Welfare Law
Journal, pp 6-7 (2003).  See also Affidavit of Cynthia Bostwick, appended.  Under the so-called
"Michigan Marriage Amendment" (MMA), approved by the electorate on November 2, 2004,
effective on December 18, 2004, the Michigan Constitution prohibits same-sex couples from
marrying. Mich. Const. 1963, art 1, §25.

foremost, there must be alleged (and ultimately proven) an injury in fact.... Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. And third, there must be redressability — a likelihood that the requested relief will redress the alleged injury." *Gill* v *Office of Personnel Management*, 699 FSupp2d 374, 383-384 (D Ma 2010), quoting from *Steel Co. v Citizens for a Better Environment*, 523 US 83, 102-103 (1998). Where the plaintiff lacks standing to pursue his claim, the court, in turn, lacks subject matter jurisdiction over the dispute.  *Gill*, FSupp2d at 383-384.  "The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentations of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " *Flast v Cohen,* 392 US 83, 99 (1968) (quoting *Baker v Carr*, 369 US 186, 204 (1962)). To establish standing, plaintiffs must "show 'injury in fact' resulting from the action which they seek to have the court adjudicate."  *Valley Forge Christian College v Americans United for Separation of Church and State, Inc*, 454 US 464,  473 (1982).

Plaintiffs have standing in this case because they suffer clear factual injury.  The child plaintiffs in this case are deprived of myriad significant legal benefits which are afforded those children having two legal parents rather than one: (a) the legal right to have a parent automatically in the event of  the death of the other parent, (b) the right to dependency benefits under laws and other contractual arrangements providing for dependency benefits, such as social security, workers compensation, pensions, insurance and tort law, and (c) the right to have at least one parent able and available to make decisions in the event the other parent is incapacitated or is unavailable.  See Affidavits of DeBoer, Rowse, Bostwick and Nelson.  See also *Adoption of*

*Tammy*, 416 Mass. 205, 214 (1993)(an adopted child can inherit from the "second" legal parent under the law of intestate succession; the second parent is legally be obligated to provide support for the child;  the child is eligible for coverage under the second parent's insurance policies, and for social security benefits in the event of the second parent's disability or death).  See also *Matter of Jacob*, 86 NY2d 651 (1995)(same, as well as entitlement to health insurance and wrongful death benefits upon the death of the second parent);  *In re Hart*, 806 A.2d 1179 (Del. Fam. Ct. 2001)(same).

Moreover, the child plaintiffs in this case suffer factual injury because this statute, when coupled with the later enactment of the Michigan Marriage Amendment (see note 2 *supra*), assures that the child of a homosexual unmarried couple will never have two legal parents so long as his or her parents remain in a stable, committed same-sex relationship because gay and lesbian persons are forbidden from marrying in the State of Michigan.

The factual injury to the parent plaintiffs in this case arises from their not being permitted to file a joint or second-parent petition for adoption.  Consequently, DeBoer is deprived of the right to determine who may share custody of R, and Rowse is deprived of the right to become a legal parent to R, who she co-parents in every way with DeBoer.  Conversely, Rowse is deprived of the right to determine who may share custody of J and N, and DeBoer is deprived of the right to become a legal parent to J and N, who she co-parents in every way with Rowse.

Defendants argue that the Plaintiffs have not demonstrated injury in fact because the parents can use "alternative legal measures" to provide the children with a degree of legal protection.  Defendants fail utterly to explain how this could realistically be effectuated. Moreover, the argument is patently incorrect. Contrary to Defendant's assertion, there are no

6

legal documents which can be executed by a legal parent to a non-legal parent which convey rights which in any way approach the protections an individual would possess as a legal parent. For instance, a power of attorney may only delegate certain limited parental responsibilities to a non-legal parent, for a period which cannot exceed six months, and the power of attorney can be revoked at will. MCL 700.5103.

Similarly, a guardian is not the equivalent of a legal parent.  The legal parent of an unmarried minor may appoint a guardian for the minor, to be made in the event of incapacity or death of the legal parent, by will or by another writing signed by the parent.  MCL 700.5202. However, such an appointment is not assured.  A probate court hearing is required, in which the court must make a determination as to whether it deems that the requested appointment appropriately serves the minor's welfare. MCL 700.5213(2). Further, the law permits nearly anyone to petition the court for guardianship of a minor, as long as they are "a person interested in the welfare of a minor",  including distant relatives, friends, and Department of Human Services (DHS) caseworkers, each of whom  can challenge the appointment of the legal parent's unmarried partner and each of whom stands on equal legal footing with the second parent. MCL 700.5204. Additionally, the law mandates that such guardianships must be reviewed annually, and can be terminated by the court for "any…factor the court considers relevant to the minor's welfare." MCL 700.5207(1)(f). According to the State of Michigan's own Child Welfare Law Manual, "[g]uardianship should not be seen as a cure-all, nor can it be equated with… parental rights and adoption in terms of the security it offers." See DHS, State of Michigan, Child Welfare Law Manual, published 11/9/07.

