# DEBOER, ET AL. v. SNYDER, ET AL.

## JOSEPH PRICE, Ph.D.

January 18, 2014

*Prepared for you by*



### BIENENSTOCK
#### NATIONWIDE COURT REPORTING & VIDEO

**Bingham Farms/Southfield • Grand Rapids**

Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

JOSEPH PRICE, Ph.D.
January 18, 2014

Page 8

```
 1   A.   Joseph Price.

 2   Q.   What I'd like for our first exhibit, which the court

 3        reporter will mark as Exhibit 1, is your expert

 4        report.

 5                      MARKED BY THE REPORTER:

 6                      DEPOSITION EXHIBIT 1

 7                      8:13 a.m.

 8   BY MR. BLOCK:

 9   Q.   If you could, take a quick look.  Is this the expert

10        report you submitted in this case?

11   A.   Yes.

12   Q.   Great.  Let's turn to the back of the report to your

13        CV.  We're at Exhibit A, CV.  I just want to ask you a

14        few questions about it.  Your CV says you have a BA in

15        economics and a Ph.D. in economics.

16   A.   Yes.

17   Q.   Have you had any professional training in psychiatry?

18   A.   No.

19   Q.   Psychiatry?

20   A.   No.

21   Q.   Sociology?

22   A.   No.

23   Q.   Social worker?

24   A.   No.

25   Q.   Anything related to children's development or well
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 9

```
 1        being?
 2   A.   Aside from economic research on family structure, no.
 3   Q.   No classes or training in that area at all?
 4   A.   No.
 5   Q.   Did you consider yourself an expert in child
 6        development?
 7   A.   Again, aside from economic research on family
 8        structure, no.
 9   Q.   An expert in children's well being?
10   A.   The outcomes of children's well being often plays an
11        important role in economics and I'm an expert in those
12        areas.
13   Q.   Have you appeared as an expert witness in any previous
14        litigation?
15   A.   No.
16   Q.   Have you filed expert affidavits in any litigation?
17   A.   I have filed this expert witness report.  I filed one
18        in Virginia and I filed one as part of another case
19        here in Michigan called Bassett.
20   Q.   Any others?
21   A.   No.
22   Q.   Isn't that true that you filed an expert report in a
23        Utah cause?
24   A.   It was an amicus brief.
25   Q.   I'm having the court reporter mark as Exhibit 2 a
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 48

```
 1   A.   No.  The only one was Exhibit 6.
 2   Q.   How many studies on an issue do you think someone
 3        should conduct before they qualify as an expert on
 4        that issue?
 5   A.   I don't know.
 6   Q.   Do you think at least one?
 7             MS. HEYSE:  Can we clarify on what issue?
 8   BY MR. BLOCK:
 9   Q.   Just in general, how many studies should someone have
10        conducted in order to qualify as an expert on that?
11   A.   I don't have an opinion on that particular subject.
12        At least within economics the publication of a seminal
13        paper is enough for an economist to be able to make
14        significant statements on the topic.
15   Q.   One seminal papers?
16   A.   Yes.
17   Q.   You would characterize your comments in Demography on
18        Rosenfeld as a seminal paper?
19   A.   I wouldn't necessarily attach the seminal.  I think
20        it's one of the most important papers.  I think
21        Rosenfeld's was a very important paper.  I think what
22        our paper does is it takes an important paper and uses
23        the exact same framework to show that just some very
24        small changes lead to very different results.
25   Q.   Was your comment paper peer reviewed?
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 49

```
 1   A.   Yes.
 2   Q.   So you would agree with me all your publications
 3        listed on your CV about the MBA aren't relevant to the
 4        topic of outcomes of children raised by same-sex
 5        parents?
 6             MS. HEYSE:  I'm going object because it's
 7        vague.  If there is something regarding the MBA that
 8        deals with empirical, it would be relevant to his
 9        expertise.
10   BY MR. BLOCK:
11   Q.   You are witness.  Can you answer my question?
12   A.   Yes.  So the other research on my vitae doesn't speak
13        specifically to same-sex parents.  It speaks to
14        expertise in using large data sets using very
15        sophisticated statistical methods and engaging in
16        transparent research that can be replicated by other
17        scholars.
18   Q.   Going back to page 8 in your report, you say, based on
19        my research and my evaluations of published research
20        in the field, I want to ask you -- we heard you
21        mention Regnerus's paper, the Rosenfeld paper, your
22        comment, the Potter paper.  Anything else?
23   A.   And then I drew on the reviews of past literature
24        conducted by Michael Rosenfeld, Doug Allen and Loren
25        Marks.
```


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOSEPH PRICE, Ph.D.
January 18, 2014

Page 50

1    Q.    Did you review that literature yourself?

2    A.    I did not review original studies.

3    Q.    So your knowledge of all the other studies conducted

4          in the field are based on the assessments from

5          Rosenfeld, Marks and Allen?

6    A.    Yeah.  And I guess other one I would add would be the

7          paper by Anderson, et al. in Demography in 2006.

8          While it's not specifically a review of literature,

9          they provide a really good discussion of many of the

10         issues and past research.

11   Q.    You read that article?

12                    MARKED BY THE REPORTER:

13                    DEPOSITION EXHIBIT 10

14                    9:22 a.m.

15   BY MR. BLOCK:

16   Q.    I'm giving you the supporting bibliography attached to

17         Dr. Brodzinsky, the plaintiff's expert witness, in

18         this case that lists, according to him, all the

19         relevant research in this field.

20   A.    Mm-hmm.

21   Q.    Have you read any -- well, let's go through this.  Let

22         me know which articles here you have read.

23   A.    Can you rephrase your question?

24   Q.    I just want to know -- let's move on.

25                    In terms of forming your expert opinion,


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOSEPH PRICE, Ph.D.
January 18, 2014

Page 60

1        families, but we don't have empirical evidence that
2        allows you to follow kids from birth.
3   BY MR. BLOCK:
4   Q.   So the evidence that we do have are from samples that
5        you say the majority of which consisted of children
6        who are the product of a failed heterosexual union
7        before being raised by same-sex couples; is that
8        right?
9   A.   Well, they're the product of a failed -- they're not
10       biologically related to both parents in the sense
11       they're listed as step-children.
12  Q.   But they came into this world by a heterosexual couple
13       conceiving them?
14  A.   Not all of them.  I mean there are two to three
15       percent that are adopted.
16  Q.   The majority?
17  A.   The majority, yes.
18  Q.   Based on the sample where the majority consisted of
19       children who were the product of a failed heterosexual
20       union, you think you can extrapolate from that data
21       and conclusions about children who are raised from
22       birth by same-sex couples?
23  A.   What you can do is draw upon the likely mechanisms
24       which include gender, biologic relatedness and
25       stability, all three of these would point to a



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 61

