UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

APRIL DEBOER, et al,

             Plaintiffs,

vs                                                          ED No. 12-10285

RICHARD SNYDER, et al,

             Defendants.
_____/

### EXPERT WITNESS REPORT OF DAVID M. BRODZINSKY, Ph.D.

I, David M. Brodzinsky, do solemnly attest as follows:

**A. Professional Qualifications:**    (*see* attached curriculum vitae for more details)

1. I received a Ph.D. in developmental psychology from the State University of New York at Buffalo in 1974, as well as additional training as a clinical psychologist during a clinical internship (approved by the American Psychological Association) at the Irving Schwartz Institute for Children and Youth in Philadelphia from 1972 to 1973 and a post-doctoral fellowship at the same institution from 1973 to 1974.

2. I am a licensed psychologist in the states of California (#21152) and New Jersey (#2014). I also received a Certification in Advanced Studies in Child Maltreatment, with Specialization in Child Sexual Abuse from the New Jersey Child Abuse Training Institute in 2004.

3. From 1974 to 2006, I was a faculty member in the Department of Psychology at Rutgers University, where I taught undergraduate and graduate courses in developmental and clinical psychology (including the psychology of adoption and foster care), conducted research, and supervised clinical Ph.D. and Psy.D. students. Currently, I am Professor Emeritus of Clinical and Developmental Psychology at Rutgers University.

4. From 1989 to 2006, I was Director of the Rutgers Foster Care Counseling Project, a state funded training and service program focusing on the clinical needs of foster children and their families in central New Jersey. During this period, I trained over 100 doctoral level students in psychological issues in foster care and adoption and the project served over 700 foster families.

5. From 1996 to 2006, I was on the Board of Directors of the Donaldson Adoption Institute in New York City, an internationally known non-profit organization focusing on policy analysis, research, education, and advocacy in the field of adoption. From 2006 to the present, I

1

have served as Research Director for the Institute.

6. I have over 35 years of experience in the fields of child development, parenting, family psychology, adoption and foster care as a researcher, scholar, teacher, clinician, trainer, consultant, and forensic expert. I have published numerous peer-reviewed journal articles, book chapters, and books on child development, parenting, adoption, and foster care. I have also reviewed hundreds of articles in these areas submitted to journals for publication.

7. I have been in private practice as a psychologist for 29 years. Most of my direct clinical work, as well as supervisory clinical work, is with children and families, including over two thousand families who have adopted or fostered children.

8. I have also been a practicing forensic psychologist for nearly 25 years. During this time, have been involved in 550 to 600 cases, testifying over 100 times in 11 different states. Most of my cases involved issues related to child custody, dependency, contested adoption, wrongful adoption, child abuse, and trauma-related personal injury.

9. I have given hundreds of conference presentations, professional workshops, grand rounds presentations, and community lectures to mental health professionals, child welfare professionals, legal professionals, and/or the public related to child development, parenting, adoption and foster care, both in the United States, Canada, and Europe.

10. I have been a consultant to hundreds of public and private adoption agencies and child welfare agencies throughout the United States, Canada, England, Ireland, Scotland, Spain, Italy, Holland, Sweden, and Norway.

## B. Specific Qualifications Related to Adoption, Foster Care, and Parenting by Lesbian and Gay Individuals and Couples

11. I recently edited a book for professionals entitled, <u>Adoption by Lesbians and Gay Men: A New Dimension in Family Diversity</u> (Oxford University Press), published in 2012.

12. I have published two book chapters and three other research articles on adoption by lesbians and gay men. Two of the articles focused on adoption agency policies and practices related to adoption by lesbians and gay men. The third article examined the perceptions, beliefs, experiences, and needs of lesbian and gay adoptive parents in the U.S. In addition, a number of my other articles on adoption also address adoption by lesbian and gay parents. (*see* CV attached).

