UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

APRIL DEBOER, et al.,

Plaintiffs,

-vs-  ED Mi #12-civ-10285

RICHARD SNYDER, et al.,  Expert Report of Vivek S. Sankaran, JD

Defendants.

---

I. Qualifications and Engagement

I have been retained by Plaintiffs' counsel as an expert in connection with the above-referenced litigation.

My compensation for serving as an expert witness in this matter is $125/hour. I have not testified in any matter in the past ten years.

I am a clinical professor of law at the University of Michigan Law School and teach in the Child Advocacy Law Clinic ("CALC"). I graduated from the University of Michigan Law School in 2001. I graduated from the College of William and Mary with a BA in Government in 1998.

I have been teaching at the law school since 2005. My CALC students represent children and parents involved in child welfare cases in a number of counties across the state. In addition to working in the CALC, I teach in our child welfare appellate clinic and direct the Detroit Center for Family Advocacy, which seeks to prevent children from unnecessarily entering and remaining in foster care. I have also taught doctrinal courses on Children and the Law and trial-skills courses related to Family Law.

Prior to my arrival at the law school, I worked for four and a half years at The Children's Law Center in Washington, DC where I represented children in foster care. Over those years, I represented hundreds of foster children. I also represented parents, relatives and foster and adoptive parents involved in the system. When I left the organization in 2005, I was supervising newer attorneys handling these cases.

My research and policy interests center on improving outcomes for children in foster care. Over the past eight years, I have written numerous articles related to the

1

foster care system, including several papers on how to better decision-making in these cases. I sit on the steering committee of the American Bar Association's National Project to Improve the Representation of Parents and the American Bar Association's Commission on Homelessness and Poverty, and was appointed by Governor Rick Snyder to serve on the Child Abuse Prevention Board. I have been appointed by the Michigan Supreme Court on several occasions to represent parents in child welfare appeals before the Court and have conducted numerous national, state and local trainings on child welfare issues. Currently, I am serving as a national consultant for the National Center for State Courts on a targeted projected aimed at engaging juvenile court judges and attorneys to improve court processes. I am certified as a child welfare law specialist by the National Association of Counsel for Children and was named 2009 Parent Attorney of the Year by the Michigan Foster Care Review Board.

II.     Facts and Opinions

My report seeks to make two basic points

1) That Michigan has a significant number of children who exit the foster care system each year without being given a permanent home. The costs for raising these children in public institutions and homes is steep and outcomes for children leaving the foster care system without a permanent home are bleak. Expanding the pool of adoptive parents who could appropriately care for these children would yield significant benefits to children while also reducing financial costs to the State.

2) That the ban on second parent adoptions by same sex couples increases the risk of children being uprooted from stable and loving homes if the parent with legal rights over the child dies. If this happens, the child may find herself placed in foster care with strangers or subject to unnecessary scrutiny from government agencies, lawyers and courts. This scrutiny would arise because of the custody, guardianship or adoption cases that would need to be filed to create a new legal relationship between the child and the surviving "parent." And, in these proceedings, there would be no guarantee that the child would necessarily end up in the care of the surviving "parent." The potential for legal uncertainty and instability in a child's life would not serve the interests of children.

**<u>A Significant Number Of Children Exit Michigan's Foster Care System Each Year Without Being Given A Permanent Home. For These Children, Outcomes Are Poor. For The Public, The Potential Costs Are Staggering.</u>**

2

· In FY 2012, approximately 7,000 children entered Michigan's foster care system.[1] At the end of the year, over 14,000 children remained in foster care.[2] Of the children exiting the foster care system, over ten percent exited without finding a permanent home.[3] Put another way, roughly 800 children "aged out" of foster care when they reached adulthood without being reunified with their birth families, adopted by foster parents or placed in other legally-securing living arrangements with adults.[4]

The costs of having such a significant number of children age out of foster care are significant. A 2005 study by researchers at Wayne State University painted a disturbing picture for outcomes of children exiting the foster care system without a permanent home.[5] Close to 50% of the youth experienced homelessness; most were homeless for over a year. Nearly as many youth spent time in jail as graduated from high school. While 54% received some form of public assistance, close to 20% did not work at all. Roughly 40% had used drugs; and more than 10% had reported suicidal ideation.

A 2009 report issued by Casey Family Programs contained similar findings.[6] It indicated that seven out of ten children aging out of foster care in Michigan had experienced at least one mental health problem. Only a third had completed high school and less than half were employed at least ten hours a week. Only a third reported having an income greater than the poverty line. These studies are illustrative of findings in national studies on what happens to children who age out of foster care.

What is especially disturbing is how much money the State invests on these children to achieve such poor outcomes. Researchers have estimated that the annual cost per foster youth can top $60,000 when direct costs such as foster care and legal representation, and indirect costs like special education, mental health and physical health care services, and juvenile delinquency are considered.[7] Additionally, many older youth in care are placed in group homes or residential settings which are extremely costly, but lack documented evidence of good outcomes. These statistics only demonstrate the need to find foster youth permanent homes before they exit the foster care system.

---

[1] These statistics are available at http://www.acf.hhs.gov/programs/cb/resource/fy2003-2012-foster-care-entries-exits.
[2] *Id.*
[3] This statistic is available at https://www.acf.hhs.gov/sites/default/files/cb/cwo08_11.pdf#page=45.
[4] *Id.*
[5] Fowler, P. J., Toro, P. A., Tompsett, C. J., & Hobden, K. (2006). Youth Aging Out of Foster Care in Southeast Michigan: A Follow-up Study. Report presented to the Michigan Department of Human Services.
[6] This report is available at http://www.casey.org/Resources/Publications/pdf/StateFosterCare_MI_es.pdf
[7] See, e.g., Gelles, Richard J., & Perlman, Staci (2012), *Estimated Annual Cost of Child Abuse and Neglect*, Chicago, IL: Prevent Child Abuse America.

