UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

APRIL DEBOER, *et al*,

      Plaintiffs,                     Civil Action No. 12-cv-10285

v.

                                     HON. BERNARD A. FRIEDMAN

RICHARD SNYDER, *et al*,       MAG. MICHAEL HLUCHANIUK

      Defendants.

_____

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to F.R.C.P. 52(a), Plaintiffs propose the following findings of fact and conclusions of law.

FINDINGS OF FACT

Having considered the evidence presented at trial, the knowledge, skill, experience, training, education, and credibility of the witnesses, and the legal arguments presented by counsel for the parties, the Court finds the following facts:

## I. GAY MEN AND LESBIANS HAVE SUFFERED A HISTORY OF DISCRIMINATION IN THE UNITED STATES AND IN MICHIGAN

1. The undisputed historical record establishes that gay men, lesbians and bisexual persons have been subject to widespread and significant discrimination and hostility in the United States by both governmental and private actors. (P. Ex. 51, Chauncey Expert Report, p. 11, ¶¶ 11-12; *see generally id.* ¶¶ 6-

7, 11-56, 66-85, 89-101).  The medical community condemned homosexuality as a "mental defect" or "disease" (*id.* ¶¶ 27–28); all states criminalized the intimate behavior of gay men and lesbians (until 1961, with the remaining laws struck down in 2003) (*id.* ¶¶ 12, 20-22); state and local governments promulgated and selectively enforced measures against disorderly conduct, vagrancy, lewdness, and loitering directed at lesbians and gay men who attempted to gather together (*id.* ¶¶ 30-34, 56); censorship codes prohibited the depiction of gay people on the stage, in movies, and on television (*id.*, ¶¶ 52–54); and gay men and lesbians were fired and prohibited from employment by the federal government (*id.* ¶¶ 78-79).

2.     Gay men and lesbians in Michigan have suffered a history of public and private discrimination and vilification, the legacy of which persists to this day. (P. Ex. 51, Chauncey Expert Report, ¶¶ 45, 56, 66, 70, 74, 77, 83, 89, 94, 98-101). In Michigan, there is "a high prevalence of discrimination based on sexual orientation and/or gender identity/expression."  (P. Ex. 50, Michigan Dep't of Civil Rights Report on LGBT Inclusion Under Michigan Law, Jan. 28, 2013, at 6 (admitted Tr. 2/28/14 p. 66-69)).  The impact falls particularly hard on parents and children because they "contend with numerous social and economic vulnerabilities due to a combination of societal stigma and ways in which current laws limit their economic security."  (P Ex. 50 at 66).  Marriage will help these families.

## II.     THE MEANING OF MARRIAGE IN THE LAW

3.     Marriage is a civil contract, MCLA 551.2, with political, economic, legal and personal components and meanings. (Cott, Tr. 2/28/14, pp. 13, 10-12). Marriage is also a legal status. (*Id.* pp. 12-13).

4.     Marriage in the United States and in Michigan has always been a civil matter (Cott, Tr. 2/28/14, p. 19-20), authorized and regulated by State authorities, with respect to who may and may not marry, and the rights, requirements, and obligations involved in the marital agreement. (*Id.* p. 20).

5.     Historically and today, the State has had many purposes in licensing and fostering marriage.  (Cott, Tr. 2/28/14, p.12).  These include:  facilitating governance and public order by organizing individuals into cohesive family units (*id.* p. 13); developing a realm of liberty, intimacy, and free decision-making by spouses which "the state does not enter (*id.* p. 16); creating stable households (*id.* p. 29-30); assigning individuals to care for one another and thus limiting the public's ability to care for the vulnerable (*id.* p. 13); and shaping the people who compose the citizenry (*id.* p. 13).  See also P. Ex. 32, Cott Expert Report, p. 4, ¶ 7.

6.     In Michigan, as in every other state, the capacity to marry has never turned on ability or willingness to procreate. (Cott, Tr. 2/28/14, pp. 14, 17-19; pp. 57, 15-19; Brown, Tr. 3/3/14, p. 15, 33).  Neither age nor sterility has ever been a bar to marriage; nor has inability to bear children been grounds for divorce. (Cott,

Tr. 2/28/14, pp 14-15). Michigan, like every other state, has encouraged marriage as advancing the public good, whether or not minor children are present, and without regard to biological relationships of descent. (*Id.* pp 17, 59).  Historically and today, couples have entered into non-procreative marriages for love, companionship, economic partnership, and to create a stable household. (*Id.* pp. 37, 58, 60, 61; *see also* P. Ex. 32, Cott Expert Report, ¶¶ 7, 11, 17, 32, 39-40, 42, 68).

7.     Today, marriage is a legal institution in which the contracting parties are legally equal and are free to decide on appropriate behavior toward one another without regard to gender of the spouses. State laws mandating different roles for husbands and wives and imposing different obligations and responsibilities within the marriage relationship have long been held to be unconstitutional under the Fourteenth Amendment's equal protection clause. (P. Ex. 32, Cott Expert Report, p. 16, ¶ 62).

8.     There is no one "traditional" view of marriage; the institution of marriage has evolved over time.  Features once considered essential – particularly (a) subordination of women, (b) limited ability to exit a failed marriage; and (c) racial restrictions  --  have been eliminated in response to social, economic, and ethical changes. (Cott, Tr. 2/28/14, p. 24; P. Ex. 32, Cott Expert Report, pp. 14-20, ¶¶ 55-82).

9.     At each stage of change, opponents of change have expressed the

4

belief that change would destroy the institution itself or would be "unnatural." (Cott, Tr. 2/28/14, pp. 35-36).

10.     The resilience of marriage and its capacity to change have been crucial to sustaining the vitality and vigor of the institution. (Cott, Tr. 2/28/14, pp. 24, 37).

11.     Religious authorities are free to maintain their particular views as to which marriages they will accredit or bless within their denomination (Cott, Tr. 2/28/14, p. 22), but any such conditions have no bearing on the legality of a marriage that is valid as a matter of law, nor may religious authorities impose conditions on marriage beyond those required by law (Cott, Tr. 2/28/14, p. 22, *see generally id.* pp. 21-25).

## III.   THE EVIDENCE PRESENTED AT THE TRIAL OF THIS CASE DEMONSTRATES THAT THE BAN ON SAME SEX COUPLES MARRYING IMPOSED BY THE MMA DOES NOT RATIONALLY ADVANCE ANY LEGITIMATE STATE INTEREST

12.     Same-sex couples in every state, including Michigan, live together, decide for themselves whether to form families together and, in many cases, have children together.  Same-sex couples have children in all states, including those in which they are not permitted to marry, and they will continue to do so. (Brodzinsky, Tr. 2/25/14, Part 2, p. 75; Regnerus, Tr. 3/3/14, pp. 24-25).

13.     The evidence shows that permitting same-sex couples to marry does not affect the decisions of opposite-sex couples to marry, have or adopt children or

remain married.  (Rosenfeld, Tr. 2/26/14, pp. 9-11).