Similarly, the Supreme Court has recognized for over thirty years that a foster parent does

not enjoy the same constitutionally protected rights as a full legal parent. In *Smith v. Org. of Foster Families for Equality and Reform*, 431 US 816, 845 (1977), the Court explained that in a foster family, the State retains legal custody over the child, while the foster parents enjoy only the right to care for and supervise the child while in their care. *Id.* 826-827.  By its nature, the foster relationship is "temporary" and "transitional".  "This is unlike the adoptive placement, which implies a permanent substitution of one home for another." *Id.* 824.  The "foster family ... has its source in state law and contractual arrangements".  The liberty rights associated with being a legal parent are, in contrast, "older than the Bill of Rights". *Id.* 845.  Once a child is legally adopted, all the rights of the natural parent are enjoyed by the adoptive parent automatically by operation of law.  Because the rights of a legal parent are grounded in the Constitution, the legal parent may only have his or her rights limited by a state wardship over the family, or terminated, after protracted hearings which are accompanied with full due process safeguards. See  MCR 3.911; 3.903(A)(18)(b); *Matter of Youmans*, 156 Mich App 679, 686-687 (1986)(right to notice adequate notice, trial by jury).  *In re Richard Hudson*, 483 Mich 928, 931 (2009); *In the Matter of C.R.*, 250 Mich App 185, 198 (2001)(parent's right to counsel is "statutory, court-rule based, and constitutional") .

The further implication by the Defendants, that Rowse could bestow upon DeBoer's children her rights to Social Security disability and death benefits, is flatly untrue.  A child may be eligible for such benefits only if they are the "child or legally adopted child" of the insured. Moreover, the adoption laws of the State where the adoption took place determine whether an individual qualifies as the insured's legally adopted child.  42 USC §402(d) and (e); C.F.R. §404.356.  Consequently, the child of a "second" parent in Michigan has no right to collect on

8

the second parent's social security benefits.

Similarly, the Defendants cite no authority for the proposition that a parent, for example, in DeBoer's position could bestow her health insurance benefits on Rowse's children, when employers (like the State itself) limit such benefits to the insured's birth or adoptive children.

The absurdity of the Defendants' position is borne out by taking it to its logical conclusion. If, as the Defendants claim, there were no discernible difference between the rights of a legal parent in contrast to those that can be gerrymandered together through various contractual procedures, powers of attorney, etc., then what exactly is the State's purpose in barring the Plaintiffs from being legal adoptive parents? If these procedures, for all intents and purposes, actually did mimic the rights of parent and child (Plaintiffs assert they do not), and if, as it appears, the State has no objection to Rowse being the functional equivalent of an adoptive parent to the children of Deboer, then there is no rational basis for this statute. See discussion *infra*.

Finally, the Defendants "cause" the Plaintiffs' injuries because they execute, implement and defend the second-parent adoption statute in the State of Michigan.

**D. The "*Burford*" abstention doctrine is not applicable in this context.**

Defendants cite the Supreme Court's decision in *Burford v Sun Oil Co.*, 319 US 315, 329 (1943), urging this Court to abstain from granting the relief requested herein. However, so-called "*Burford*" abstention is a "rare", "extraordinary and narrow exception to the duty of the district court to adjudicate a controversy properly before it." *Quackenbush v Allstate Insurance Company*, 517 US 706, 728 (1996). *Burford* abstention operates in isolated instances to prevent a federal determination of state law in a case where federal court action would interfere with

proceedings or orders of state administrative agencies with respect to a specialized aspect of a complicated regulatory system, which is better left to the state administrative agencies and the state courts. It is limited to the situation where timely and adequate state court review is available, and there are either "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar," or "the exercise of federal review of the question in a  case or similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Public Service, Inc. v Council of New Orleans*, 491 US 350, 361 (1989). In that case, the Court held that *Burford* abstention was improper where a utility challenged a city's order denying it a refund of charges that was preempted by federal law. The Court noted that in that case there was no unsettled question of state law and that federal intervention would not amount to disruption of efforts to establish a coherent ratemaking policy.

Similarly, in *American Electric Power Company v KPSC*, 787 F2d 588, 593 (6th Cir 1986),  a utility company challenged a state public utility commission rate order on federal grounds, and had simultaneously brought an attack on the same order raising the same claims in state court.  The Court held that *Burford* abstention was improper, because the district court was not required to rely on state law or review a state agency's decision under state law, because no implications of a complex state policy existed. The Court noted that, "[t]here is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of state policy", citing *Zablocki v Redhail*,434 US 374, 379-380 (1978).[3]

---

[3]  The Court in that case did conclude that *Younger* abstention was proper because of the pending lawsuit in state court. *Younger v Harris*, 401 US 37 (1971).   There is no pending state action in this case.