```
 1        disadvantage of children of same-sex couples even if
 2        they're raised from birth.
 3    Q.  I want to turn back to the expert report of Professor
 4        Allen which is marked as -- what exhibit number is
 5        that?
 6    A.  Exhibit 9.
 7    Q.  Exhibit 9.  So just to turn to paragraph 33.  So in
 8        this paragraph.  He's just finished discussing
 9        Rosenfeld's studies and your comment on it.  He is
10        talking about his study in 2013.  He says, you know,
11        there are several problems with the empirical debate
12        just mentioned before getting to his 2013 study.
13                First, one must not put too much weight on
14        a result that depends on whether a sample restriction
15        or control is used in the analysis.  Second, the data,
16        test data is from the 2000 census.  Third -- skipping
17        down a couple lines -- in 2000 no states in the union
18        had legal same-sex marriage.  Fourth, since the two
19        studies -- and he means Rosenfeld's and yours -- were
20        unable to control for marital history of the
21        parents -- fourth, the two studies were unable to
22        control for the marital history of the parents.  Since
23        the results found by both studies are close to those
24        of children in single parent homes, the slower
25        progress through school may be the result of a
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOSEPH PRICE, Ph.D.
January 18, 2014

Page 62

```
 1        previous divorce and not same-sex structure of the
 2        household.
 3               Do you disagree with that Allen that the
 4        slower progress reflected in your study could be the
 5        result of a previous divorce and not the same-sex
 6        structure of the household?
 7    A.  Again, this statement is based on something we have to
 8        often do as scholars, which is extrapolate a little
 9        bit beyond the available data is.  I would actually
10        feel more strongly about the fact that the mechanisms
11        point to children facing a disadvantage that are
12        raised -- that are raised even from the start in  a
13        same-sex couple because they're going to -- they're
14        going to lack either a father or a mother.  They're
15        not going to be biologically related to both parents
16        and they're going to experience less stability in that
17        family structure.
18    Q.  Have you been able to exclude the hypothesis that the
19        poorer outcomes in your study are attributable to the
20        result of a previous divorce and not the same-sex
21        structure of the house?
22    A.  Again, we don't -- we are unable to directly test the
23        outcomes of children that have been raised from the
24        start in the same-sex house, but the mechanisms that
25        we can examine all point to them facing a
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 63

```
 1       disadvantage.
 2   Q.   I just want an answer to my question about the role of
 3       divorce.
 4   A.   Okay.
 5   Q.   Have you been able to exclude the possibility that the
 6       poorer outcomes are the result of divorce?
 7   A.   The data do not allow you to distinguish whether the
 8       effects are operating through divorce or some other
 9       mechanism.
10   Q.   Great.
11   A.   Just to be clear, divorce is a family of instability
12       and it's really clear that same-sex couples have less
13       stable unions than opposite sex couples.
14   Q.   The nature of same-sex couple unions, you believe,
15       makes it more likely that there was a previous failed
16       heterosexual union before they got together?
17   A.   No.  I'm saying that it is true that children are
18       negatively effected by instability and that's one of
19       the mechanisms through which child outcomes are worse
20       for children raised by same-sex couples.
21   Q.   When Allen says the slower progress in school may be
22       the result of a previous divorce and not the same-sex
23       structure of the household, he is not talking about
24       the same-sex divorce, he is talking about the
25       heterosexual divorce?
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 64

1    A.    He is definitely referring to a heterosexual divorce.

2    Q.    Okay.  Good.  Parental gender, biological relatedness

3          and stability, how did you come up with that list?

4    A.    So what made me interested in the first place was what

5          channels -- through which channels family structure

6          effects child outcomes.  It's clear that there is a

7          lot of research that focuses on the gender of the

8          parents.  There's a lot of research that focuses on

9          biologic relatedness.  This is research about

10         step-families.  That there is a lot of research

11         related to stability.  As an economist, these would be

12         three of the natural channels through which children

13         are affected by families structure.

14   Q.    As an economists it would be the natural --

15   A.    These would be the lens through which an economist,

16         but I think actually most reasonable scholars would

17         review this as reasons through which children are

18         affected by family structure.

19   Q.    Did you read any research about what psychologists

20         think about the channels through which the children

21         could be affected by family structure?

22   A.    I'm not a psychologist.  I imagine would they have

23         their own list of channels through which children are

24         affected by family structure.

25   Q.    You haven't familiarized yourself with what that list



JOSEPH PRICE, Ph.D.
January 18, 2014

                                                              Page 65

1        might be?

2                    MS. HEYSE:   Objection.   He answered the

3        question.

4    BY MR. BLOCK:

5    Q.   Go ahead.

6    A.   No.   I'm an economist.   I focus primarily on the tools

7         that we're experts at.

8    Q.   They train you -- when you get an economics degree,

9         they give you training on parental gender, biological

10        relatedness and stability?

11   A.   We're trained in the empirical method that allow you

12        to test wether these are potential channels through

13        which child outcomes are affected.

14   Q.   Are you interested in testing whether a previous

15        heterosexual divorce can be a channel through which

16        child outcomes can be affected?

17                   MS. HEYSE:   Objection, irrelevant.

18   A.   If there was available a nationally large data set,

19        that would be an interesting question.

20   BY MR. BLOCK:

21   Q.   Would it be fair to add that to this list of

22        mechanisms as a fourth possible mechanism?

23   A.   Again, one of the mechanisms is stability.   I think

24        stability fits very closely with this idea of divorce

25        being a contributing factor.



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 66

```
 1   Q.   We're not talking about the divorce of the same-sex
 2        couples.  I'm talking about a previous heterosexual
 3        divorce.  Do you think that could be a potential
 4        mechanism?
 5   A.   It's possible, yeah.
 6   Q.   Isn't it true that children's outcomes are better when
 7        they're raised by a married couple than an unmarried
 8        couple on average?
 9   A.   On average that -- if you don't control for anything
10        else, then married couples tend to have children with
11        higher outcomes than other family structure types.
12   Q.   Do you have any interest in testing whether the lack
13        of availability for marriage for same-sex couples
14        could be a mechanism through which these purported
15        differences operate?
16                  MS. HEYSE:   Objection.
17   A.   Again, I don't have really -- there's other mechanisms
18        through which children would be effected even in that
19        situation such as gender and biologic relatedness.
20   BY MR. BLOCK:
21   Q.   We're listing potential mechanisms which would be
22        useful to test.  Do you think that's a potential
23        mechanism that would useful for an economist to test?
24   A.   Yes.
25   Q.   So it would be fair to add that to that a list of
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 67

```
 1        possibilities?
 2                    MS. HEYSE:   Objection, vague.
 3                    MR. BLOCK:   Withdrawn.
 4    BY MR. BLOCK:
 5    Q.   So what qualifies you to be an expert in analyzing the
 6         way parental -- what qualifies you to be an expert in
 7         way the parental gender influences parenting?
 8    A.   As an expert in the field of empirical methods, I'm
 9         able evaluate the research of others.  I've been
10         reviewer of others.  I've been the reviewer for 40
11         different journal.  Editors put a lot of trust in my
12         opinion of other's research.
13                    More specifically in my own area, I have
14         done research on how much time parents spend time with
15         children.  In that area there are some clear
16         differences in how fathers and mothers invest time in
17         their children.
18    Q.   Have you personally conducted any studies of gender
19         roles of same-sex couples raising children?
20    A.   Again, the data that I was using related to time use
21         had too few same-sex couples to provide any
22         information.
23    Q.   Do you know of any studies that look at that to
24         evaluate the gender roles of same-sex couples raising
25         children?
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 68

```
 1   A.   I'm not specifically familiar with any particular
 2        studies.  I don't know if you had anything in mind.
 3        I'm not specifically familiar with any -- I have
 4        looked at -- I have -- you know, in the course of my
 5        research, I have looked at a number of studies.  None
 6        of them come directly to mind at this point.
 7   Q.   So sitting here today, you are not sure one way or the
 8        other about whether such studies exist that examine
 9        the gender roles of same-sex couples raising children?
10   A.   Again, within kind of the confines of nationally
11        representative large data sets, if such a data set
12        existed that would allow you to do that, I'm not
13        familiar with it.
14   Q.   Are you familiar with any studies that evaluate child
15        outcomes in light of the gender roles of their
16        parents?
17   A.   So in my published paper with Catherine and Doug,
18        which builds on the work of Michael Rosenfeld, one way
19        you can think about gender differences, it looks at
20        differences in single mothers and single fathers and
21        that's the case where you see the children being
22        raised by a single father have noticeably worse
23        outcomes than a single mother which would indicate
24        that not having a mother seems to be a bigger deal
25        than not having a father.
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 69