13. I am currently heading up a survey research project for the Donaldson Adoption Institute on diversity issues in adoptive families that addresses, among other issues, the experiences, attitudes, beliefs, and needs of lesbian, gay, and heterosexual adoptive parents and their children. This project draws from adoptive families across the country and, to date, has yielded over 1,600 respondents, including over 200 lesbian and gay adoptive parents.

14. I have consulted with and/or worked clinically with hundreds of families headed by

2

lesbian and gay parents during my career, including those who have adopted or fostered children. I have also supervised the clinical work of other professionals working with lesbian and gay families.

15.   I am on the Scientific Advisory Board of the Rockway Institute in San Francisco. This institute, which is associated with Alliant University, focuses on LGBT issues.

16.   I am a clinical supervisor and consultant to the Pacific Center in Berkeley, CA, a non-profit organization serving the mental health needs of the LGBT community.

17.   I have been involved in numerous court cases related to adoption and parenting by lesbians and gay men, both as an evaluator and as a testifying expert.   I have been accepted by the court as an expert on lesbian and gay parenting, adoption and foster care.   *See Baehr v Miike*, No. 91-1394 (1st Cir Hawaii)(trial regarding same sex marriage ban); *Amer v Johnson*, 4 Fla. L. Weekly Supp. 854b (Fla 11th Cir. Ct. 1997)(challenge to Florida's ban on adoption by lesbians and gay men); *Florida Department of Children and Families v Adoption of X.X.G.*, 45 So.2d 79 (Fla. App. 3 Dist. 2010)(same); *In the Matter of the Adoption of John Doe*, 2008 WL 5006172 (Fla. 11th Cir. Ct.) (same); *see also Lofton v Kearney*, 157 F.Supp.2d 1372 (S.D. Fla 2001)(expert witness in another challenge to Florida's adoption ban that did not go to trial); *Catholic Charities v Illinois*, No. 11-MR-254 (7th Cir. Ill.)(submitted expert report in case involving discrimination against lesbian and gay couples by private child placement agencies).

18.   I have made numerous presentations on issues related to lesbian and gay parenting, adoption, and foster care to mental health professionals, child welfare professionals, and legal/judicial professionals throughout the United States, Canada, Spain, England, and Italy.

**C. Opinions**

The following opinions are supported by research and scholarly writings in the areas of child development, parenting, family psychology, child welfare, and adoption.   A selective list of authoritative books, book chapters, peer reviewed journal articles, and other documents upon which my opinions rest are provided below.   In addition to the supporting documents, my opinions are also based upon over 25 years of clinical, consultation, and training experience in child development, parenting, family psychology, adoption and foster care, as well as my direct clinical involvement and supervisory experience with hundreds of families headed by lesbian and gay parents.

19.   **Social science research demonstrates that there are no differences in the quality of parenting of lesbian and gay adults compared to heterosexual adults, nor in the psychological adjustment of children raised by these two groups of parents.**

(a)   Over a quarter century of social science research indicates that lesbian and gay parents are as well adjusted emotionally and have similar parenting competence as their heterosexual peers.   Furthermore, children growing up in same-sex parent headed households show no differences in their developmental outcomes compared to those boys and girls raised by

3

heterosexual couples.   These results not only apply to lesbian and gay families with children who are biologically related to one of the parents, but also to families that have adopted children unrelated to both partners. The small differences between children of gay and heterosexual parents that are occasionally reported in research (e.g., less gender-stereotyped play in children of lesbians and gay men; greater levels of egalitarian attitudes in adolescents of lesbian and gay parents) represent variations in normal development, not indices of adjustment problems.

(b)   The fact that children of same-sex couples fare no differently than children of heterosexual couples is not surprising given what we know from more than half a century of scientific research on what promotes healthy child development.   It is now well-established that the primary factors that influence the variability in children's adjustment, regardless of their family structure, are: mental health of the parents; quality of relationship between parenting figures; quality of the parent-child attachment; parenting characteristics (e.g., warmth, empathy, sensitivity to children's needs, and use of age appropriate rules and structure); peer relationships; educational opportunities; and resources and supports available to the family.