3

But Michigan's ban on second parent adoption by same-sex couples creates disincentives for qualified same-sex couples to provide permanent homes for these youth. The irrationality of the current ban on second parent adoption by same-sex couples is only underscored by the fact that the foster care system allows same-sex parents to jointly serve as temporary foster parents for children in foster care. In order for these couples to do this, both parents must go through an extensive licensing process by the State, which includes a home inspection, proof of employment and a comprehensive medical assessment, among other things. [8] The State, however, prohibits these qualified, licensed parents to then jointly adopt those children and provide them with a permanent home even though the criteria for assessing the qualifications of adoptive parents are nearly identical to those required for licensure.[9] Illustrative of this fact that is the reality that a child's foster parents are typically the ones who adopt that child out of the foster care system. Because of the ban, same-sex foster parents cannot do this.

In my opinion, it is in the best interests of foster youth to remove barriers for qualified couples to adopt those youth who are in the system. The ban on second parent adoption by same-sex couples deprives some children of the very thing they need – a loving and permanent home that will allow them to exit the foster care system.

### The Ban on Second Parent Adoptions By Same-Sex Parents Increases the Risk Of Children Being Uprooted From Stable And Loving Homes If The Parent With Legal Rights Over The Child Dies.

Because of the ban on second parent adoptions by same-sex parents, children living in two parent same-sex households can only have one legal parent. The other "parent" is a legal stranger to the child and has virtually no rights to him or her. Thus, in situations where the legal parent dies, the child faces a heightened risk of being uprooted from a stable and loving home. This risk would not exist if same-sex couples could jointly adopt children.

Consider the following scenarios. The child's legal parent dies but lists in her will that the surviving "parent" should be granted rights over the child. To secure those rights, the surviving "parent" would have to go to court and file an acceptance of that appointment. MCL 700.5202(3). But the guardianship that would be created would be legally tenuous. A court would review it every year. MCL 700.5207(1). At such a review, the court could order the DHS or a court employee to conduct an investigation and file a written report, or could appoint a lawyer-guardian ad litem to

---

[8] The requirements for becoming a licensed foster parent are available at
http://www.michigan.gov/documents/dhs/DHS-BCAL-PUB-10_274716_7.pdf
[9] MCL 710.22(g) lists the factors a court must consider in determining whether an adoption is in the best interests of the child.

4

represent the child's best interests. MCL 700.5207(2); MCL 700.5213(5). At the end of the hearing, the court could continue the guardianship, schedule an interim hearing or terminate the guardianship in response to a motion filed by an interested party. MCL 700.5207(3); MCL 700.5209. In fact, <u>any person</u> interested in the child's welfare could petition the court to remove the surviving "parent" as the guardian. MCL 700.5219. This review process would need to be repeated every year until the child turns 18.

If the surviving "parent" was not named in the legal parent's will, then the situation would become even more complicated. The surviving "parent" would have to affirmatively petition the court to obtain a guardianship over the child or to adopt the child. Both would require a court, after conducting an investigation,to make a finding that the living arrangement would be in the best interests of the child, which is an inherently subjective determination which often invokes racial, cultural and socio-economic biases. The surviving "parent's" life would be closely scrutinized by a court, and perhaps a child welfare agency and a lawyer appointed to represent the child. And as noted above, if the surviving parent only received a guardianship, then the arrangement would be reviewed on an annual basis and would always be subject to modification or termination. There would be no guarantee that the surviving parent would be awarded a guardianship or an adoption, particularly if a relative of the legal parent stepped forward and requested that the child be placed with him or her.

In addition to the scrutiny that these processes would invite, seeking a guardianship or an adoption over a child would be both time-consuming and costly. At a minimum, both would involve filing fees, not to mention the costs associated with leaving a job to attend court hearings. Additional fees may also result if child welfare agencies and children's lawyers are involved.

And if the surviving "parent" experiences any delay in securing custodial rights to the child, she may come to the attention of the Department of Human Services ("DHS"), which investigates allegations of child abuse and neglect. Under the Juvenile Code, a child is deemed to be neglected if he is without proper custody or guardianship. MCL 712A.2b(1). This can include situations in which children are left with legal strangers who have no decision-making authority over the child, which would be the case when a child is left with the surviving "parent" in a same-sex relationship. If the DHS filed a petition in Juvenile Court because the child lacked proper custody or guardianship and sought to place the child in stranger foster care, the surviving "parent" would not be a party to the proceeding, would not be afforded a lawyer, and would have no right to have the child placed with her because she would be neither a legal parent nor a relative. Instead, her only option would be to become licensed as a foster parent, which is a lengthy process that would require a child welfare agency to approve her home under an extensive set of factors, including the size of her home, her employment history and her income. And even if she became a licensed foster parent, she would have no guarantee of having her child placed with her. The

5

laws governing foster care proceedings explicitly give relatives a placement preference where the child cannot be returned to her legal parent. MCL 722.954a.

In my option, no rational basis exists for the State to impose a ban on second parent adoptions by same sex parents. Instead, for children living in same-sex households, the ban unnecessarily heightens the instability and uncertainty these children may face if their legal parent dies.

12-20-13
Date

Vivek S. Sankaran

6