14.     The evidence shows that the capacity to parent effectively is not in any way related to a person's sexual orientation.  Indeed, Michigan permits gay men and lesbians to adopt as single individuals, even when they live with a partner, and to foster parent jointly.  (Sankaran, Tr. 2/26/14, pp 65-66, 69).

15.     The key factors that predict positive child outcomes are (a) the quality of the parent-child relationship, (b) the quality of the parents' relationship, (c) the parents' parenting characteristics – *e.g.*, warmth, nurturing, emotional sensitivity, age appropriate rules and structure, (d) educational opportunities, (e) adequate financial and other support resources and (f) good mental health of the parents. That is, successful child-rearing depends on the quality of parents' parenting, not the sexual orientation or gender of the parents.  (Brodzinsky, Tr. 2/25/14, pp. 10-11).

16.     The roles and parenting styles that parents choose to adopt varies from family to family, but both mothers and fathers are equally capable of fully meeting the needs of children.  (Brodzinsky, Tr. 2/25/14, Part 2, pp. 15-21; Price, Tr. 3/5/14, p. 27).

17.     Over 30 years of research establishes that children raised by lesbian and gay couples develop no differently than children raised by heterosexual couples.  (Brodzinsky, Tr. 2/25/14, Part 2, p. 21-44).

18.     This research has been published in peer-reviewed journals; it is corroborated by clinical experience; and its conclusions are supported by all of the relevant professional associations dedicated to children's health and well-being, including the American Psychological Association, the American Sociological Association, the American Medical Association, the American Academy of Pediatrics, the American Academy of Child and Adolescent Psychiatry, the Child Welfare League of America, the National Association of Social Workers and the Donaldson Adoption Institute.  (Brodzinsky, Tr. 2/25/14, Part 2, pp. 21-49); Rosenfeld, Tr. 2/25/14, pp. 51-52).

19.     There is no reasonable basis for questioning the consensus within the scientific communities as to the equivalent outcomes of children raised by same-sex and opposite-sex parents.  (Brodzinsky, Tr. 2/25/14, Part 2, pp. 21-49).

20.     Having considered the testimony of the parties' witnesses with respect to the scientific evidence and the consensus of the scientific communities, the Court finds the testimony of Plaintiffs' witnesses to be far more credible than the testimony of the State Defendants' witnesses.  In particular as to the State Defendants' witnesses –

> a.  The Court finds that Prof. Regnerus' testimony based on his New Family Structures Study is entitled to no weight.  As noted by the chairperson of his own department at the University of Texas –

Austin, the study was fundamentally flawed conceptually and methodologically and does not measure the effect of being raised by same-sex parents. The Court finds the criticism of Prof. Regnerus' study by the American Sociological Association and others to be logical and credible. The Court further finds that the fact that over half of the individuals Prof. Regnerus studied never lived in a same-sex household precludes granting any credibility to the results of his study. (Regnerus, Tr. 3/3/14, pp. 25-44; Brodzinsky, Tr. 2/25/14, Part 2, pp. 63-68; Rosenfeld, Tr. 2/25/14, Part 1, pp. 97-112; Rosenfeld, Tr. 2/26/14, Part 2, p. 4).

b. The Court has considered Prof. Rosenfeld's 2010 *Demography* study on normal progress through school, the critique of that study by Prof. Allen, Prof. Price and Prof. Pakaluk, Prof. Rosenfeld's reply to the critique, and the witnesses' testimony as to the methodological differences employed by Prof. Rosenfeld and these critics. The Court finds that Prof. Rosenfeld's explanation of the appropriate methodology to be applied was substantially more credible, and the Court accepts Prof. Rosenfeld's conclusions and rejects the critics' conclusions (Rosenfeld, Tr. 2/25/14, Part 1, pp. 87-94); and

c. The Court has considered Prof. Allen's 2013 study of high school

8

graduation rates based on the 2006 Canadian census and concludes that, since Prof. Allen's data show that there is no statistically significant difference in high school graduation rates when controlling for five years of residential stability, parental education and parental marital status, Prof. Allen's study, when properly considered, supports the "no difference" consensus.  (Allen, Tr. 3/6/14, p. _[1]; Regnerus, Tr. 2/25/14, pp. 46-47; Brodzinsky, Tr. 2/25/14, Part 2, pp. 69-72; Rosenfeld, Tr. 2/25/14, Part 1, pp. 93-97).

21.    It is undisputed that the children of couples of certain demographic groups within society – those who are less educated, those who are economically disadvantaged, some racial minorities, as well as children of parents who have previously been married – have poorer child outcomes on average.  The law does not prohibit individuals in any of these categories from marrying.  (Regnerus, Tr. 3/4/14, Part 2, pp. 20-23; Price, Tr. 3/5/14, p. 46; Marks, Tr. 3/5/14, pp. 78-79).

22.    The State has stipulated that DeBoer and Rowse are responsible and caring parents who are providing a stable and loving home for their children.  Ex. 53, ¶ 9.

23.    For more details from the record, see Appendix.

---

[1]    Plaintiffs do not have the March 6, 2014 transcript yet and cannot provide a page number.

## IV.   MICHIGAN MARRIAGE AND ADOPTION LAWS HURT SAME SEX COUPLES AND CHILDREN

24.    The absence of an opportunity to marry materially harms same-sex couples and their children.  The absence of an opportunity to marry deprives these families of the multiple social, material and legal benefits of marriage, including its status, support and stabilizing effects.  (Brodzinsky, Tr. 2/25/14, Part B, pp. 69, 75-76, 79-80).

25.    The absence of an opportunity for their same-sex couple parents to marry deprives their children of the status and security that come from having two legal parents because only married couples can do joint or step-parent adoptions in Michigan.  (Brodzinsky, Tr. 2/25/14, Part 2, pp. 76-78).

26.    The absence of an opportunity for unmarried same-sex partners to adopt jointly or to adopt their partner's child leaves both the adult and the child vulnerable and without the multiple legal protections for parent and child that come from the status of being a legally recognized parent. (*Id.*; Sankaran, Tr. 2/26/14, pp. 29, 48-50).

27.    The availability of wills, trusts, powers of attorney and guardianships do not provide sufficient protection for children who suffer the loss of their only legal parent; while such legal vehicles provide some degree of protection, in addition to being lesser protection than available to a legal parent, such vehicles can be expensive and time-consuming to obtain and financially unavailable to

some people; at the very least, the lesser protection available to a non-legal parent and increased expense of obtaining the lesser degree of available protection impose an unreasonable burden on a non-legal parent. (Sankaran, Tr. 2/26/14, pp. 29, 48-57, 66; Brodzinsky, Tr. 2/25/14, Part 2, p. 79).

28.    The expert testimony substantiates what the Supreme Court recognized in *United States v. Windsor*, 133 S.Ct. 2675, 2694 (2013): that the denial of recognition of same sex marriages "humiliates tens of thousands of children now being raised by same sex couples [and] makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their communities and in their daily lives."