Urging the application of *Burford* abstention in this case, the Defendants assert first that this case "involves a question of state law bearing on strongly-held public policy, *i.e.*, imitation of the traditional family for adopted children, whose importance transcends the results in the case at bar." Defendants' Brief at pp 12-13. This alleged "policy", as articulated by the Defendants, however, is belied by the statute itself. A single parent household, permitted under this statute, is not an "imitation of the traditional family". See discussion *infra.*

Second, the State is not engaged in an effort or process to "establish a coherent policy" (*id.* 13) with respect to adoption. This policy is fixed and longstanding. As explained by the Defendants, the statute was first enacted in 1945 in near identical form. (*Id.* 6). In 2002, the prohibition against second-parent adoptions was re-affirmed in a directive from the Michigan Supreme Court (see note 2 *supra*), and it persists today, with county clerks refusing to even process second parent petitions for adoption. See Bostwick Affidivit.

Third, the Defendants argue that "much of [the Plaintiffs] complaint is premised upon sociological and psychological studies regarding the benefits of having two parents" (*id.* 15), and that as such, this case will necessitate the Court engaging in social policy determinations which are more properly left to the state legislature. On the contrary, as is demonstrated in the Statement of Undisputed Material Facts filed contemporanously herein, this matter can be decided solely on the basis of the statute itself, without any necessity for the Court to engage in adjudicating so-called "legislative" facts. As discussed above, the injury here, for example to the children, is clear – the loss of myriad rights associated with having two legal parents. This Court need not decide the question of whether two parents are better than one in order to resolve this case.

Fourth, the Defendants rely on *Adrian Energy Associates v Michigan Public Service*

11

*Commission*, 481 F3d 414, 422-423 (6th Cir 2007), to support this argument.  In that case, the Court was concerned primarily with the fact that the federal suit was undertaken while there was a "pending state action raising identical claims."  There is no pending state court proceeding involved here.  Further, in *Adrian*, the federal litigation would not resolve the controversy because the "Michigan Court of Appeals would still be required to decide the pending appeal and the Michigan Public Service Commission ("MPSC") must apply and enforce the ruling regardless of whether it rests on state or federal law."  *Id*. 422.  Moreover, the Court found that the administrative agency involved, the MPSC, was "more knowledgeable of federal law affecting energy rates than the federal court because it often considers federal law when making regulatory decisions."  *Id.*  Here,  the second parent adoption statute is completely straightforward, and  the Michigan courts are not more knowledgeable than this Court as to the federal constitutional claim.[4]  Worse, the Michigan courts have steadfastly refused to consider federal equal protection challenges to the statute, and will not even allow such petitions to be filed. See *Harmon* v *Davis*, MSCt No. 141888, COA No. 297968  (Kelly, J., dissenting, *4); see also Bostwick Affidavit.

The Defendants also cite *McCarty v McCarty*, 453 US 210 (1981), for the proposition that domestic relations are purely the province of state law.  However, the *McCarty* holding actually supports the Plaintiffs' position as to abstention.   In that case, the Court held that federal law trumped state domestic relations law, and precluded the California courts from dividing an officer's military nondisability retirement pay under that state's community property laws.

---

[4] In *Adrian*, the Court explained that the *Burford* abstention doctrine applies to avoid determination as to policies "that are committed in the first instance to expert administrative resolution."  *Adrian*, 481 US at 423.  The Defendants fail to articulate how the instant federal constitutional challenge fits that paradigm.

Finally, axiomatic but apparently worth mentioning,  federal courts have historically struck down state laws dealing with family law and domestic relations when the state laws violate the federal Constitution. See discussion *infra* at §E and F.  See also *Loving v Virginia*, 388 US 1 (1967) (state law prohibiting interracial marriage); *Zablocki v Redhail*, 434 US 374 (1978) (state law prohibiting marriage by non-custodial parent under a duty of support); *Turner v Salfey*, 482 US 78 (1987) (state law prohibiting marriage by prison inmate without the approval of the warden); *Troxel v Granville*, 530 US 87 (2000) (state "grandparent visitation" law giving courts the power to order visitation over the objections of the custodial parent); *Stanley v Illinois*, 405 US 645 (1972) (state law denying the father of an out-of-wedlock child the ability to establish paternity); *Moore v City of East Cleveland*, 431 US 494 (1977) (city zoning law that prohibited grandmother from sharing a home with her grandsons who were cousins with each other rather than siblings); *Orr v Orr*, 440 US 268 (1979) (state law providing alimony for dependent wives, but not for dependent husbands); *Caban v Mohammed*, 441 US 380 (1979) (where father had established a relationship with out-of-wedlock child, state violated equal protection by not requiring the father's consent to the adoption of the child).