```
 1   Q.   But that study didn't analyze the gender roles that
 2        the mothers and fathers played in the sample, did it?
 3   A.   Maybe you could clarify what you mean by gender roles.
 4   Q.   Did it analyze whether or not the mother acted in a
 5        stereotypical manner or spent more time doing
 6        housework with the kids versus acting in a more
 7        masculine stereotypical manner and spent more time
 8        house roughhousing?
 9   A.   That study didn't.  As an economist, we could ask the
10        question, do children need a mother.  The way you
11        could ask that question is comparing children from the
12        different family types that either lack a father or a
13        mother.  In that case the comparison of single parents
14        is a reasonably way to think about whether fathers or
15        mothers contribute differently to child outcomes.
16   Q.   Let's look at what you say in your report here.
17   A.   Sure.
18   Q.   Let's look at paragraph 41.
19             MS. HEYSE:  I'm sorry.  I didn't catch the
20        number.
21             MR. BLOCK:  41.
22  BY MR. BLOCK:
23   Q.   In the second sentence of that paragraph it says,
24        mother tends to be more empathetic, tender mining and
25        nurturing than men.  Did your study analyze whether or
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOSEPH PRICE, Ph.D.
January 18, 2014

Page 70

```
 1        not the women, the mothers in that sample set, were
 2        more empathic, tender minded and nurturing in that
 3        sample set?
 4   A.   No.  In this paragraph I'm citing research done by
 5        other scholars.
 6   Q.   You cite David Popenoe, but you don't provide a cite.
 7        What are you referring to when you cite to David
 8        Popenoe?
 9   A.   That's probably an oversight on my part.  I have a
10        copy of the paper.  I don't have the citation here
11        with me.
12   Q.   Do you know if it was based on a large random national
13        sample of how mothers and fathers behave?
14   A.   I'm not entirely sure.
15   Q.   It's possible it's based on small observational sample
16        set; is that right?
17   A.   It's possible.
18   Q.   But if it based on a small observational sample set of
19        how mothers and fathers behave, do you think it's
20        appropriate as an economist to generalize from that
21        and make conclusions about how on average all mothers
22        and fathers behave?
23   A.   Yes.  Again, here I'm speaking to the issue of
24        potential mechanisms.  Again, these are all cases
25        where there is reasonable evidence that mothers parent
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 71

1       differently than fathers.

2    Q.   The reasonable evidence in this case are small

3        nonrandomized sample sets.

4    A.   If you look at the paragraph 43, this is evidence

5        based on a nationally representative sample based on

6        my own research.

7    Q.   I want to talk about Popenoe.

8    A.   Sure.

9    Q.   So you think Popenoe's study is worthy of including,

10       but you don't think that other small sample sets by

11       psychologists that study same-sex families are worthy

12       of including.  Why is it okay to generalize about the

13       nurturing nature of mothers in this context, but at

14       the same time not look at studies that have actually

15       examined how same-sex parents parent?

16              MS. HEYSE:  I'm going object to the form of

17       the question, because I don't think he said they

18       weren't worthy of including.

19   BY MR. BLOCK:

20   Q.   Go ahead.

21   A.   I think paragraph 39 probably clarifies my position.

22       This relates back to the issue of how to conduct

23       hypothesis testing.  One of the kinds of limitations

24       in research in the no difference literature is, again,

25       they're making a statement that there is no statical



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 72

```
 1        difference, but there is rarely any reporting about
 2        what the confidence intervals on that there.  There is
 3        a large difference between something not be statically
 4        different and there actually being no true difference.
 5                 In that case, the hypothesis testing is a
 6        little one-sided in that it's much easier to reject
 7        the no difference hypothesis from a statistical
 8        perspective than it is to actually prove that there is
 9        no difference.  Because in order to prove that there
10        is no difference, you actually need a study that a has
11        co-efficient that is close to zero and has really
12        tight confidence intervals.
13                 The main challenges in most of the studies
14        that have been used is the sample size is too small.
15        From the start there is actually, if you conduct a
16        power calculation, there is actually no way they're
17        going to be able to reject even, you know, confidence
18        intervals close to zero.
19   Q.   Isn't everything you just said also true when a small
20        sample set concludes that all mothers tend to be more
21        affectionate and nurturing and fathers tend to be more
22        engaged in roughhousing?
23   A.   No, it's not.  It's actually asymmetric in the sense
24        that when you have really small sample size, you're
25        making it hard to detect the true effect.  So if you
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 73

```
 1         actually find a true effect, then that's evidence that
 2         rejects the null hypothesis.  If you fail to object to
 3         the null hypothesis, you actually learned anything.
 4   Q.    Let's go on to see what's cited in your report.  We
 5         talked about Popenoe.  You talk about your study of
 6         parent/child time.  Did your study examine the
 7         outcomes of the children in that study?
 8   A.    Not in that study.
 9   Q.    Okay.  So you don't know whether children did better
10         or worse in terms of subsequent outcomes in terms of
11         how the parents interacted with them in your study?
12   A.    That's right.
13   Q.    So have you cited in this report any studies that give
14         you as an economist, you know, a high enough
15         confidence interval to make statements about how an
16         average mother tends to act and fathers tend to act in
17         terms of -- have you cited any studies that allow you
18         as an economist to predict that mothers on average
19         will be more empathic, tender minded and nurturing and
20         men on average will have a more rough and tumble
21         approach?
22   A.    I'm still confused by your question.
23   Q.    Okay.  You say here that mothers tend to be empathic,
24         tender minded and nurturing and fathers tend to have a
25         more rough and tumble approach.
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOSEPH PRICE, Ph.D.
January 18, 2014

Page 86

1         biological relatedness matters for child outcomes?

2    A.   There were other studies that I looked at.  I remember

3         choosing these two, the second one in particular just

4         because it had, you know, met the kind of bar of

5         having a large data set.

6    Q.   So what search process did you engage in when looking

7         for articles that addressed the relationship between

8         biological relatedness and child outcomes?

9    A.   I don't remember.

10   Q.   Did you use the Google Scholar?

11   A.   That would be a way I often look for related

12        literature, but I'm not actually sure in this case.

13   Q.   Did you search only for studies say that biological

14        relatedness affects child outcomes or did you also

15        look for studies saying biological relatedness does

16        not affect child outcomes?

17   A.   Again, you have this asymmetry where --I hate to

18        repeat these several times.  But you have this

19        asymmetry that failing to reject a null hypothesis is

20        not as convincing evidence as rejecting a null

21        hypothesis.  In these cases, the papers I focused on

22        were the ones that rejected a null hypothesis.

23   Q.   In terms of your search process for what you looked at

24        when you were doing your search here, did you look to

25        see if there were any papers out there that



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 87