(c)   Opponents of same-sex marriage and adoption by lesbians and gay men often cite three studies, one by Mark Regnerus, a second by Douglas Allen, and a third by Sotirios Sarantakos, that they claim show that being raised by lesbian or gay couples disadvantages children in terms of their psychological, social, emotional, and/or educational adjustment.[1]   But no conclusions can be drawn from these studies about the impact of being raised by same-sex parents because they did not study individuals *raised* by same-sex parents.

In the Regnerus study, individuals were included in the "gay father" or "lesbian mother" group if they affirmatively answered the following question: "From when you were born until age 18 (or until you left home on your own), did either of your parents ever have a romantic relationship with someone of the same sex?"   This doesn't take into account the length of the parent's romantic relationship with a same-sex individual (e.g., a few weeks, months, years) or the length of time the respondent lived in a household with a parent and his or her same-sex partner. Indeed, half of the respondents never lived in a same-sex couple household.   Furthermore, the majority of respondents identified as having a "lesbian mother" or "gay father" were born in heterosexual marriages or unions that resulted in separation or divorce, followed by living with either a single parent or in a family with a step-parent.   In contrast, Regnerus excluded from his heterosexual comparison group all families that had experienced parental separation and divorce, resulting in a sample that included only those who had provided their children with an intact two-parent family experience throughout the developing years.   There is an abundant literature showing that children who experience parental separation and divorce are disadvantaged in many important ways that impact development compared to those who live in more stable families. There is also a comparable literature showing that growing up in a single parent family and with step-parents who later joined the family also places children at risk for adjustment difficulties. Thus, this study merely shows, as many other studies have, that living in stable, two parent

---

[1]   Regnerus, M. (2010).   How different are the adult children of parents who have same-sex relationships? Findings from the New Family Structures Study.   Social Science Research, 41,, 752-770; Allen, D. (2013). High school graduation rates among children of same-sex households.   Rev. Econ. Household, 11, 635-658; Sarantakos, S. (1996).   Children in three contexts:   Family, education and social development.   Children Australia, 21, 23-31.

families is associated with better child outcomes. In fact, Regnerus himself notes that "[c]hild outcomes in stable, 'planned' [gay, lesbian or bisexual] families and those that are the product of previous heterosexual unions are quite likely distinctive, as previous studies' conclusions would suggest."[2]

The study by Sarantakos, which was published in an obscure Australian periodical (not a known scientific journal), similarly studied a group of children in households headed by same-sex couples who all had experienced parental separation or divorce and were living in step-families and compared them to children living with their married, heterosexual parents.

The study by Allen purports to show, based on Canadian Census data, that being raised by same-sex parents is associated with lower high school graduation rates. But no information was available about the families in which the children had actually been raised before high school. Moreover, Allen notes that the data suggest there may be a high number of adopted children among the same-sex couples and we know that being adopted is associated with poorer outcomes due to children's adverse pre-natal and early life experience. This data simply do not provide information from which conclusions can be drawn about the significance of family structure.

None of these studies examined a sample of individuals raised from birth or at least early in life by two same-sex parents; and in Regnerus and Sarantakos's studies, their subjects were mainly children of failed heterosexual unions, who, at most, were living with a lesbian or gay parent and her/his same-sex partner who later joined the household for some period of time. Research has consistently shown that family instability caused by parental separation and divorce is a major stressor for children, placing them at increased risk for adjustment difficulties. This data say nothing about same-sex couples seeking to marry and create families together and the well-being of children raised in such families.

(d) In summary, over a quarter century of research has shown conclusively that children raised by lesbian and gay individuals and couples show similar patterns of psychological, social, emotional, and academic adjustment compared to children raised by heterosexual individuals and couples. There is no scientific basis to conclude that children are best off in heterosexual parent families.