29.    The absence of an opportunity for same-sex couples jointly to adopt harms children because it reduces the number of qualified couples willing to adopt children currently in foster care. (Brodzinsky, Tr. 2/25/14, Part 2, pp. 81-86; Sankaran, Tr. 2/26/14, pp.29, 59-66; Gates, Tr. 2/27/14, pp. 31-33).

30.    Children who are adopted into loving homes routinely have better outcomes than children raised in foster care, as such homes provide them with the stability and security that they do not have in foster care. (Brodzinsky, Tr. 2/25/14, Part 2, pp. 81-86).

31.    Permitting same-sex couples to adopt as couples would be consistent with the State's policy of permitting same-sex couples jointly to be certified as

foster parents.  (Sankaran, Tr. 2/26/14, pp. 65-66; Ex. 53, ¶ 7).

32.    Because permitting same-sex couples jointly to adopt would be likely to increase the number of children adopted out of the foster care system, doing so would be highly likely also to save the State a substantial amount of money currently expended supporting children in foster care. (Sankaran, Tr. 2/26/14, pp. 29, 59-66).

33.    For more details from the record, see Appendix.

## CONCLUSIONS OF LAW

Having made the findings of fact as set forth above, and applying applicable principles of law to those findings of fact, the Court makes the following conclusions of law.

## I.    PLAINTIFFS' CHALLENGE TO THE MICHIGAN MARRIAGE AMENDMENT UNDER THE FOURTEENTH AMENDMENT DUE PROCESS AND EQUAL PROTECTION CLAUSES

1.    The plaintiffs are harmed by the Michigan Marriage Amendment, Mich. Const. 1963, Art. I § 25, and its statutory counterparts, MCL §§ 551.1-551.4 and § 551.272, which foreclose them from marrying because they are of the same sex. I conclude that same-sex couples would benefit from the legal rights and responsibilities pertaining to other married couples, Finding of Fact Nos. 24-25, and that they are denied "a dignity and status of immense import." *United States v. Windsor*, 133 S. Ct. 2675, 2692 (2013). The Plaintiffs' children are harmed by the

MMA because they will also lack the additional security, benefits and protections that marriage would provide to their parents, and because MMA makes it more difficult for them to "understand the integrity and closeness of their own family and its concord with other families in their community." *Windsor,* 133 S. Ct. at 2694.

2.     The Supreme Court's summary dismissal in *Baker v. Nelson*, 291 Minn. 310, (1971), *app.dis.*, 409 U.S. 810 (1972), is no impediment to determining the constitutional question presented in this case given significant doctrinal developments in the Supreme Court's analysis of equal protection and due process since 1971.  *Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) (a summary dismissal is not binding "when doctrinal developments indicate otherwise.").  *See, e.g., Windsor v. U.S.,* 699 F.3d. 169, 178-79 (2d Cir. 2013) (discussing relevant doctrinal developments).

### A.     Due Process Challenge to Denial of The Freedom to Marry

3.     The right to marry is a fundamental right guaranteed by the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution. *See, e.g. Turner v. Safley*, 482 U.S. 78, 95-96 (1987); *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978); *Loving v. Virginia*, 388 U.S. 1, 12 (1967); *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

4.     The fundamental right to marry applies to same-sex couples. As a

legal institution, marriage has evolved from a relationship based on gender-defined roles, rights and responsibilities to one of legal equality with mutual, reciprocal and identical rights for the married pair. Finding of Fact No. 7; *Weinberger v. Weisenfeld*, 420 U.S. 636 (1975). The right to marry is distinct from the legal right to procreate. *Griswold*, 381 U.S. 479, 485-86 (1965); *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1971).

5.      The MMA's direct infringement on the Plaintiffs' freedom cannot satisfy rational basis review, and *a fortiori*, fails heightened scrutiny as well.

## B.      Equal Protection Challenge to Plaintiffs' Exclusion From Marriage

6.      Applying rational basis review[2] to Plaintiffs' equal protection claim that they have arbitrarily been denied the ability to marry under state law, the Court reiterates and supplements its discussion of the two-part test from its Order and Opinion Denying Cross Motions for Summary Judgment, (R. 89), at pp 4-5, 8. When applying this standard, courts will not invalidate a provision of law on equal protection grounds "unless the varying treatment of different groups or persons is

---

[2]      Plaintiffs preserve their argument that a heightened standard of review applies to classifications based on sexual orientation. *See* R 89, Opinion and Order Denying Cross Motions for Summary Judgment, pp. 2-3 & n. 4. Plaintiffs also preserve their argument that classifications that disparately burden a fundamental right, such as access to marriage, call for heightened scrutiny regardless of whether those disadvantaged constitute a class that would otherwise trigger heightened review. *See, e.g., Attorney Gen'l of NY v. Soto-Lopez*, 476 U.S. 898, 902 (1986); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 672 (1966).

so unrelated to the achievement of any combination of legitimate purposes that [a reviewing court] can only conclude that the government's actions were irrational." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 84 (2000).  However, when a provision of law adversely affects a group that has endured "historic patterns of disadvantage, courts make "a more careful assessment of the justifications than the light scrutiny offered by conventional rational basis review. *Massachusetts v. United States Dep't of Health and Human Servs.*, 682 F.3d 1, 11 (1st Cir. 2012); see also *Windsor*, 133 S. Ct. at 2696 (invalidating the Defense of Marriage Act on the ground that "no legitimate purpose overcomes the purpose and effect to disparage and to injure those whom the State, by its marriage laws, sought to protect in personhood and dignity.").Under the rational basis test, the Court must determine whether the MMA proscribes conduct in a manner that is rationally related to a legitimate governmental purpose.

7.     In assessing legitimacy, the desire to favor one set of individuals is just as invalid as the desire to disfavor the opposite set. *See Kelo v. City of New London*, 545 U.S. 469, 491 (2005) (Kennedy, J., concurring); *Zobel v. Williams*, 457 U.S. 55, 63-64 (1982).   In addition, classifications may not be premised on "negative attitudes," *Cleburne v. Cleburne Living Ctr*, 473 U.S. 432, 448 (1985); "fear," *id.*; "irrational prejudice," *id.* at 450; or "some instinctive mechanism to guard against people who appear to be different in some respects from ourselves,"

*Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring). And "[t]he Constitution's guarantee of equality 'must at the very least mean that a bare [governmental] desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *Windsor*, 133 S. Ct. at 2693 (quoting *United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 534-35 (1973)).

8.     In assessing the rational relationship prong, an asserted relationship may be too attenuated, such as when a purported justification "ma[kes] no sense in light of how [the government] treated other similarly situated groups," *Garrett*, 531 U.S. at 366 n. 4, *discussing Cleburne*, 473 U.S. at 446-50; *id*. at 449 (when an excluded group does not pose a "different or special hazard" from an included group with respect to the asserted purpose, it fails rational basis review); or when a law is so "riddled with exceptions" that the asserted purpose cannot "reasonably be regarded as [the law's] aim." *Eisenstadt*, 405 U.S. at 449.