### E. Defendants' enforcement and defense of  MCL 710.24 results in discrimination against the child based upon the fact that his or her parents are unmarried.

The Defendants' actions in this case single out and deny legal benefits to a subset of children: those who are parented by unmarried couples. The Supreme Court frequently has held that disparate treatment of the children of unmarried parents based on the conduct or status of their parents violates the Equal Protection Clause. *See, e.g, Levy v Louisiana*, 391 US 68  (1968) (invalidating provision denying children of unmarried parents the right to claim for wrongful

13

death); *Weber v Aetna Cas. & Sur. Co.*, 406 US 164, 175 (1972) (invalidating provision denying

"unacknowledged illegitimate" children the right to collect, under workman's compensation, upon

father's work-related death); *Mathews v Lucas*, 427 US 495, 505 (1976) ("visiting condemnation

upon the child in order to express society's disapproval of the parents' liaisons 'is illogical and

unjust'"). In this series of cases, the Supreme Court has struck down as unconstitutional state laws

that burdened or disadvantaged children born to unmarried couples.  In *Levy*, the Court noted what

should be obvious, both then and now: that "illegitimate children are not 'nonpersons.' They are

clearly 'persons' within the meaning of the Equal Protection Clause of the Fourteenth

Amendment."  *Id*. 70, quoting from Note, "The Rights of Illegitimates Under Federal Statutes", 76

Harv.L.Rev. 337 (1962).  Similarly, the Court explained in *Pickett v Brown*, 462 US 1, 7 (1983):

> Obviously, no child is responsible for his birth and penalizing the
> illegitimate child is an ineffectual–as well as unjust–way of
> deterring the parent ... [T]he Equal Protection Clause does enable us
> to strike down discriminatory laws relating to status of birth
> where–as in this case–the classification is justified by no legitimate
> state interest, compelling or otherwise.

*See also Gomez v Perez*, 409 US 535, 538 (1973) ("a State may not invidiously discriminate

against illegitimate children by denying them substantial benefits accorded children generally.")

This statute is irrational on its face.  Moreover, the State's purported interests in defending

and implementing the statute, as articulated by the Defendants in this lawsuit, are likewise

irrational.

Significantly, the Defendants do not dispute, nor can they dispute, that gay and lesbian

people can be just as good parents as heterosexual people. Single people, both homosexual and

heterosexual, are permitted to adopt under the statute, and the Defendants concede as much.

14

Moreover, a consensus has developed among the medical, psychological, and social welfare communities that children raised by gay and lesbian parents are just as likely to be well-adjusted as those raised by heterosexual parents. See Exhibit 6, Howard Affidavit.  See also Position Statement of American Psychiatric Association, No. 200214, approved November 2002; E. Perrin, *Coparent or Second Parent Adoption by Same-Sex Parents,* Pediatrics 339 (2002); R.U. Paige, *Proceedings of the American Psychological Association, Incorporated, for the Legislative Year 2004: Policy Statement on Lesbian and Gay Parents* (2004); J. Stacey and T. Bilbarz, *(How) Does the Sexual Orientation of Parents Matter?*, 66 American Sociological Review 159 (2001); American Academy of Child & Adolescent Psychiatry, *Gay, Lesbian, Bisexual, or Transgender Parents Policy Statement*, Vol. 92 (2011); American Medical Association, AMA Policy Regarding Partner Co-Adoption, H-60.940 (2012); Child Welfare League of America, Position Statement on Parenting of Children by Lesbian, Gay, and Bisexual Adults (2011), available http://www.cwla.org/programs/culture/glbtqposition.htm.[5]

Moreover, given the Defendants' contention that a single parent, straight or gay, can provide a stable and nurturing environment for adopted children in Michigan (because the statute allows the single person to adopt alone), it is then both perverse and irrational to contend that *two* unmarried parents, straight or gay, cannot provide the same stable and nurturing environment, perhaps even more so, since there are two parents caring for the child.   Defendants' argument

---

[5]  As to a similar consensus amongst legal authorities, see e.g., *Florida Department of Children and Families* v *Adoption of S.S.G. and N.R.G.*,  45 So.3d 79, 85 (District C.O.A. Fla. 2010)(striking down a law barring homosexuals from serving as adoptive parents as lacking a rational basis).  See also *Gill*, 699 FSupp2d at 388-389, n 106 (citing the "consensus" that children of gay and lesbian parents are just as likely to be well-adjusted as those raised by heterosexual parents).

might at least have some logical underpinning (but would still fail the rational basis test, see *infra*) if the state allowed adoption only by a married couple, and no one else. This statute is especially irrational, however, because the State permits a single person to adopt.