```
 1       established in -- did you look to see if there were
 2       papers out there concluding biological relatedness
 3       does not matter for child outcomes?
 4    A. I was looking for papers that dealt with the question
 5       of step-families or biological relatedness.  I don't
 6       remember exactly which studies I considered or thought
 7       to conclude.
 8    Q. When you did the search process, though, you -- did
 9       you anticipate that you would be writing an opinion in
10       this case saying that biological relatedness does
11       matter for child outcomes?
12    A. So based on my training in graduate school, we talked
13       a lot about the evolutionary roots of parenting
14       practices.  So based on kind of the selfish gene
15       theory, my hypothetic would be that biological parents
16       would behave differently toward their children than
17       nonbiologic parents.
18    Q. So would you say that you have engaged in a
19       comprehensive study of the literature on this issue?
20    A. I'm not sure what would, you know, classify as a
21       comprehensive.  When I was looking for studies, I was
22       looking for studies related to step-families, not
23       studies related to a specific result.
24    Q. Would you say that you've engaged in a comprehensive
25       analysis on the literature on step-families?
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 88

```
 1   A.   No.  This is a very small part of my expert report.  I
 2        imagine a study of that type would entail a much
 3        larger review.
 4   Q.   Review of the literature?
 5   A.   Yeah, that's right.
 6   Q.   How many studies have you read on step-parents?
 7   A.   I don't know.
 8   Q.   Would you say it's less than 20?
 9   A.   Yeah, less than 20.
10   Q.   Would you say it's less than 10?
11   A.   Probably less than 10.
12   Q.   Probably less than five?
13   A.   No, probably between five and 10.
14   Q.   Okay.  So as far as you know, there may be studies out
15        there showing the biological relatedness does not
16        affect children's outcome?
17   A.   Again, I would be concerned about whether they have
18        tight enough confidence intervals to actually rule out
19        large differences.
20   Q.   Do you know whether or not such studies even exist?
21   A.   I don't know.
22   Q.   You haven't evaluated any studied and determined they
23        don't have a high enough confidence interval, have
24        you?
25   A.   No.  One of the challenges is is many studies don't
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOSEPH PRICE, Ph.D.
January 18, 2014

Page 89

```
 1          include the confidence intervals in their tables.
 2     Q.   So as for these studies by Anderson and Brown, did
 3          either of those studies involve same-sex couples?
 4     A.   No.
 5     Q.   Did either of those studies involve families that were
 6          created through sperm or egg donation?
 7     A.   I don't know about that.
 8     Q.   In fact, isn't that true that both of these studies
 9          involved heterosexual families?
10     A.   Yes.
11     Q.   So those are studies about which one parent brings a
12          new spouse into the family?
13     A.   That's right.
14     Q.   They're not studies about families where both spouses
15          together decided to bring into the world or adopt a
16          child, right?
17     A.   Yes, but they draw on the evolutionary literature that
18          wouldn't actually make that distinction.
19     Q.   In fact, Anderson, he says they were defining
20          step-children as children of one's mate from previous
21          relationships.
22     A.   I think that is what we would refer to as a
23          step-child.
24     Q.   Is it your understanding that research on poorer
25          outcomes for children in step-families attributes this
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 90

```
 1        poorer outcomes to lack of biological connection
 2        between step-parent and child?
 3   A.   One of the things we do in empirical work is try to
 4        draw on theoretical prediction.  The theoretical
 5        prediction from evolutionary biology is that people
 6        would treat those with genetic relatedness better than
 7        those that aren't genetically related to them.
 8   Q.   The theories of evolutionary biology, are those based
 9        on the same rigorous data sets that other types of
10        empirical work by economists are based on?
11   A.   The tests of that particular hypothesis have actually
12        been tested by lots of rigorous large scale data sets.
13   Q.   Isn't it true that literature on poorer outcomes of
14        children with step-parents attributes those poorer
15        outcomes on the disruption that is caused to a family
16        when a new person is brought into it?
17   A.   If you could, just clarify or repeat.
18   Q.   Isn't it true that the literature on the poorer
19        outcome for children with step-parents attributes
20        those poorer outcomes to the disruption of the family
21        unit when a new stranger to the family unit coming
22        into the family?
23             MS. HEYSE:  I'm going object to the form of
24        the question because it's very broad.
25                  To the extent that you can answer, though,
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 91

```
 1      go ahead.
 2  A.  I'm not sure how to answer your question.  The one
 3      thing I could say is there are studies looking at
 4      children in the same household and it does appear in
 5      some cases the parent treats the biological children
 6      different than the step-child.
 7  BY MR. BLOCK:
 8  Q.  A child who has a step-parent, in order for that to
 9      happen, the child was a product of previous failed
10      heterosexual union?
11  A.  It doesn't have to be necessarily.
12  Q.  Would you say in most cases?
13  A.  Given the census data I talked about earlier, you
14      know, most step-families are probably the result of a
15      previous union.
16  Q.  So there's --
17  A.  Or a union that was never there to begin with.
18  Q.  Okay.  Then at some point later in life a new third
19      party enters the family unit as the spouse of the
20      child's parent?
21  A.  Yeah.  It doesn't have to be later in life.  If you
22      think about a mother who has a child when she is
23      unmarried and then marries another man within the
24      first year of life, then that would be a step-father.
25  Q.  Isn't it true that the literature on step-families say
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOSEPH PRICE, Ph.D.
January 18, 2014

Page 92

```
 1          the poorer outcome is diminished the earlier the
 2          step-parents enter the family unit?
 3                    MS. HEYSE:  I'm going to object to the
 4          broad language of the literature.  Can we refer to
 5          something in the literature?  I don't think anything
 6          has been identified at this point.
 7   BY MR. BLOCK:
 8   Q.     Go ahead and answer my question.
 9   A.     I don't know specifically about that.
10   Q.     Well, let's look at one of the studies you cited, this
11          is the Albuquerque study.  This is Exhibit 12.
12                    MARKED BY THE REPORTER:
13                    DEPOSITION EXHIBIT 12
14                    10:36 a.m.
15   BY MR. BLOCK:
16   Q.     You know what, I'm going to come back to this so I can
17          give you the right quote.
18                    Do you know one way or the other sitting
19          here today whether or not the poorer outcomes diminish
20          earlier -- whether or not as -- the earlier that the
21          step-parents enter the family unit, the lesser the
22          negative outcomes are one way or the other?
23   A.     I'm not sure.
24   Q.     Have you read any other psychological literature
25          discussing reasons why having a step-parent in the
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 93

1          puncture can lead to poorer outcomes?

2    A.    I can't think of any specifically in the field of

3          psychology.

4    Q.    Okay.  So as far as you know in the field of

5          psychology, they might attribute those poorer outcomes

6          to the fact that the family is being disrupted and not

7          to the affect of the step-parent?

8    A.    I don't have any direct knowledge.

9    Q.    If children with step-parents are at higher risk of

10         abuse, do you oppose allowing people with children

11         from previous relations to remarry?

12               MS. HEYSE:  Objection, assumes facts not in

13         evidence.

14   A.    Repeat your question.

15   BY MR. BLOCK:

16   Q.    If children with step-parents are at a higher risk of

17         abuse, do you oppose allowing people with children

18         from a previous relationship to re-marry and bring a

19         new step-parent into the family?

20   A.    I don't have an expert opinion on that issue.

21   Q.    Do you believe the data -- do you believe that

22         children raised by a step-parent are at a greater risk

23         for abuse?

24   A.    Do I believe that --

25   Q.    Do children with a step-parent have a higher risk of



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 94