20. **Research methods used in studying same-sex parent families are consistent with accepted standards in the field.**

(a) Researchers in the fields of child development, parenting, family psychology, and clinical psychology use a wide range of methodological strategies for studying issues of interest, including quantitative and qualitative data, large and small samples, and representative and

---

[2]  Regnerus' study has been discredited by an internal audit conducted by *Social Science Review*, the journal that published it.  Darren E. Sherkat, *The Editorial Process and Politicized Scholarship:  Monday Morning Editorial Quarterbacking and a Call for Scientific Vigilance*, Social Science Research 41 (2012) 1346–1349 (concluding that the paper has "serious flaws and distortions" and should not have been published).

convenience samples.   Some studies employ cross-sectional designs, looking at children and families at a specific time in their lives; others follow subjects longitudinally, collecting data over many years.   Data can be collected through interviews, surveys, observations, psychological tests, parenting measures, and so forth.   Information about subjects of interest (e.g., children) may be collected from the subjects themselves (e.g., self-report data), from others (e.g., their parents, other caregivers, siblings, teachers, etc), or from existing records (e.g. school or medical records).   In short, there is no single methodology, research design, or type of data that is accepted as the "gold standard" for social science research focusing on understanding children's development, parenting, and family life, including the impact of being raised by lesbian and gay parents.   The use of a specific methodology is governed by, among other factors, the theory being tested, the constructs being studied, findings from past research, the subjects being studied, and practical matters such as project funding, location where the research is being conducted, and access to target subjects.

(b)   Much of the research on same-sex parenting has been conducted by developmental psychologists.   These scholars are much more likely to use small to moderate size convenience samples to study the issues in question than large scale, nationally representative samples (e.g., census data or data from national health surveys), although there are a number of studies of gay parent families that used representative samples and their results are consistent with the rest of the body of research.   Although data from nationally representative samples offer some advantages over data from small scale, convenience samples (e.g., greater confidence in being able to generalize the research findings beyond the sample employed in the study), it does so with some clear costs. For example, large-scale survey data seldom allow for in depth analyses of critical factors affecting children, parents, and family life—a primary focus of child development and family researchers.   Only through direct observations, interviews, and the use of more complex and informative testing measures are researchers able to understand the complex, and often nuanced, array of factors affecting children and their parents.

(c)   To overcome the limitations of small scale, convenience samples, developmental and family researchers rely upon replication of results over time with different groups of subjects, and the use of a multi-method, multi-source approach to data collection.   The use of large-scale survey data on representative samples of interest is one important tool that some researchers—particularly sociologists and demographers—use to gather broad-based information on children and their families, but it is certainly not the best means for understanding the intricacies of human development and adjustment. Other methods, including small convenience samples, that allow for in depth examination of individual, relationship, and systemic processes are critical for understanding the nuanced factors impacting human development. Findings that are consistent over time, using different research strategies, different types of data, and difference reporting sources, and that are put through a rigorous peer review (as the body of data on same-sex parenting has been) are considered reliable and valid.

6

21. **Professional organizations in the fields of medicine, mental health, child development, and child welfare have issued position statements supporting parenting, adoption, and fostering by lesbian and gay couples.**

(a)   Every major professional organization in this country whose focus is the health and well-being of children and families has reviewed the data on outcomes for children raised by lesbian and gay couples, including the methods by which the data were collected, and have concluded that these children are not disadvantaged compared to children raised in heterosexual parent households.   Organizations expressing support for parenting, adoption, and/or fostering by lesbian and gay couples include (but are not limited to):   American Medical Association, American Academy of Pediatrics, American Psychiatric Association, American Academy of Child and Adolescent Psychiatry, American Psychoanalytic Association, American Psychological Association, Child Welfare League of America, National Association of Social Workers, and the Donaldson Adoption Institute.