9.     In addition to laws burdening historically disadvantaged groups, laws that burden personal and family choices - as opposed to mere economic regulation – may also command closer attention, even where fundamental rights are not implicated. *Lawrence*, 539 U.S. at 580 (O'Connor, J., concurring in the judgment); *Eisenstadt*, 405 U.S. at 447-53; *Windsor*, 133 S. Ct. at 2696; *M.L.B. v. S.L.J.*, 519 U.S. 102, 116, 120(1996).

### C.      The State's Claimed Justifications Fail Rational Basis Review

10.      Under any application of rational basis review, the State cannot justify

the MMA's discrimination against the Plaintiffs and other same-sex couples

because there is no rational connection between the marriage exclusion and any

legitimate governmental interest.

11.      There is no rational connection between the exclusion of same-sex

couples and the claimed interest in providing children with biologically connected

role models of both genders that the State claims are necessary to foster healthy

psychological development.[3] First, the MMA does not rationally lead to more

children being raised in biological mother-father families because same-sex

couples have and will continue to have children whether or not they are permitted

to marry, Finding of Fact No. 12, and there is no conceivable basis to believe that

procreation among heterosexual couples is affected by whether or not same-sex

couples are permitted to marry. Moreover, the State's own conduct of placing

children for adoption in families headed by same-sex couples such as Plaintiffs'

makes it impossible to credit the State's assertions about same-sex parent families.

*See Romer v. Evans,* 517 U.S. 620, 635 (1996) (rejecting state's asserted rationale

when the circumstances made it "impossible to credit"). In addition, based on the

expert testimony presented at trial, this Court has found that it is a matter of

---

[3]      The rationales addressed at trial are set forth in R 89, Opinion, p. 6.

scientific consensus that children raised by same-sex parents and children raised by opposite-sex parents have comparable outcomes with respect to all matters relating to child development. Finding of Fact Nos. 19-20. Thus, there is no rational basis for the assertion that children need "biologically connected" role models of both genders. The assertion is a negative assumption about same-sex couples without basis in reality. *See Heller*, 509 U.S. at 321; *Moreno*, 413 U.S. at 535. Even if, counter-factually, there were a difference in outcomes, the State does not exclude from marriage those who belong to groups that have been documented to be less likely to raise well-adjusted children; for this reason, too, there is no rational basis for the MMA. *Cleburne*, 473 U.S. at 448-49.

12.     Stereotypical assumptions about men and women and their respective societal roles are not constitutionally permissible justifications for laws or governmental action. *United States v. Virginia*, 518 U.S. 515, 541-42 (1996) (government "may not exclude qualified individuals based on 'fixed notions concerning the roles and abilities of males and females.'"); *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 736 (2003) (discussing impermissible sex stereotyping about women's roles "when they are mothers or mothers to be"); *Caban v. Mohammed*, 441 U.S. 380, 388-89 (1979) ( rejecting the notion of "any universal difference between maternal and paternal relations" in parental roles); *Stanley v. Illinois*, 405 U.S. 645 (1972) (a state law presumption that unmarried

fathers were unfit violated Due Process and Equal Protection Clauses).

13.     The asserted state interest in "forestalling the unintended consequences" that would accompany same-sex couples marrying cannot survive rational basis review. This nebulous argument fails to explain what those consequences might be, what they might involve or why the State has any plausible interest in discriminating against gay men and lesbians in order to avoid them. The argument that this Court should preserve the status quo and its discriminatory classifications in order to guard against unidentified, entirely speculative future harms fails rational basis review because there is no "independent and legitimate legislative end" served by doing so. *Romer*, 517 U.S. at 633.

14.     "Tradition" and "morality" both fail to justify the MMA. There is no single "traditional" notion of marriage, Finding of Fact No. 8, and even if there were, equal protection requires more -- i.e., a reason independent of the classification itself rather than merely asserting that it is permissible to deny marriage to same-sex couples because they have been denied access to marriage in the past. *Romer*, 517 U.S. at 633. "Ancient lineage of a legal concept does not give it immunity from attack for lacking a rational basis." *Heller,* 509 U.S. at 326; *Williams v. Illinois*, 399 U.S. 235, 239-40 (1970). Likewise, moral disapproval of homosexuality fails to state a rational basis as a matter of law. *Lawrence,* 539 U.S.

at 577; *id*.at 583 (O'Connor, J., concurring).

15.     The State's claimed interest in promoting the transition of "naturally procreative relationships into stable unions" fails to justify the MMA because it does nothing to incentivize marriage, child-bearing or child-rearing within marriage for heterosexual couples.  The rights and benefits afforded to married couples exist with or without the MMA, which merely excludes same-sex couples from marriage.  Moreover, the State allows heterosexual couples to marry regardless of their ability, willingness or plans to procreate, including older and infertile couples, and regardless of whether they are at risk of an unplanned pregnancy. *See* Mich. Comp. Laws §§ 551.1 et seq. (eligibility to marry); Finding of Fact No. 6. The Court also notes that Michigan law allows both individuals and married couples to become parents without any biological relationship to their children through adoption, Mich. Comp. Laws, § 710.24, and through forms of assisted reproduction. Mich. Comp. Laws § 333.20179.  The State's rationale is not rooted in the realities of life; its classification fails to meet the rational basis standard.  *See Garrett*, 531 U.S. at 366 n.4; *Cleburne*, 473 U.S. at 447-450; *Eisenstadt*, 405 U.S. at 449.

16.    As the Supreme Court recently explained, "until recent years, many citizens had not even considered the possibility that two persons of the same sex might aspire to occupy the same status and dignity as that of a man and woman in lawful marriage. For marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization. That belief, for many who long have held it, became even more urgent, more cherished when challenged. For others, however, came the beginnings of a new perspective, a new insight." *Windsor*, 133 S. Ct. at 2689. Whether Michigan voters approving the MMA in 2004 were motivated from "malice or hostile animus" or simply "insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves," *Garrett*, 531 U.S. at 374 (Kennedy, J., concurring), these are not permissible bases for unequal treatment of a group of people.

17.    The Court concludes that there is no rational basis for the MMA. In light of the Findings of Fact and Conclusions of Law stated in this Opinion, the Court further concludes that the Plaintiffs are entitled to the relief they have requested.

## II.    Plaintiffs' Challenge to Michigan Adoption Code, MCL § 710.24(1) ("Section 24")

18.    Plaintiffs challenge Section 24 of the adoption statute as violating the equal protection and due process guarantees of the 14th Amendment because it (1) irrationally deprives unmarried couples, including same-sex couples, of the ability to adopt children together; (2) penalizes children because of the circumstances of their birth and the status of their caregivers; and (3) burdens the fundamental rights of parental autonomy and decision making, and interferes with the integrity of Plaintiffs' family, by denying them the opportunity to adopt the other's child ("second parent adoption") or to adopt jointly ("joint adoption").