In *Levy*, the State articulated an analogous purpose in denying wrongful death benefits to illegitimate children – to "discourage[] bringing children into the world out of wedlock". *Levy*, 391 US at 70. The United States Supreme Court found that this purpose flunked the rational basis test because the "[l]egitimacy or illegitimacy of birth has no relation to the nature of the wrong allegedly inflicted on the mother", which in that case was a tort committed by a third party. *Id.* 72.

This statute is irrational further because Michigan already allows unmarried couples, including gay and lesbian couples, to be foster parents and legal guardians, and indeed, both DeBoer and Rowse were certified *as a couple* by the State to be foster parents for "J", a status which remained in effect until J was adopted by Rowse. See DeBoer Affidavit, ¶12. In striking down a law barring homosexuals from serving as adoptive parents as violating of equal protection, the Court in *Florida Department of Children and Families* v *Adoption of S.S.G. and N.R.G.*, 45 So.3d at 85, observed, "[i]t is difficult to see any rational basis for using gay persons as foster parents or guardians, on a temporary or long term basis, while imposing a blanket prohibition on adoption by the second parent in a gay household." *Id.* 86. The Court in that case found this to be "a distinction without a difference". *Id.* 86, n 9. Even more absurd, the statute is irrational as applied here because *both* Deboer and Rowse were approved by the State as individuals to adopt their respective children after an extensive individualized assessment. See discussion *infra*.

16

Additionally, the statute is irrational because marriage is certainly not a prerequisite to procreation, and the unmarried birth father in Michigan can become a legal parent simply by his inclusion on the child's birth certificate.

In this lawsuit, the Defendants contend that the statute serves the State's interests in replicating, through adoption, the "traditional family", which the Defendants define as a husband, wife, and one or more children.   However, again, looking at the statute on its face, Michigan also defines a family to include a single parent and his or her child.   Moreover, decades of Supreme Court jurisprudence, some cited by the Defendants' themselves, establishes that the "traditional family" cannot be defined so narrowly and still pass constitutional scrutiny.   For example, in *City of East Cleveland  v Moore*, 431 US 494 (1977), the Court struck down a city housing ordinance on due process grounds, finding that the State could not define the "traditional family" so as to exclude a grandmother and her grandchildren living under the same roof.  *Id.* (constitutional family protections could not be limited to the "arbitrary ... boundary of the nuclear family").

Similarly, in *Smith v Org. of Foster Families for Equality and Reform*, 431 US 816, 845 (1977), the Supreme Court noted again that, for constitutional purposes, a family is not limited to the nuclear family of a husband, wife and their children by birth.

> [B]iological relationships are not the exclusive determination of the existence of a
> family.... [T]he importance of the familial relationship, to the individuals involved
> and to the society, stems from the emotional attachments that derive from the
> intimacy of daily association[.]

*Id.* at 844.

In support of its "traditional family" argument, the Defendants cite the Supreme Court's decision in *Michael H.* v *Gerald D.*, 491 US 110, 122 (1989), for the proposition that "[o]ur

17

traditions have protected the marital family ..."  In *Michael H*.,  the Court rejected an alleged birth father's right to visitation to a child born during a valid marriage between a woman and another man.   The State in that case expressed its concern that the child would be disinherited by the cuckolded husband if the identity of the birth father were litigated in court.   However, in *Michael H*., the Court goes on to say (even in 1989) that  " .. in modern times ... the rigid protection of the marital family has in other respects been relaxed ...", and that while  "'the unitary family' is typified, of course, by the married family, *[it] also includes the household of unmarried parents and their children*. Perhaps the concept can be expanded beyond this ..."  *Id*. 125, 123, n2 (emphasis supplied). The Court in *Michael H.* further cites to *Stanley v Illinois*, 405 US 645, 651 (1972), where "we forbade the destruction of ... a family when, upon the death of the mother, the State had sought to remove the children from the custody of the [unmarried] father who had lived with and supported them and their mother for 18 years." *Id.*  The *Stanley* holding, in turn, supports DeBoer's claim that her rights should be protected to N and J if Rowse dies, and Rowse's claim that her rights should be protected to R if DeBoer dies.   Consequently, when read more closely, neither the statute itself nor Supreme Court jurisprudence  supports the Defendants' narrow definition of what constitutes a "traditional family".

The Defendants also cite the State's interest in not affording adoptive rights to people who have demonstrated "uncertain levels of commitment to each other" by failing to marry.   This argument is especially absurd as applied to the Plaintiff parents in this case, (a) who have demonstrated their commitment both to the children and to each other in every way possible under existing Michigan law, and (b) who are barred by a state constitutional amendment from

confirming their commitment through a legal marriage.[6]  As to this peculiarity in Michigan law,

the United States Supreme Court observed in an analogous context that "the burdens of

illegitimacy, already weighty, become doubly so when neither parent nor child can legally lighten

them."  *Weber*, 406 US at 171 (deceased parent was legally precluded from marrying the mother

of the illegitimate child, while still married to his wife who had been committed to a mental

institution; unacknowledged illegitimate child could not collect under Louisiana workman's

compensation laws).[7]

Moreover, any concern the State has that these or any other prospective adoptive parents

may individually be unfit, or that as a couple, they have an "uncertain level of commitment to

each other",  can be addressed within Michigan's legal and regulatory framework for adoption

which mandates an individualized assessment of the qualifications to become a parent.