```
 1        abuse?
 2   A.   Yes.
 3   Q.   So you don't have an opinion on whether or not that
 4        higher risk of abuse should lead the government to
 5        prohibit someone with a child from a previous
 6        relationship from re-marrying?
 7   A.   As an economist, I would have to weigh the trade-offs
 8        against the extra income that you would have from a
 9        two-parent household.  I don't have any specific
10        opinion that would apply broadly to remarriage policy.
11   Q.   But do you, based on the fact that children with
12        step-parents are at a higher risk of abuse, have an
13        opinion that same-sex couples shouldn't be allowed to
14        marry; is that right?
15                  MS. HEYSE:  Objection.  He has not
16        testified that he has an opinion with regard to
17        same-sex couples.
18   BY MR. BLOCK:
19   Q.   Go ahead.
20   A.   I don't have a response to that.
21   Q.   You say that children raised by same-sex couples are
22        the equivalent of children raised by a parent and a
23        step-parent; is that right?
24   A.   Sorry.
25   Q.   You said that children raised by same-sex couples, you
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 95

```
 1        know, essentially one parent who is a biologic parent
 2        and one parent who is a step-parent?
 3   A.   I think the statement I'm making is that a child can't
 4        be biologically related to both parents in a same-sex
 5        couple.
 6   Q.   So you think that a -- let me ask it again a different
 7        way.
 8             Do you think a heterosexual couple, a man
 9        and a woman who conceive a child, you know, through
10        sperm or egg donation where only one of them has a
11        biological relationship to the child, do you think
12        they are equivalent to the relationship of a parent
13        and step-parent?
14   A.   I don't really have an opinion on that.  If the
15        channel of biological relatedness is important, then
16        it's possible that you might expect worse outcomes in
17        that situation.
18   Q.   So if biological relatedness is a channel or mechanism
19        through which poorer outcome for children are caused,
20        you would expect those poorer outcomes to be equally
21        present if it was a heterosexual couple having a kid
22        from sperm or egg donation than if it was a kid having
23        a child from a sperm or egg donation?
24   A.   Yes, that's possible.
25   Q.   Do you think heterosexual couples who conceive through
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 96

```
 1          sperm or egg donation have children that are at a
 2          greater risk or abuse?
 3    A.    I don't know actually.
 4    Q.    Do you agree if research were conducted that showed
 5          that children of heterosexual couples who were
 6          conceived through sperm or egg donation fared just as
 7          well as children of heterosexual couples conceived
 8          through sexual intercourse that would disprove the
 9          hypothesis that biological relatedness is a mechanism
10          that produces poorer outcome?
11                  MS. HEYSE:  Objection, speculation.
12    A.    Again, the real challenge in conducting an empirical
13          test would be the fact that heterosexual couples who
14          conceive through artificial means might be different
15          than couples that don't.  I don't really have a --
16          sorry.  If you could, rephrase your question.
17    BY MR. BLOCK:
18    Q.    I'm not asking you if it would disprove the idea of
19          your broader theory that children of same-sex couples
20          have poorer outcomes.  I'm asking focusing on this
21          theory that the mechanism is biological relatedness,
22          if research showed that children of heterosexual
23          couples conceived through sperm or egg donation did
24          not have poorer outcomes than children of heterosexual
25          couples conceived through intercourse, do you agree
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 97

1          that that would disprove the hypothesis that

2          biological relatedness is the mechanism through which

3          the children of the same-sex couples have poorer

4          outcomes?

5                    MS. HEYSE:   Same objection.

6     A.   Again, it would have to be a study that had a

7          co-efficient that was close to zero with really tight

8          confidence intervals.  It would also have to be a

9          study that, you know, carefully controls for the basic

10         characteristics of the individuals involved.

11    BY MR. BLOCK:

12    Q.   If that study existed, though, that it would disprove

13         the hypothesis that biological relatedness is the

14         mechanism?

15    A.   I don't know that I would necessarily agree with it

16         disproving that it's a mechanism.  I don't know.

17    Q.   I thought it was easier to disprove a null hypothesis

18         than to -- I'll end the question there.

19                    MS. HEYSE:   Objection, argumentative.

20                    MR. BLOCK:   I'll withdraw it.

21    BY MR. BLOCK:

22    Q.   Are you familiar with the research that has been

23         conducted on kids conceived through sperm or egg

24         donation?

25    A.   I've read it at times over my career, but I'm not



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 98

```
 1          specifically familiar with any studies.
 2     Q.   Sitting here, can you recall what studies you have
 3          read?
 4     A.   Yeah.  It would just be a vague recollection.
 5     Q.   Okay.  Isn't it true that the research shows -- the
 6          research that is out there concludes -- let me start
 7          over.
 8               Isn't it true that the research that is out
 9          there concludes that the children conceived through
10          sperm and egg donation fare just as well as the
11          children conceived through sexual intercourse?
12               MS. HEYSE:  I'm going object to the vague
13          reference research.
14     A.   I don't know.
15     BY MR. BLOCK:
16     Q.   Do you think that as an expert on an issue you should
17          be familiar with the literature on that issue?
18     A.   So my expert opinion is about the outcomes of children
19          across the different family structure types.  The ones
20          that economists have focused primarily on have been
21          based on these kind of groups that are large enough to
22          provide meaningful statistical inference.  There is no
23          information in the census data about artificial
24          reproductive technology used or other things, so I
25          wouldn't really fall into that category of a large
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 99

1          nationally representative data set.

2   Q.     You are not offering any expert opinion on the effect

3          that artificial reproductive technologies have on

4          child outcomes?

5   A.     I am not.  Unless it operates through these mechanisms

6          on biological relatedness, gender composition,

7          stability.

8   Q.     So my question is:  Are you offering an expert opinion

9          as to the effect that having a child through

10         artificial reproduction such as sperm or egg donation

11         has on child outcomes?

12  A.     So I would say that based on what we know about

13         biological relatedness, that it's likely that children

14         are going to have worse outcomes through artificial

15         reproductive technology than through an otherwise

16         similar couple that are biologically related to one

17         another.

18  Q.     We have discussed studies on step-parents?

19  A.     Yes.

20  Q.     Now we are discussing studies on a children born

21         through sperm or egg donation?

22  A.     Yes.

23  Q.     You testified as an economist you can't form expert

24         conclusions without a sufficiently rigorous data set;

25         is that right?



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 100

1    A.    That's right.

2    Q.    You said that there isn't a sufficiently rigorous data

3          set for children conceived through sperm or egg

4          donation?

5    A.    That's correct.

6    Q.    So, therefore, as an economist, you can't form an

7          expert conclusion for children that are conceived

8          through sperm or egg donation?

9    A.    That's correct.  What you can do as an economist is

10         extrapolate what you know from other settings.  The

11         research on biological relatedness could be

12         extrapolated to say these children would have worse

13         outcomes.  I don't have any direct evidence of the

14         particular setting that you are describing.

15   Q.    So what studies are you relying on that attribute

16         poorer outcome for children raised by a step-parent to

17         the lack of biological relatedness as opposed to the

18         disruption caused by bringing a new parent into the

19         family unit?

20   A.    I'm drawing on the broader base of research related to

21         evolutionary biology that reenforces the fact that

22         people treat those that they are genetically related

23         to than those they aren't related to.  It's built into

24         our selfish gene to promulgate our own genetics.

25   Q.    So what research are you referring to?



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 101