22. **There is no basis for the assertion that children are best off if raised by a parent of each gender.**

(a)   Opponents of same-sex marriage and adoption by gays and lesbians often argue that children are best off if raised by two parents of the opposite gender.   In support of their argument, they frequently point to research showing that children, on average, do better in intact, two-parent families versus single parent families. Yet this research is not relevant to issues related to same-sex parenting.   Growing up in a single parent household, whether headed by heterosexual or gay parents, is often the result of previous family disruption; moreover, single parents, whether heterosexual or gay, often do not have the resources and supports commonly found in two-parent families. Thus, the relative disadvantage to children in single parent families is due to the impact of previous family disruption and/or limited resources, not the absence of a male or female parent.

(b)   Similarly, while research indicates that women and men in heterosexual families often choose to play different parenting roles in raising their children (i.e., mothers more often take the role of primary parent) and, thus, adopt different parenting styles that tend to go along with these roles, there is no support for the belief that children require gender differentiated parenting to be healthy and well adjusted, or that same-sex couples are unable to provide for the full range of needs of their children.

(c)   In short, children's healthy development is not affected by the gender combination of their parents.   What makes the difference in children's development are the factors discussed earlier: mental health of the parents; quality of relationship between parenting figures; quality of the parent-child attachment; parenting characteristics (e.g., warmth, empathy, sensitivity to children's needs, and use of age appropriate rules and structure); peer relationships; educational opportunities; and resources and supports available to the family.

23.  **Children fare well in families regardless of whether or not they have a biological relationship with their parents.**

(a)  Opponents to same-sex marriage often argue that children are disadvantaged when raised by non-biological parents.   Yet there is strong societal support for adoption of children and with good reason.   The vast majority of adopted children make good adjustments to their new home and display normal patterns of development.   Most adjustment difficulties experienced by some adopted children have more to do with their adverse prenatal experiences (e.g., exposure to drugs or alcohol, exposure to heightened prenatal stress), adverse pre-placement experiences (e.g., neglect, abuse, exposure to unfit biological parents, multiple foster placements, orphanage life), and genetic heritage than with being adopted per se.   In fact, research shows that parenting by loving, committed and skillful adoptive parents—whether heterosexual or gay—helps children overcome many of the difficulties that are associated with their adverse histories, including those circumstances experienced while living with their birth family.   In this context, adoption is viewed as a protective factor in the life of the child.

(b)   Children conceived by couples through donor insemination are at no greater risk of adverse developmental outcomes than children raised by two biological parents.   This is equally true for children raised by heterosexual parents (who comprise the majority of individuals who create their families through reproductive medicine techniques) and those raised by same-sex parents.   This finding is not surprising given that the factors that primarily cause the higher rate of adjustment difficulties among children adopted into families in which neither parent is biologically related to the child—i.e., adverse prenatal and early life experiences—do not apply in these families.   Similarly, the factors that cause the higher rate of adjustment problems among children living in step-families—i.e., the family disruption that typically precedes the formation of a step-family and the introduction of a new adult into the household—do not apply in these families.

(c)   In short, raising healthy children, does not depend on whether parents and children share a biological relationship; rather, what makes the difference in children's development are the factors discussed earlier:   mental health of the parents; quality of relationship between parenting figures; quality of the parent-child attachment; parenting characteristics (e.g., warmth, empathy, sensitivity to children's needs, and use of age appropriate rules and structure); peer relationships; educational opportunities; and resources and supports available to the family.

24.  **Preventing same-sex couples from adopting children harms the tens of thousands of children lingering in foster care who are awaiting adoption.**

(a)   In the U.S., there are nearly 400,000 children currently in foster care, of which over 100,000 are waiting to be adopted.[3]   In Michigan alone, there are over 4,000 foster children who have been freed for adoption, but are still lingering in care because of an insufficient number of

---

[3] Adoption and Foster Care Analysis and Reporting System (AFCARS) (2013).   ACYF, Office of Data, Analysis, Research, and Evaluation. Downloaded December 17, 2013.
http://www.acf.hhs.gov/programs/cb/research-data-technology/statistics-research/afcars

8

families willing or able to adopt them.[4]   Categorically excluding a group of capable prospective parents from the pool of potential adopters undermines efforts to find timely residential, psychological, and legal permanence for these boys and girls, which increases their risk for long-term psychological problems.