19.    Michigan law relating to adoption by individuals and couples is governed by MCL § 710.24, which provides in relevant part:" (1) If a person desires to adopt a child …, *that person, together with his wife or her husband, if married, shall file a petition*" with the court. Section 24 classifies by allowing *married couples* to adopt, but not *unmarried couples*. Children placed with married heterosexual couples may gain through a joint adoption a full measure of material benefits and stability and psychological permanency, whereas those placed with an unmarried individual in a relationship may be adopted by only one of them, with a concomitant loss of protections. When a parent marries, his or her spouse may adopt the parent's child, but that second parent adoption is foreclosed to unmarried and same-sex couples. In addition, the statute also allows *unmarried*

22

*individuals* to adopt, whether or not they are cohabiting with a partner, but not *unmarried couples* jointly, even though the State also licenses jointly unmarried couples as foster parents, as it has done with respect to the Plaintiffs here.

20.    For all of the reasons stated above with respect to the MMA, the adoption restriction harms children. All of the State rationales for MMA are also rejected with respect to Section 24, as there is no rational basis for denying unmarried couples, including all same-sex couples, the opportunity jointly to adopt children or adopt their partner's children.  There is no conceivable benefit to children where the statute allows them to be adopted by one unmarried individual, but not two. Accordingly, Section 24 violates the due process and equal protection rights of the Plaintiffs and their children.[4]

## **CONCLUSION**

Based on the foregoing proposed findings of fact and conclusions of law, Plaintiffs respectfully request that the Court enter judgment for the Plaintiffs as prayed for in their Amended Complaint.

---

[4]     Although the Court expressed no view on the constitutionality of Section 24 in R 89, Opinion, p. 3 n. 5, Plaintiffs urge the Court to do so now. The State Defendants are ultimately responsible for executing the adoption laws of the State. In any event, the Plaintiffs request the Court to allow them to preserve their adoption challenge for appellate review.

Respectfully submitted,

_s/Carole M. Stanyar_
CAROLE M. STANYAR P34830
221 N. Main Street, Suite 300
Ann Arbor, MI 48103
(313) 819-3953
cstanyar@wowway.com

Dated: March 10, 2014

Of counsel:

_s/Robert A. Sedler_
ROBERT A. SEDLER  P31003
Wayne State University Law School
 471 W. Palmer Street
Detroit, MI 48202
(313) 577-3968
rsedler@wayne.edu

_s/Mary L. Bonato_
MARY L. BONAUTO
_s/Vickie L. Henry_
VICKIE L. HENRY
Gay & Lesbian Advocates & Defenders
30 Winter Street, Suite 800
Boston, MA  02108
(617) 426-1350
mbonauto@glad.org
vhenry@glad.org

_s/ Dana Nessel_
DANA M. NESSEL P51346
645 Griswold Street, Suite 4300
Detroit, MI 48226
(313) 556-2300
dananessel@hotmail.com

Attorneys for Plaintiffs

_s/ Kenneth M. Mogill_
KENNETH M. MOGILL P17865
MOGILL, POSNER & COHEN
27 E Flint Street, 2nd Floor
Lake Orion, MI 48362
(248) 814-9470
kmogill@bignet.net

_s/Leslie Cooper_
LESLIE COOPER
American Civil Liberties Union
125 Broad Street
18th Floor
New York NY 10004
(212) 549-2627
lcooper@aclu.org

# APPENDIX

<u>The scientific research on the well-being of children of same-sex parents</u>

1.      Based on more than half a century of scientific research on what promotes healthy child development, it is now well-established that the key factors that predict positive child adjustment are:  the quality of the parent-child relationship; the quality of the relationship between the parents (harmonious relations produce better adjusted children); the parenting characteristics (e.g., warmth, nurturance, emotional sensitivity, the use of age appropriate rules and structure); educational opportunities; adequate resources; and good mental health of the parents.  These factors predict positive adjustment regardless of family type, ie. biological two parent families, adoptive families, step-families, and same-sex parent families.  (Brodzinsky, Tr. 2/25/14, Part B, pp. 10-11).

2.      It is also well-established that both men and women have the capacity to be good parents.  While there are differences, on average, in the parenting styles adopted by mothers and fathers in heterosexual parent families largely related to the role parents choose to adopt (ie primary vs. secondary parent), there is more overlap than difference and there is significant variability among families.  In other words, while fathers, on average, spend more of their time with their children engaged in playful interactions, for example, and mothers tend to spend more time soothing and giving physical affection, mothers and fathers engage in both types of

activities. And in some families, it may be the father who is the more soothing parent. Children adjust well whether or not their parents adopt sex-stereotyped parenting roles or styles. What matters is whether the factors discussed above are present. (Brodzinsky, Tr. 2/25/14, Part B, pp. 15-21).

3.      Over 30 years of research has established that children raised by lesbian and gay couples develop no differently than children raised by heterosexual couples. Studies examining their psychological, social and educational development have consistently found that the sexual orientation of the parents has no bearing on children's healthy development. This research, which has been conducted by distinguished psychologists in the United States and Europe, uses well-accepted methods in the field of psychology and has been published in peer reviewed journals. (Brodzinsky, Tr. 2/25/14, Part B, pp. 21-44).

4.      The studies on same-sex parent families used a variety of methods. Some used convenience samples and some used representative samples. Some are cross-sectional (a single assessment) and some are longitudinal (looking at families over time). The studies looked at both young children and adolescents or young adults. More of the studies examined children of lesbian couples but a number of studies evaluated children raised by gay fathers. In all of the studies, regardless of the method used or the population studied, the findings were consistent - the parents' sexual orientation had no effect on children's outcomes. (Brodzinsky, Tr.

2/25/14, Part B, pp. 21-44).

5.     The fact that children fare equally well whether raised by same-sex or opposite-sex parents is a matter of scientific consensus.  Every major professional organization in the country whose focus is on the health and well-being of children has expressed support for parenting by same-sex couples.  They include the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, American Medical Association, the American Academy of Child and Adolescent Psychiatry, the American Sociological Association, the Child Welfare League of America, the National Association of Social Workers, and the Donaldson Adoption Institute. (Brodzinsky, Tr. 2/25/14, Part B, pp. 44-49; Rosenfeld, Tr. 2/25/14, pp. 51-52).