Significantly, like any other prospective adoptive parent in Michigan (including married step

parents), DeBoer and Rowse had to petition the circuit court for permission to adopt each of these

children.  Before each of the children could be adopted by Rowse or DeBoer, (a) both Rowse and

DeBoer were interviewed extensively, (b) they were screened by the State for criminal history

---

[6] Plaintiffs DeBoer and Rowse are a same sex couple.  In this action, they are only asserting their own rights and those of their children.  As a structural matter, the Plaintiffs cannot assert the rights of unmarried opposite sex couples.  Consequently, this Court can leave to some future case the question of whether the State would have a rational basis for barring a second parent or joint adoption as to those couples who can legally marry but have chosen not to.

[7] The Louisiana statute in *Weber* allowed *acknowledged* illegitimate children of the deceased to collect on workman's compensation upon his work-related death, denying same to *unacknowledged* illegitimate children.   The Court found an equal protection violation "where the acknowledgment so necessary to equal recovery rights may be unlikely to occur *or legally impossible* to effectuate where the illegitimate child may be nourished and loved."  *Weber*, 406 US at 174. (Emphasis supplied).

and, through the  Department of Human Services, for any history of abuse or neglect, (c) an assessment was done through the county where the adoptions were to take place, (d)  their home was inspected, (e) a temporary placement of each child was made in their home, (f) they were monitored by the State in their home with visits by social workers and nurses, and (g) a determination was made by the circuit court of applicable jurisdiction that they were suitable parents and that the child being adopted was being properly cared for while in the temporary placement. See Affidavits of Rowse, Deboer, Bostwick, and Nelson.[8]   Significantly, the parent plaintiffs in this case are not asking this Court to grant their petitions for second parent adoption. Rather, they are requesting an order from this Court preventing the Defendants from barring these adoption petitions from being filed or considered based solely on the fact that Plaintiffs are an unmarried same sex couple.

Despite the purposes articulated by the Defendants for this statute, it goes too far and fails the most fundamental of equal protection requirements – that it be  "narrow enough in scope and grounded in a sufficient factual context for [the court] to ascertain some relation between the classification and the purpose it serve[s]." *Romer*, 633.  Here the categorical exclusion of same sex parents from the ability to file a joint petition for adoption is unnecessarily broad, and is actually counterproductive to the state's asserted goal of protecting children.  It screens out all so-called "second" parents when the vast majority, like DeBoer and Rowse, are competent and caring.  Moreover, in doing so, it harms children by denying them the legal benefits that come with having a second parent.

---

[8] As to two of the children, R and N, at the time of the adoption, the circuit court also had to make "best interest" findings in order to terminate the rights of the birth parents.

The matter of individual determination of the parents' qualifications illustrates a broader principle. The state cannot rely on a categorical exclusion where any valid state interest can be advanced by an individual determination. In *Orr v Orr*, 440 US 268 (1979), the Court held violative of equal protection a state law providing alimony for dependent wives but not for dependent husbands. The state argued that the purpose of the law was to overcome past discrimination against women in the marriage relationship. The Court, applying the important and substantial relationship test (see discussion *infra*), held that the law was unconstitutional, because there were individualized hearings on support and alimony in divorce case, and it could be determined in the particular case whether the wife had been discriminated against in the marriage relationship. See also *Stanley*, 405 US at 655-656 (striking down state law which created a presumption of parental incompetence as to unmarried birth fathers seeking custody upon death of birth mother, holding that individualized hearings were required under Due Process).

> Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care ...it needlessly risks running roughshod over important interests of both parent and child.

*Stanley*, 405 US at 656-657. See also *Carrington v Rash*, 380 US 89, 95-96 (1965)(striking down a blanket exclusion of the right to vote as to all military servicemen in the State of Texas, holding that an individualized assessment of genuine residency was required). Similarly, in this context, whether a couple, married or same sex (who cannot legally marry) are qualified to adopt together can be determined on an individual basis.

In a related argument, the Defendants cite the State's interest in avoiding the additional

21

custody battles it claims would necessarily follow from allowing the unmarried to adopt jointly.

However, if that truly were the State's interest, married step-parents would not be permitted to

adopt either because the danger of more custody battles is equally present in that scenario.