```
 1   A.   I wouldn't have the study on hand.  These would be a
 2        broad class of studies that are well known.
 3   Q.   They're not cited on your report?
 4   A.   No.
 5   Q.   You are not an expert on evolutionary biology?
 6   A.   No.
 7   Q.   You are just aware there are studies about
 8        evolutionary biology?
 9   A.   Yes.
10   Q.   Are you aware of studies that critique theories of
11        evolutionary biology?
12   A.   No.
13   Q.   You don't know one way or the other whether such
14        studies exist?
15   A.   No.
16   Q.   When you conducted your research for materials to cite
17        for purposes of this report, you did not conduct broad
18        comprehensive research of the studies that have been
19        conducted on this issue?
20             MS. HEYSE:  Objection, mischaracterizing
21        his testimony.
22   A.   If you could repeat it.
23   BY MR. BLOCK:
24   Q.   When you conducted your search for studies, when you
25        conducted your research for studies to cite when
```


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOSEPH PRICE, Ph.D.
January 18, 2014

Page 102

```
 1        preparing your expert testimony on the issue of
 2        biological relatedness, you did not conduct a
 3        comprehensive search of the literature on that topic,
 4        did you?
 5   A.   No.
 6   Q.   Let's move on to the third mechanism, family
 7        stability.  You cite studies from Norway and Sweden
 8        involving the dissolution rates for same-sex couples.
 9        Prior to being retained as an expert in this case, had
10        you read those studies?
11   A.   I had read the Anderson study.
12   Q.   For what purpose did you read that?
13   A.   Just general intellectual interest.
14   Q.   When did you read it?
15   A.   I don't remember exactly.
16   Q.   In the past year?
17   A.   Yeah.  I wouldn't be able to pinpoint a specific time.
18   Q.   So you don't know, it could have been five years ago
19        was the first time you read it or it would have been
20        last year is the first time you read it?
21   A.   I don't remember.
22   Q.   Okay.  How did you first come across that study?
23   A.   I don't remember that either.
24   Q.   Okay.  Now, isn't it true that the couples examined in
25        those studies were in domestic partnerships, not
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 139

1          by same-sex couples, do you think it would be -- it
2          would benefit those children if they could have an
3          established legal relationship with both of the
4          parents who are raising them?
5                    MS. HEYSE:  Objection, vague, outside the
6          scope of his expert report.
7     A.   I don't know on that one.
8     BY MR. BLOCK:
9     Q.   Let's talk about the plaintiffs in this case.  One of
10         the women in the couple has adopted several children
11         out of the foster care system in Michigan.  Those
12         children are being raised by a same-sex couple.  The
13         child who was in foster care did not have a married
14         different sex biologically connected couple to raise
15         them.  Those children only have a legal relationship
16         with one of their parents.  Do you think it would be
17         in the best interest of those children based on your
18         knowledge of family structure and child outcomes for
19         them to be able to have a legal relationship with both
20         of their parents instead of just one?
21                   MS. HEYSE:  Objection, calls for a legal
22         conclusion, outside of his expert report, vague.
23                   To the extent you think you can answer, go
24         ahead.
25    A.   I don't have an answer to that.  I don't know.



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 140

```
 1   BY MR. BLOCK:

 2   Q.   So you don't know one way or the other whether you

 3        would expect it to be in the best interest of the

 4        child to have a legal relationship with both of their

 5        parents in those circumstances?

 6             MS. HEYSE:  Again, objection, asked and

 7        answered and for all of the reasons I noted earlier.

 8   A.   Yeah, I don't know.  My research is about moving from

 9        a situation where the -- yeah, I don't know the answer

10        to that question.

11   BY MR. BLOCK:

12   Q.   So this litigation was started because this family

13        wanted to be able to have a second parent adoption and

14        form a relationship where the children knew that if

15        one of the moms that had a legal connection to the

16        child died, they wouldn't be put back into foster care

17        or something similar.  Do you, in submitting your

18        expert report in this case, purport to have any

19        opinion on that issue of whether a second parent

20        adoption should be granted?

21   A.   Yeah.  I don't have any expert opinion on that very

22        narrowly defined specific issue.  It's not one that

23        would show up in many data sets.

24   Q.   Do you think that the data that you do have about

25        poorer outcomes for children raised by same-sex
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 141

1        parents compared to poorer outcomes for children

2        raised by married heterosexual parents, do you think

3        that data can help answer the question of whether a

4        child who is adopted out of the foster care system by

5        one same-sex parent should be able to have a legal

6        relationship with both of their same-sex parents?

7    A.   It was a bit of a long question.

8                MS. HEYSE:  Right.

9    A.   I don't know.

10               MR. BLOCK:  Off the record.

11               (Off the record at 11:45 a.m.)

12               (Back on the record at 12:01 p.m.)

13   BY MR. BLOCK:

14   Q.   Just to tie up loose ends, I think we asked a similar

15        question, but indulge me asking it again.

16               Do you believe data on child outcomes of

17        children raised by same-sex couples is relevant to the

18        question whether same-sex couples should be allowed to

19        marry?

20               MS. HEYSE:  Objection, calls for a legal

21        conclusion as to what's relevant.

22   BY MR. BLOCK:

23   Q.   Do you have a legal opinion?

24   A.   No.

25   Q.   Do you have a layperson's opinion?



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 146

1          great place to look for the answer.

2    Q.    What inspired you to do this study when you hadn't had

3          a published study on this topic before?   What inspired

4          you to take on this topic?

5    A.    I don't remember exactly.   I have always had an

6          interest in family structure questions.   Same-sex

7          couples provide an unique opportunity to look at a new

8          type of family structure.

9    Q.    Did you ever have any discussions with either people

10         at the Witherspoon Institute or the National

11         Organization of Marriage or the Alliance Defending

12         Freedom about there being a need for scientific

13         studies that could be used to justify the

14         constitutionality of state laws that prevented

15         same-sex couples from marrying?

16                   MS. HEYSE:   I'm going to object to asking

17         for him to testify to hearsay and compound.   If you

18         want to, take those one by one so that we're clear on

19         what he is talking about.

20   A.    If you could split them up, I could answer better.

21   BY MR. BLOCK:

22   Q.    Did you ever have any conversations with people at the

23         Witherspoon Institute about the need to develop

24         scientific research that could be used in defending

25         bans on same-sex marriage?



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 147