(b)   Every adopted child has a unique and often complicated set of needs.   Finding families that can meet the full range of a child's needs can be a daunting task for child welfare professionals. Accepted child welfare judgment and practice related to adoption emphasize the importance of matching the needs of the child with the strengths of the family.   There is no one type of family that is "ideal" for all children.   Prohibiting lesbian and gay couples from jointly adopting reduces the pool of competent parents who potentially can meet the needs of these children and, consequently, is inconsistent with accepted child welfare practice and disadvantages boys and girls who continue to linger in foster care.

(c)   Excluding this particular group of prospective adoptive parents—lesbian and gay couples—is especially harmful because research has shown that they are highly motivated to adopt children and do so at rates exceeding heterosexual couples.   One study found that same-sex couples are four times more likely than heterosexual couples to be raising adopted children.[5]   And same-sex couples tend to be more open than other prospective adoptive parents to adopting children of color (regardless of their own race) and children with special needs (i.e., medical problems, developmental delays, and mental health challenges), who constitute approximately half of all children in foster care and tend to linger the longest waiting to be adopted.

25.   **Excluding same-sex couples from marriage deprives their children of the stability, resources, social recognition and legal rights associated with marriage.   Consequently, it is in the best interests of children of same-sex couples to allow their parents to marry**.

(a)   Contrary to existing myths and stereotypes about lesbian and gay adults, research indicates that they are highly motivated to parent children and, in fact, are already doing so in great numbers.   For example, based upon several nationally representative datasets, demographer Gary Gates[6] reports an estimated 3 million LGBT Americans have had a child and as many as 6 million American children and adults have a parent who is LGBT.   These families live in every state in the country and in virtually every county in the United States.

(b)   In short, parenting by same-sex couples is a reality and has been for some time. Marriage promotes family stability, which is beneficial to children.   And it affords children and families significant benefits, including economic resources (e.g., access to health insurance and financial support in the event one of the spouses passes away) and social recognition.   Excluding same-sex couples from marriage denies their children these benefits of marriage.

---

[4] North American Council on Adoptable Children, Fall, 2013.   Downloaded December 17, 2013.
  http://childwelfaresparc.org/nacac-adoption-fact-sheet/

[5] Gates, G. (2013).   LGBT parenting in the United States.   Los Angeles.   The Williams Institute.

[6] *Id.*

**26.  Children, including those living in same-sex parent families, benefit from having legal parent-child relationships with both of their parents.**

(a)  It is critically important to children to have legally recognized parent-child relationships with the people they know to be their parents.   A legal parent-child relationship affords children access to important economic resources, including but not limited to health insurance, social security disability and survivor's benefits, and inheritance rights.   Having legal ties to their parents is also enormously important to children's psychological well-being. Preventing same-sex couples from establishing legal ties for both partners through second parent or joint adoption can harm the child psychologically because of the ambiguous, socially unrecognized, and seemingly non-permanent relationship with the second parent.   Such an arrangement can deprive the child of the emotional security, societal affirmation, sense of normality, identity, and social stability that comes with a full legal relationship with the second parent.   They can also suffer unnecessary fear, anxiety, and insecurity related to possible separation from the second parent in the event of their parents' separation or upon the death of the biological or adoptive legal parent.   And they are, in fact, at risk of losing an important attachment relationship if such circumstances occur.   It is well established in the research that children can suffer profoundly from broken attachments to parental figures.

(b)  In short, the evidence overwhelmingly shows that having legal ties to both parents provides greater stability for children, enhanced economic resources, and supports their development and emotional well-being.

27.  I declare under penalty for perjury under the laws of the United States that the foregoing statement is true.

Dated:  12/20/13

David M. Brodzinsky

10