6.     Some of the State's expert witnesses acknowledged that there is a body of research on children of same-sex parents showing that these children fare just as well as their peers (Regnerus, Tr. 3/4/14, Part A, pp. 12-13; Marks, Tr. 3/5/14, pp. 61-62)(Professor Marks acknowledged a "consensus" of opinion), but they believe it is premature to draw conclusions based on this research because they object to the methodology used in these studies.  They argue that we should not draw conclusions about the well-being of children of same-sex parents until there are long-term, large scale, nationally representative studies confirming equally good outcomes in same-sex and opposite-sex parent families.  However,

none of the State Defendants' expert witnesses are psychologists—the field in which the majority of the research on same-sex parent families has been conducted—and their quarrel is with the way research is routinely conducted in that field, nothing specific to this particular body of literature. (Brodzinsky, Tr. 2/25/14, Part B, p. 42). Indeed, some of the State's witnesses acknowledged that the research methods used in the studies of same-sex parent families are the kinds of research methods that are typically used by psychologists and, specifically, that most research in psychology uses smaller non-representative samples. (Regnerus, Tr. 3/4/14, Part B, p. 14; Marks, Tr. 3/5/14, p. 39). The Court, thus, rejects the opinions of the State Defendants' experts regarding the reliability and sufficiency of the research on same-sex parent families and credits the testimony of Plaintiffs' experts that the scientific consensus in this area is based on body of research that is reliable and sufficient.

The studies relied on by the State Defendants' experts

7.      The studies by the State's experts did not evaluate children who were actually raised in families created by same-sex parents and, thus, do not provide any information about the impact of growing up in a same-sex parent family.

8.      Dr. Regnerus's study, called the New Family Structures Study (NFSS), evaluated a group of respondents who reported that during their childhood, one of their parents ever had a romantic relationship with someone of

the same-sex. He referred to these groups as the "lesbian mother" and "gay father" groups. Most of these individuals were the product of a prior heterosexual union that broke up and more than half never lived in a same-sex household. Only two individuals were raised from birth in a same-sex parent family and those individuals had positive outcomes. In contrast, for his comparison group, Regnerus excluded all respondents who had experienced parental separation or divorce, keeping only those who grew up from birth to age 18 in an intact heterosexual parent family. In other words, he compared a group in which the majority had experienced a family break up to a group that was defined by their family stability. Research confirms that children who experience their parents' separation tend to have significantly poorer outcomes than children who grow up in stable families. For these reasons, the disparities in outcomes found by Dr. Regnerus cannot be attributable to being raised by same-sex parents. (Regnerus, Tr. 3/3/14, pp. 25-30; Brodzinsky, Tr. 2/25/14, Part B, pp. 63-68; Rosenfeld, Tr. 2/25/14, p. 97-110).

9.      After Dr. Regnerus's NFSS study was published, it was greeted by severe professional criticism. The journal that published the study asked for an audit of the study and published the report of the audit, which concluded that the study should not have been published. (Brodzinsky, Tr. 2/25/14, Part B, pp. 66-68).

10.     Dr. Rosenfeld evaluated the NFSS data and found that when he controlled for family instability, there was no disparity in outcomes between the individuals in the so-called "lesbian mother" and "gay father" groups and those in the intact biological family group.   (Rosenfeld, Tr. 2/25/14, pp. 100-01). The overwhelming majority of instability in these families had nothing to do with instability of same-sex couple relationships, but rather, transitions such as the biological father or grandparents moving in and out or changes in custody. (Rosenfeld, Tr. 2/26/14, p. 4).

11.     Dr. Regnerus acknowledged that his study does not make claims about causation and that the disparities found may not be due to parents' sexual orientation.  (Regnerus, Tr. 3/4/14, Part A, p. 32).  He also acknowledged that his study does not allow for conclusions about the impact of growing up in a planned same-sex parent family, and that "child outcomes in stable 'planned' GLB families and those that are the product of previous heterosexual unions are quite likely distinctive as previous studies' conclusions would suggest."  (Regnerus, Tr. 3/4/14, Part A, pp. 34-35).

12.     The American Sociological Association filed an amicus brief at the Supreme Court in *Windsor* and *Perry* stating that the Regnerus study does not allow for conclusions about the impact of being raised by same-sex parents. (Rosenfeld, Tr. 2/25/14, pp. 111-12; Regnerus, Tr. 3/4/14, Part A, pp. 44-45).

13.    Dr. Regnerus has been severely criticized within his field for suggesting that his study supports conclusions about the well-being of children who are raised by same-sex parents.  Paul Amato, a sociologist who served as a consultant on Dr. Regnerus's NFSS study, issued a statement that it is "disingenuous" to claim that the Regnerus study "provided evidence that  being raised by gay or lesbian parents is harmful to children"  and that "it is exasperating" to see Regnerus cite his study as evidence against same-sex marriage.  (Regnerus, Tr. 3/4/14, Part A, pp. 36-43). The chair of the Department of Sociology at the University of Texas at Austin (Dr. Regnerus's department) issued a statement stating that Dr. Regnerus's study was fundamentally flawed conceptually and methodologically, that his views "do not reflect the views of the Sociology Department of The University of Texas at Austin" and that "findings from Dr. Regnerus's work have been cited inappropriately in efforts to diminish the civil rights and legitimacy of LBGTQ partners and their families."  (Regnerus, Tr. 3/4/14, Part A, pp. 43-44).

14.    Dr. Regnerus acknowledged that the idea for his NFSS study came out of discussions with advocates against same-sex marriage including Luis Tellez of the Witherspoon Institute (an organization that opposes same-sex marriage) and Maggie Gallagher, a prominent advocate against same-sex marriage.  (Regnerus, Tr. 3/3/14, pp. 43-44, 77-79). He further testified that it was Luis Tellez's

Witherspoon Institute that ultimately funded Dr. Regnerus's study.  (Regnerus, Tr. 3/4/14, Part A, pp. 79-80).  The involvement of these advocates in Dr. Regnerus's NFSS study is reflected in correspondence from Dr. Regnerus asking for feedback from Luis Tellez and Maggie Gallagher on the project, including their "optimal timelines" and "their hopes for what emerges from the project."  (Regnerus, Tr. 3/4/14, Part A, pp. 80-82).  In addition, Tellez emailed Dr. Regnerus asking him to "move on it, don't dilly dolly" because "[i]t would be great to have this before major decisions of the Supreme Court."  (Regnerus, Tr. 3/4/14, Part A, pp. 84-85). Dr. Regnerus then submitted a manuscript to a journal before the data collection was complete and asked the journal editor for a speedy publication.   (Regnerus, Tr. 3/4/14, Part A, pp. 85-86).

15.    Dr. Allen's study based on Canadian Census data purports to show that living in a same-sex parent household is associated with lower high school graduation rates.  However, when controlling for five years of residential stability, parental education and parental marital status, Allen's study actually demonstrated that there was no difference in high school graduation rates of children raised in same-sex parent households compared to those raised in opposite-sex parent households.  It is notable that this finding by Allen was noted only in a table in an appendix to his study and not discussed in the report itself.  (D. Ex. 15).