Moreover, as to this argument, the Court in *Stanley* observed as follows:

> "Clearly the objective of reducing the workload on probate courts by eliminating
> one class of contests is not without some legitimacy ... (But to) give a mandatory
> preference to members of either sex over members of the other, merely to
> accomplish the elimination of hearings on the merits, is to make the very kind of
> arbitrary legislative choice forbidden by the Equal Protection Clause of the
> Fourteenth Amendment" ... [T]he Constitution recognizes higher values than
> speed and efficiency.

*Stanley*, 405 US at 656-657, quoting from *Carrington*, 380 US at 96.

Defendants argue that if the statute is determined to be unconstitutional, "multiple people"

could attempt to adopt a child, evoking the image a posse of well-meaning adults lining the

courthouse steps to adopt a lone infant.  First, with throngs of unwanted children in Michigan's

foster care system, the State should be so fortunate to have such an unlikely scenario arise. See

Howard Affidavit.  Second, when the proverbial "village" comes before this Court to adopt a

child, this Court can consider that situation when it arises.  This case presents an "as applied"

challenge.  It involves a family which includes two parents and children -- for all practical

purposes, the equivalent of what the State is touting as the  "traditional family".

Finally, the Defendants argue that "Michigan has a legitimate interest in encouraging a

stable and nurturing environment of its adopted children" as a purportedly rational reason for

upholding this statute.  However, the Defendants concede in this case that "it appears the children

are being raised in a loving, caring environment with two people who are committed to their

wellbeing."  Defendants' Brief in Support of Motion to Dismiss, pp 9-11, p 5, n1.  Moreover, as

Plaintiffs establish in their affidavits, these were abandoned, surrendered, unwanted special needs children destined for state wardship, foster care or orphanages before DeBoer and Rowse stepped up to care for them.  Even more significantly, as adoption expert Jeanne Howard points out in her affidavit, attached, gay and lesbian parents adopt special needs children from the foster care system in far greater numbers than their heterosexual counterparts.  Consequently,  Plaintiffs' interpretation of the constitutionality of this statute has a far better chance of furthering  the State's professed  "interest in encouraging a stable and nurturing environment of" both its adopted and foster children.

Consequently, the categorical exclusion of same sex couples as joint adoptive parents under this statute is unconstitutional even under the lowest level of scrutiny, that of rational basis, for all the reasons set forth above.  Alternatively, the Plaintiffs would respectfully submit that the applicable standard of review in this situation is intermediate scrutiny, a test that has historically been used to evaluate laws which discriminate against out-of-wedlock children -- children subject to discrimination because of the status of their parents.  In *Clark v Jeter*, 486 US 456, 461 (1988), the United States Supreme Court recognized this intermediate level of review, between strict-scrutiny and rational-basis review, under which a challenged statutory classification will be upheld only if it is "substantially related to an important governmental objective". This "heightened scrutiny" standard has been applied to legislation creating classifications on such bases as illegitimacy and gender. The standard recognizes that, while there may be certain immutable distinctions, for example, between men and women or between legitimate and illegitimate children, that justify differing legislative treatments under some circumstances, the Legislature's authority to invoke those distinctions should not be viewed as an "impenetrable

23

barrier that works to shield otherwise invidious discrimination." *Gomez v Perez*, 409 US at 538. See also, *Clark, supra*; *Mills v Habluetzel*, 456 US 91 (1982); *Mathews v Lucas*, 427 US at 505-506 (all applying heightened scrutiny to classifications based on illegitimacy).

For all the reasons set forth above, the Defendants cannot show that this statute is substantially related to an important state interest, and consequently, it fails intermediate constitutional scrutiny as well.

### F. Defendants' enforcement and defense of  MCL 710.24 results in discrimination against  the children's unmarried parents:

Defendants also discriminate against DeBoer and Rowse by targeting unmarried couples and their constitutionally protected intimate relationships. As in *Lawrence v Texas*, 539 US 558 (2003), Defendants subject parents to penalties for exercising their constitutionally protected fundamental liberty interest in having an unmarried, intimate adult relationship when it imposes no such penalty on married adoptive parents exercising their fundamental relationship rights. Significantly, in Michigan, the State allows a single person to adopt, punishing him or her under this statute only when he or she become coupled, but unmarried, seeking to adopt.  Conversely, Defendants punish the "second" parent in an unmarried couple by prohibiting that person from becoming an adoptive parent altogether.  Under both scenarios, Defendants  impinge on Plaintiffs' fundamental liberty interests in family autonomy and in the care, custody and control of their children.  *Stanley*, 405 US at 651.  As discussed above, state actions that infringe upon fundamental rights, and in particular, laws that involve "sex or illegitimacy"  trigger intermediate scrutiny which requires the classification to be substantially related to an important governmental objective.  *Clark*, 486 US at 461; *Weber*, 406 US at 175.  Consequently, Plaintiffs maintain that

the intermediate scrutiny standard applies to any analysis that this statute violates the equal protection rights of the parent plaintiffs in this case.