```
 1   A.   It wasn't specifically at the Witherspoon Institute.
 2        I attended a meeting at the Heritage Foundation that
 3        included people from the Witherspoon Institute,
 4        Alliance Defense Fund.  I don't remember if the
 5        National Organization of Marriage was there.
 6   Q.   Was this meeting in DC?
 7   A.   This was in DC, yes.
 8   Q.   Was Professor Regnerus at that meeting?
 9   A.   I don't actually remember.  I don't remember.
10   Q.   Do you remember when the meeting was?
11   A.   I don't remember exactly.
12   Q.   Was it after the trial in the Perry case had
13        concluded?
14   A.   It was probably before it had concluded, but I'm not
15        totally sure on that.
16   Q.   Was Maggie Gallagher at that meeting?
17   A.   I don't remember exactly, but there is a pretty good
18        chance she was, yeah.
19   Q.   So what was said at that meeting about the need for
20        research?
21             MS. HEYSE:  Objection, hearsay.
22   A.   I don't remember exactly what happened there, but it
23        might actually have been the first time I met Doug
24        Allen.  I'm not totally sure on that.
25   BY MR. BLOCK:
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 74

```
 1    A.    Mm-hmm.
 2    Q.    Are there are any studies that you are aware of as an
 3          economist that allows you to make that generalized
 4          conclusion on a broad population-based level?
 5    A.    So with those specific activities that you are
 6          referring to or with a broader fact that men and women
 7          parent differently?
 8    Q.    Those specific things I'm referring to.
 9    A.    Again, just as an expert, I'd be relying on the
10          aggregation of past studies done by Rhoads and Popenoe
11          with regard to specific time use measures.  I would be
12          relying on my even analysis of a very large data set.
13    Q.    So another study that you cite is by Cancian and
14          Meyer.
15    A.    Mm-hmm.
16    Q.    Who you say used data from divorce cases in Wisconsin
17          from 1986 to 1994 and find that only 10 percent of the
18          cases result in the child being placed in the sole
19          custody of the father compared to 70 percent of the
20          cases of children being placed in the sole custody of
21          the mother.
22                 Is it your expert opinion that the fact
23          that during this period in Wisconsin fathers rarely
24          received sole custody indicates children need to be
25          raised by a mother?
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 75

```
 1   A.   It think indicative of a set of judges who ha to weigh

 2        a bunch of evidence.  In general those judges, acting

 3        in wisdom, felt that the children would be better off

 4        being raised by their father than their mother --

 5        sorry -- being raised by their mother rather than

 6        their father.

 7   Q.   You think as a general matter children will be more

 8        likely to be better off raised by their mother instead

 9        of their father?

10   A.   Actually, what I'm saying is that a set of able, wise

11        judges evaluated information and made a judgment that,

12        in their opinion, they, you know, aggregating across

13        lots of judges they tend to feel that fathers are more

14        able -- sorry -- mothers are more able parents than

15        fathers.

16   Q.   Did the study analyze whether placing custody with the

17        mother or father had any effect on child outcomes?

18   A.   No.  I'm offering this as indirect evidence that is

19        drawing on the evaluation of a set of judges.

20   Q.   The time period that the study examined ended 20 years

21        ago in 1994?

22   A.   Yes.

23   Q.   Have you read any studies about custody placement for

24        periods since 1994?

25   A.   In preparing this report, this was a well-known study
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 76

```
 1        that I could refer to.  I'm sure there's the ability
 2        to use more recent data.  I imagine the gap is
 3        smaller.  I imagine that it is still the case that
 4        more children are placed in the sole custody of their
 5        mother than the sole custody of their father.
 6   Q.   Have you actually examined any studies other than this
 7        one concerning custody placement?
 8   A.   No, but it's data that could be accessed by others.
 9        This was a well-cited paper I used.
10   Q.   What do you mean when you say it's well-cited?
11   A.   Published in a really nice journal, went through peer
12        review.
13   Q.   How did you learn that this study existed?
14   A.   I think I had heard of this study in graduate school.
15        I found it through Google Scholar in this case.
16   Q.   You haven't done a comprehensive analysis of custody
17        placement decisions, have you?
18   A.   No, not myself.
19   Q.   Do you have any idea what the criteria are for custody
20        placement in Michigan?
21   A.   I'm not an expert on that.  I wouldn't know.
22   Q.   Do you know if in Michigan children are more likely to
23        be placed in sole custody of their mothers than their
24        fathers?
25   A.   I would not know.
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOSEPH PRICE, Ph.D.
January 18, 2014

Page 77

1   Q.   Are you aware in Michigan the courts are not allowed

2        to consider gender at all when making placement

3        decisions?

4              MS. HEYSE:   I'm going to object.

5   A.   I don't have any information.  Again, I was using this

6        as a way to aggregation information of judgments

7        across parents.   Regardless whether it's legal now to

8        base custody decisions on gender, this would provide

9        evidence that at least historically the judges have

10       felt that the mothers were better parents than

11       fathers.

12             The data I wanted to look at was nannies.

13       Again, parents are making a judgment whether they want

14       their kids raised by a man or a woman.   Unfortunately

15       the census data doesn't distinguish household workers

16       and nannies.   I would guess that nannies are

17       predominantly women which would indicate most parents

18       are making a judgment it's better to have a female

19       raise their children than a male.

20  BY MR. BLOCK:

21  Q.   So on paragraph 42 at the bottom, talking the fourth

22       to last line, fathers tend to stress competition,

23       challenge, initiative, risk taking and independence.

24       Do you believe that's true of all fathers?

25  A.   Again, when we make statements comparing differences



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 78

1         across gender, we're talking about average
2         differences.  Within any group there is going to be
3         some fathers that are either above or below some
4         mothers in the sample.
5    Q.   This is not in the context of talking about your
6         study.  Did your study analyze whether fathers
7         stressed competition, challenge or initiative?
8    A.   No.  I'm citing the work by David Popenoe.
9    Q.   You are saying that this reflects an average; is that
10        right?
11   A.   That's right.
12   Q.   But you don't have any knowledge of what data set
13        Popenoe was looking at, right?
14   A.   I could go back and look through the citations and
15        figure that out.  I don't know it offhand.
16   Q.   So you don't know how big the sample size was, do you?
17   A.   I don't know.
18   Q.   You don't know whether it was recruited by convenience
19        sampling method or not?
20   A.   I don't know that either.
21   Q.   Okay.  So assuming it represents like averages, it's
22        true that some mothers stress competition, challenge,
23        initiative, risk taking, independence, right?
24   A.   That's likely to be true.
25   Q.   And in contrast it's true that some fathers stress



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOSEPH PRICE, Ph.D.
January 18, 2014

Page 79