16.    Dr. Price and Dr. Allen also rely on their replication of Dr.

Rosenfeld's study in which, after using a different methodology to assess the data, they claim (contrary to what Dr. Rosenfeld found) that children of same-sex couples are more likely to be held back in school than children of heterosexual couples.  Dr. Rosenfeld's restriction of the sample to those children known to have lived with the same family for five years, rather than including children whose family during the past five years is unknown and attempting to control for it after the fact, was more reliable.  Moreover, as Dr. Allen conceded, because the children in the study are from failed heterosexual relationships, the same-sex aspect of these families may have nothing to do with the progress of children in school.  (P. Ex. 9; Allen, Tr. 3/6/14, p. _).  Moreover, Dr. Allen and Dr. Price agree that being held back in school rarely occurred in either group. (Price, Tr. 3/5/14, pp. 3-4; Allen, Tr.3/16/14, p. _)  In addition, children from other demographic groups—low-income parents, low-educated parents, rural parents, and parents of certain racial groups—had significantly higher rates of being held back.  (Rosenfeld, Tr. 2/25/14, pp. 63-70; P. Ex. 202, Rosenfeld Demonstrative Exhibit).

17.    In his expert report in this case, Dr. Allen provided a diagram captioned "What Rosenfeld actually found is represented in Figure 2."  (D. Ex. 26, Report of Douglas Allen; Allen, Tr. 3/6/14, p. _).  At trial, however, he admitted that his diagram is "metaphoric", is not meant to be accurate, and is not in fact accurate.  (D. Ex. 26, Allen, Tr. 3/6/14, p. _).  Rather, his diagram significantly

distorted what the data actually showed. (Rosenfeld, Tr. 2/25/14, pp. 74-87).

18.     In sum, the Court should find that the studies relied on by the State Defendants' experts are either irrelevant to the issue before the Court because they do not evaluate the well-being of children who were raised in families created by same-sex couples (as opposed to children born into families headed by heterosexual couples who subsequently separated and the children experienced the adverse consequences of a family break-up), or to the extent they bear on issues before the Court, actually support the scientific consensus about same-sex parent families.

19.     While the State Defendants' experts assert that same-sex couples should be excluded from marriage because, in their view, we do not yet know for sure that children of same-sex couples fare just as well as children of heterosexual couples, Dr. Regnerus and Dr. Marks recognize that there are demographic groups that are actually *known* to raise children with significantly poorer outcomes, ie. low income parents and low educated parents, but they do not favor excluding those groups from marriage.  (Regnerus, Tr. 3/4/14, Part A, pp. 20-23; Marks, Tr. 3/5/14, pp. 78-79).   Thus, the Court does not credit their assertion that concern about child outcomes in this group is what motivates their opposition to marriage for same-sex couples.

Couple stability

20.     Marriage promotes stability for couples. (Regnerus, Tr. 3/4/14, Part A, pp. 53-54; Marks, Tr. 3/5/14, pp. 27-28).

21.     Research prior to the era of same-sex marriage showed greater instability among same-sex couples than heterosexual married couples, but more recent research of same-sex couples in legally recognized partnerships shows comparable stability.  (Rosenfeld, Tr. 2/26/14, pp. 4-8).

22.     Even the earlier research shows break up rates among same-sex couples that were comparable to many other demographic groups that are not excluded from marriage.  There are significant disparities among demographic groups with respect to divorce rates—higher divorce rates are found among low educated people, low income people, and people in certain racial and ethnic groups.  For example, the divorce rate after 10 years for individuals without a high school degree is 40%, compared to 15% for those with a college education. (Rosenfeld, Tr. 2/25/14, pp. 112-14). Dr. Regnerus and Dr. Marks recognize that these groups have elevated rates of divorce but do not favor excluding them from marrying on that basis.  (Regnerus, Tr. 3/4/14, Part A, pp. 56-58; Marks, Tr. 3/5/14, pp. 78-79).   Thus, as with their asserted concern about child outcomes, the Court does not credit their assertion that concern about couple instability in this group is what motivates their opposition to marriage for same-sex couples.

<u>Non-biological parenthood</u>

23.     Families in which children are not biologically related to one or both parents are not limited to same-sex couples.  The vast majority of families raising non-biological children – whether through adoption or assisted reproduction-- are heterosexual.  (Brodzinsky, Tr. 2/25/14, Part B, pp. 49-50; *see also* Regnerus, Tr. 3/4/14, Part A, pp. 59-60).

24.     Research confirms that children's positive development is not tied to whether they have a biological relationship with their parents.  While adopted children are at higher risk for adverse outcomes, those risks are attributable to the children's pre-adoption experience—i.e. adverse pre-natal experience such as drug exposure, and the experience of abuse or neglect prior to placement in the adoptive family-- not the lack of biological connection to their parents.  Research shows that children conceived through donor insemination (whether to heterosexual or same-sex couples), who are biologically related to only one of their parents, fare just as well as their naturally conceived peers.  (Brodzinsky, Tr. 2/25/14, Part B, pp. 50-62).

25.     Research shows that the poorer outcomes found in step-families are due not to the lack of biological relationship with the step-parent, but rather to the family dissolution that typically precedes step-family formation and the introduction of a new adult in a household.  These circumstances do not exist when same-sex couples create families together through assisted reproduction or

adoption.  (Brodzinsky, Tr. 2/25/14, Part B, pp. 59-62).

There are various demographic groups whose children are more likely to

have poorer outcomes

26.    There are significant disparities among demographic groups with

respect to child outcomes.  It is well documented that children of low-income

parents fare significantly worse than children of higher income parents.  Children

of low-educated parents have poorer outcomes on average than children of college-

educated parents, and children in some racial and ethnic groups are more likely to

have poor compared to children form other racial and ethnic groups.   (Brodzinsky,

Tr. 2/25/14, Part B, pp. 74-75; Rosenfeld, Tr. 2/25/14, pp. 65-66; P. Ex. 202,

Rosenfeld Demonstrative Exhibit; Regnerus, Tr. 3/4/14, Part A, pp. 20-23; Marks,

Tr. 3/5/14, pp. 78-79). None of those groups are excluded from marrying.  To the

contrary, we try to support these families, including through marriage.

(Brodzinsky, Tr. 2/25/14, Part B, pp. 74-75).

Same-sex couples have children in states where they cannot marry

27.    Same-sex couples have children in every state, including states like

Michigan that do not permit them to marry. (Brodzinsky, Tr. 2/25/14, Part B, p.

75).  The marriage exclusion does not prevent same-sex couples from having

children and they will continue having children whether or not they are permitted

to marry.  (Regnerus, Tr. 3/4/14, Part A, pp. 24-25).

<u>Allowing same-sex couples to marry does not lead heterosexual couples to stop</u>
<u>marrying</u>

28.     Marriage rates of heterosexuals have not declined in other states when they allowed same-sex couples to marry.  (Rosenfeld, Tr. 2/26/14, pp. 9-11).