In 1968, the United States Supreme Court decided the case of *Glona v American Guarantee & Liability Insurance Company, et. al,* 391 US 73 (1968), along with *Levy*, addressing both the parents' (*Glona*) and the childrens' (*Levy*) claims that the State's wrongful death statute discriminated against families which included out-of-wedlock children.   In *Glona*, the Court did not need to apply a higher standard of scrutiny, finding that there was not even a rational basis for barring a mother's recovery for the wrongful death of her illegitimate child while allowing a mother of a legitimate child to recover.   "... [T]he Equal Protection Clause necessarily limits the authority of the State to draw such 'legal' lines as it chooses."  *Glona,* 391 US at 76.

Even were no fundamental right involved here, Defendants may not constitutionally discriminate against plaintiff parents in the exercise of their parental, family and relationship rights because of their unmarried status, their sexual orientation or their decision to be in a same-sex relationship. See *Lawrence,* 539 US at 579 (O'Connor, J., concurring).

Additionally, this statute discriminates against the unmarried couple on its face because both persons in a married couple can consent to the adoption by joining in the petition, while the unmarried plaintiffs have been barred by the Defendants from doing so.  In other words, Rowse cannot consent to the adoption of J and N by DeBoer, and DeBoer cannot consent to the adoption of R by Rowse.  Based upon the foregoing, this law fails rational basis review because the "purported justifications ... [make] no sense in light of how the [government] treated other groups similarly situated in relevant respects ..." -- the married couple can gain a second parent adoption by consenting and joining in the petition, the unmarried couple has no such option.  There is no

25

logical relationship between the classification adopted and the object to be attained.  This statute is neither "narrow enough in scope [nor] grounded in a sufficient factual context for [the court] to ascertain some relation between the classification and the purpose it serves."  *Gill*, 699 FSupp2d at 387-388, quoting from *Cleburne*, 473 US at 439.   Conversely, had this law allowed the second parent adoption by both the married and the unmarried couple by simply requiring the existing birth or adoptive ("first") parent to consent or join in the petition, it would have been constitutional.

## III. RELIEF REQUESTED:

WHEREFORE, based upon all of the foregoing reasons, Plaintiffs respectfully request that this Court deny the Defendants' motion to dismiss the instant complaint.

In addition, for all the foregoing reasons, Plaintiffs respectfully request that this Court grant the Plaintiffs' motion for summary judgment, and that the Court issue the following orders.

(1) to declare that the provision of the Michigan Adoption Code denying same sex parents the right to file a joint petition for adoption, or a petition for second parent adoption, violates the Equal Protection rights of the children and the parents;

(2) to issue an injunction enjoining the Defendants from enforcing in any way the provisions of the Michigan Adoption Code that deny same sex parents, such as the Plaintiffs, the ability to file a joint petition for adoption, or a petition for second parent adoption;

(3) to issue a mandatory injunction directing the Defendant Schuette in his capacity as Attorney General of Michigan to specifically inform each probate judge, or other judge having jurisdiction over adoptions, of this Court's order;

(4) issue an order awarding plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. §1988;

(5) to grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Dana Nessel
DANA M. NESSEL P51346
645 Griswold Street, Suite 3060
Detroit, MI 48226
(313) 556-2300
dananessel@hotmail.com

*s/Carole M. Stanyar*
CAROLE M. STANYAR P34830
682 Deer Street
Plymouth, MI 48170
(313) 963-7222
*cstanyar@wowway.com*

Attorneys for Plaintiffs

Of counsel:

*s/Robert A. Sedler*
ROBERT A. SEDLER  P31003
Wayne State University Law School
 471 W. Palmer Street
Detroit, MI 48202
(313) 577-3968
rsedler@wayne.edu

*s/ Kenneth M. Mogill*
Kenneth M. Mogill P17865
MOGILL, POSNER & COHEN
27 E Flint Street, 2nd Floor
Lake Orion, MI 48362
(248) 814-9470
*kmogill@bignet.net*

Dated: March 13, 2012

27

## <u>CERTIFICATE OF SERVICE</u>

CAROLE M. STANYAR hereby certifies that a copy of Plaintiffs' Motion for Summary Judgment, Plaintiffs' Combined Brief in Response to Defendants' Motion to Dismiss and in Support of Plaintiffs' Motion for Summary Judgment,  and this Certificate of Service were served upon Assistant Attorney General Joseph E. Potchen, an ECF filer, on March 13, 2012.

*<u>s/Carole M. Stanyar</u>*
CAROLE M. STANYAR P34830
Attorney for Plaintiffs
682 Deer Street
Plymouth, MI 48170
(313) 963-7222
*cstanyar@wowway.com*