```
 1        emotional security and personal safety, right?
 2   A.   That's also likely to be true.
 3   Q.   Is it your belief that children are worse off if it's
 4        the father who expresses emotional security and
 5        personal safety and it's the mother who expresses
 6        competition, challenge, initiative, risk taking and
 7        independence?
 8   A.   I don't have any opinion on that.  I would probably
 9        just echo Popenoe's statement that what is clear is
10        that children have dual needs, one for independence
11        and the other for relatedness; one for challenge and
12        the other for support.  In that sense, fathers and
13        mothers play complimentary roles.
14   Q.   Did Popenoe examine the outcomes of children?
15   A.   I'm not sure.  Again, he is aggregating research
16        across the stuff.
17   Q.   When Popenoe says children have different needs, do
18        you understand him to be saying if those -- that
19        children will tend to have poorer outcomes if those
20        needs are not met?
21   A.   I don't know what his intentions were, but I would
22        read that to mean children have dual needs and when we
23        think of those needs, we think of those contributing
24        to positive outcomes in children.
25   Q.   It seems to me based on this paragraph he has said how
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 80

```
 1        fathers tend to behave and mothers tend to behave and
 2        then concluded from that children have different
 3        needs.  Are you aware of any studies that have
 4        demonstrated that there is that need as opposed to
 5        just drawing the inference that there is a need from
 6        the fact that those differences in parental gender
 7        roles happen to exist?
 8   A.   Yeah, I don't know.
 9             MS. HEYSE:  Whenever is a good time to take
10        a restroom break.
11   BY MR. BLOCK:
12   Q.   Just one more question about the custody placement.
13        So if you think it's particularly important for a
14        child to have a mother, is there any -- would that
15        lead you to conclude that being raised by two women
16        would be better than being raised by a different sex
17        couple?
18   A.   I think the conclusion is that children need to have a
19        mother, so not having a mother is likely to contribute
20        to worse outcomes for children, the absence of a
21        mother.  I don't think we know whether a second mother
22        can replace the types of things that a father
23        contributes to children, but based on this evidence
24        about the fact that fathers and mothers play
25        complimentary roles for child outcomes, my assessment
```


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOSEPH PRICE, Ph.D.
January 18, 2014

Page 81

```
 1          would be it wouldn't replace the father.
 2                         MR. BLOCK:  We can take a break.
 3                         (Off on the record at 10:05 a.m.)
 4                         (Back on the record at 10:19 a.m.)
 5     BY MR. BLOCK:
 6     Q.   I just want to tie things up on the parental gender.
 7          I just want a good summary of your opinions on this.
 8                         When you describe the way mothers tend to
 9          behave and fathers tend to behave, you are describing
10          averages?
11     A.   Yes.
12     Q.   So in individual, sir, some mothers may behave in a
13          ways that fathers normally would and some fathers may
14          behave in a way that is normally associated with the
15          way mothers behave?
16     A.   Yes.  In the same way some single mothers might have
17          better outcomes than a heterosexual married couple.
18     Q.   In some families, the mom might play sports with the
19          kids and the dads may help the kids cook?
20     A.   Yes.
21     Q.   In terms of your study on parental quality time, it's
22          also true that that was looking at averages, right?
23     A.   Yes.  When doing these kinds of studies, that's the
24          only option you have.  You are going to find some
25          mothers that have timing problems that are difficult
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 82

```
 1        than normal, but you compare the average.

 2   Q.   There are some cases where moms spent more time

 3        watching TV and roughhousing and the dads spent more

 4        time with the kids?

 5   A.   I would have to look at the individual, but I assume

 6        that would be the case.

 7   Q.   There are also some cases where both the mother and

 8        father spent equal amounts of time roughhousing or

 9        doing housework?

10   A.   Yes.

11   Q.   Are you aware of any studies saying that when parents

12        don't behave the parents tend to behave on average --

13        let me rephrase that.  Strike that.

14                  Are you aware of any studies saying that

15        when the mom behaves in a way that is typically

16        associated with how dads behave or when a dad behaves

17        the way that is typically associated with the way moms

18        behave, that that leads to poorer outcomes for

19        children?

20   A.   Maybe simplify it a little.

21   Q.   Yeah.

22   A.   I think I almost have it.

23   Q.   I'll find a better way of phrasing it.  Are you aware

24        of any studies saying children are worse off if the

25        mother is the one to play sports with them and the
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 83

```
 1          father is the one that does housework and reading with
 2          them?
 3    A.    I'm not aware of studies that look specifically at
 4          those factors and how they contribute to the child
 5          outcomes.
 6    Q.    Okay.  Are you aware of any studies saying that --
 7          have you read any studies that conclude that parental
 8          gender does not of affect a child's outcome, parental
 9          gender roles does not affect the child's outcomes?
10    A.    So in reading the expert witness report of the
11          plaintiff's, I do remember statements to the effect
12          that gender composition does not affect child
13          outcomes.  So I imagine that must have been based on
14          published studies.  Again, my concern would be that
15          there is often confusion between failing to find a
16          statistical difference and there being no difference
17          in truth.
18    Q.    Were you aware of that study before reading the
19          plaintiffs' expert report?
20    A.    Not of any specific studies.  Again, the way I
21          interpreted the statement of the other expert witness
22          report is basically saying that children don't need a
23          mother.  I don't know if that particular statement has
24          been rigorously and empirically tested.  I imagine
25          that it hasn't been examined because I imagine many
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 84

```
 1          scholars would believe that the absence of a mother is
 2          likely to have consequences for children.
 3    Q.    Are you aware of any studies that found that when
 4          mother's behave in ways typically associated with
 5          fathers that children have poor outcomes?
 6    A.    No.
 7    Q.    I'm going to ask vice versa.  Are you aware of any
 8          studies that found that fathers behave in ways
 9          typically associated with mothers that children have
10          poor outcomes?
11    A.    I don't know.
12    Q.    The last question is a variation on this matter.  Are
13          you aware of any studies that show when both parents
14          behave in roughly the same way, equal amount of
15          roughhousing and equal amount nurturing, that children
16          have poor outcomes?
17    A.    Yes, I don't know.
18    Q.    So when you say you don't know, you mean that you are
19          not aware of any such studies?
20    A.    I'm not aware of any such studies.
21    Q.    Great.  Are you aware of any studies finding in
22          same-sex couples when one of the moms behave in a way
23          typically associated with way dads typically behave
24          and the other mom behaves in a way typically
25          associated with the way a mom behaves that that leads
```



JOSEPH PRICE, Ph.D.
January 18, 2014

Page 85

```
 1        to poor child outcomes?
 2   A.   I'm not aware of a study.  Again, within the confines
 3        of a nationally representative data set on a large
 4        sample of children being raised by those families,
 5        yeah, I am not aware of any study that fits that
 6        criteria.
 7   Q.   Okay.  Let's go onto the second mechanism you talked
 8        about regarding relatedness.  In this section, you
 9        cite two studies, one by Anderson and one by Brown; is
10        that correct?
11   A.   That's correct.
12   Q.   Prior to being retained as an expert witness in this
13        cases, had you seen these publications by Anderson and
14        Brown?
15   A.   No.
16   Q.   So for what purpose -- so you reviewed them for the
17        first time in connection with preparing your expert
18        report in this case?
19   A.   That's correct.
20   Q.   Prior to being retained as an expert witness in this
21        case, had you seen any studies that dealt with
22        biologic relatedness?
23   A.   I'd seen studies related to ten families.
24   Q.   Busies these two studies in this report, are you aware
25        of any other studies that support your opinion that
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com