<u>Michigan places children for adoption in same-sex parent families.</u>

29.     The State agency responsible for children welfare-  the Michigan Department of Human Services – places children in adoptive families where they will be raised by same-sex couples such as the plaintiffs in this case.  (P. Ex. 53, Plaintiffs' Stipulation; Sankaran, Tr. 2/26/14, p. 69). In Michigan, an individual lesbian or gay person may adopt if they are deemed fit by the Department of Human Services and the court, and they can do so even if living with a partner. (*Id.* 69).

30.     Michigan licenses gay and lesbian couples jointly to serve as foster parents.  (Sankaran, Tr. 2/26/14, pp. 65-66).

<u>Effects of marriage exclusion on children of same-sex couples</u>

31.     Excluding same-sex couples from marriage stigmatizes their children by denying them the social affirmation that comes with having parents who are married.  Marriage brings a recognition by society that this is a real and legitimate family just like any other.  When their parents are not allowed to marry, children recognize that society views their family as different and this can cause stigma.

(Brodzinsky, Tr. 2/25/14, Part B, pp. 75-76, 79-80).

32.     Excluding same-sex couples from marriage denies these couples the stabilizing effect of marriage, which is important to children because it is well-established that family stability is strongly associated with positive child outcomes. (Regnerus, Tr. 3/4/14, Part A, pp. 53-54; Marks, Tr. 3/5/14, pp. 27-28; Brodzinsky, Tr. 2/25/14, Part B, p. 69).

33.     In Michigan, the marriage and adoption laws deny children who are being raised in same-sex parent families the ability to have legal ties with both of the people they know to be their parents because only married couples are permitted to adopt or do step-parent adoptions.  This can harm the children psychologically when they are old enough to understand that one of the people they know as a parent is not legally recognized as such.  It can deprive the children of emotional security and a sense of stability in their families.

34.     Moreover, because the marriage and adoption laws deny children a legal parent-child relationship with one of their parents, this leaves them vulnerable to losing a relationship with that parent should something happen to the legal parent or in the event the parents separate.  Children can suffer profound and long-term harms when attachment relationships are broken, including depression and anxiety, behavioral problems, failure to progress in school, and the inability to trust in other relationships.  (Brodzinsky, Tr. 2/25/14, Part B, pp. 76-78).

35.     Wills and guardianships do not provide sufficient protection against children suffering the loss of a relationship with their non-legal parent.  Even if the legal parent has a will designating his or her partner as guardian to the child, a court is not legally required to consider or honor it.  The surviving partner has to convince a court that he or she should be appointed guardian (and this has to be done annually until the child is of majority) and there could be a contest with relatives or anyone else with an interest in the child seeking to be appointed guardian.  (Sankaran, Tr. 2/26/14, pp. 29, 48-57, 66; Brodzinsky, Tr. 2/25/14, Part B, p. 79). Thus, a child who suffers the loss of his or her legal parent is at risk of also losing his or her relationship with the surviving parent.

36.     The expert testimony substantiates what the Supreme Court recognized in *United States v. Windsor*, 133 S.Ct. 2675, 2694 (2013):  that the denial of recognition to same sex marriages "humiliates tens of thousands of children now being raised by same sex couples [and] makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their communities and in their daily lives."

37.     Michigan's marriage and adoption laws, which preclude same-sex couples from jointly adopting children, also harm the thousands of children in Michigan's foster care system who are waiting to be adopted because it deters lesbian and gay couples from coming forward to adopt them. There are 14,000

children in the Michigan child welfare system, 3500 of whom have been freed for

adoption but are still in care because of the lack of available families to adopt

them.  Many of these children are considered hard to place because of serious

medical or emotional challenges or because they are older children.  These children

are disproportionately children of color and often are sibling groups.  When we do

not have enough families to meet the needs of these children they linger in foster

care, too often moving from home to home, and some "age out" of foster care

without ever being adopted.  Eight hundred children aged out of the Michigan

foster care system last year.  The future prospects for children who age out and

have no family to rely on are extremely bleak.  They are at high risk of

homelessness, illicit drug use, criminal activity and mental health problems.

(Brodzinsky, Tr. 2/25/14, Part B, pp. 81-86; Sankaran, Tr. 2/26/14, pp. 59-65).

38.    The child welfare field recognizes the importance of eliminating

barriers to adoption in order to expand the pool of prospective adoptive parents to

meet the needs of children in the foster care system.  Among the barriers to

adoption identified by child welfare professionals are state laws and policies that

make it harder for same-sex couples to adopt. Denying same-sex couples the

ability to adopt jointly and, thus, allowing only one partner in a couple to adopt,

discourages some couples from adopting because it subjects them to the disrespect

of being told "you can adopt but you can't," and it puts them in the vulnerable

position of raising a family without secure legal family ties for both parents.

(Brodzinsky, Tr. 2/25/14, Part B, pp. 82-86; Sankaran, Tr. 2/26/14, pp. 61-63, 66).

U.S. census data shows that same-sex couples are far more likely to adopt children

and serve as foster parents than heterosexual couples (nationwide, 14% of same-

sex couples with children report having an adopted child vs. 3% of opposite-sex

couples, and same-sex couples care for foster children at twice the rate of

heterosexual couples).  But they are far less likely to adopt in states where same-

sex partners are not both able to adopt:  in states where they can both adopt, 18%

of same-sex couples with children have adopted children; in states where they

cannot, it is only 7%.  (Gates, Tr. 2/27/14, pp. 31-33).

39.     Plaintiffs April DeBoer and Jayne Rowse-- both nurses who

apparently have an extraordinary commitment to helping medically needy

children-- were willing to adopt special needs children despite the stress and

challenges created by the inability to jointly adopt. (P. Ex. 53, Plaintiffs'

Stipulation).  But this doesn't mean that all or most same-sex couples are willing to

adopt under these insulting and challenging conditions.  Indeed, because Michigan

does not let both partners jointly adopt, some lesbian and gay couples who are

interested in adopting children out of foster care are adopting foster children from

other states where they can adopt jointly.  Because of Michigan's law, Michigan

children are losing out on these available families.  (Sankaran, Tr. 2/26/14, pp. 63-

64). And this costs Michigan significantly both in terms of harm to children and the financial costs of keeping children in foster care and the costs to society when they age out. (Sankaran, Tr. 2/26/14, pp. 64-65).

40.    Based on this expert testimony, the Court should find that the marriage and adoption laws, by preventing same-sex couples from jointly adopting, deter a pool of potential adoptive parents from coming forward to provide families for the thousands of Michigan children who remain waiting for a family of their own.

## <u>CERTIFICATE OF SERVICE</u>

CAROLE M. STANYAR hereby certifies that a copy of Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Appendix, and this Certificate of Service, were served upon Assistant Attorneys General Kristin Heyse, Joseph Potchen, Michelle M. Brya, and Tonya Jeter, and upon counsel for Ms. Brown, Andrea Johnson, Michael Pitt, and Beth M. Rivers, ECF filers, on March 10, 2014.


*s/Carole M. Stanyar*
CAROLE M. STANYAR