UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

APRIL DEBOER, ET. AL.,

    Plaintiffs,

-v-                                      Case Number: 12-10285

RICHARD SNYDER, ET. AL.,

    Defendants.
_____/   VOLUME 1 - AM SESSION

BENCH TRIAL
BEFORE THE HONORABLE BERNARD A. FRIEDMAN
UNITED STATES DISTRICT JUDGE
100 U. S. Courthouse & Federal Building
231 West Lafayette Boulevard West
Detroit, Michigan 48226
TUESDAY, FEBRUARY 25, 2014

APPEARANCES:

|  |  |
|---|---|
|  | Leslie Cooper, Esq. |
| For the Plaintiffs: | Carole M. Stanyar, Esq. |
|  | Dana M. Nessel, Esq. |
|  | Kenneth Mogill, Esq. |
|  | Robert Sedler, Esq. |
|  | Vicki L. Henry, Esq. |
|  |  |
| For the Defendants: | Tonya C. Jeter, Esq. |
| Richard Snyder, | Kristin M. Heyse, Esq. |
| Bill Schuette, | Joseph E. Potchen, Esq. |
|  | Michelle Brya, Esq. |
|  |  |
| Lisa Brown | Beth M. Rivers, Esq. |
|  | Andrea J. Johnson, Esq. |
|  | Michael L.  Pitt, Esq. |

To Obtain Certified Transcript, Contact:
JOAN L. MORGAN, OFFICIAL COURT REPORTER
734 812-2672
Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

2

I  N  D  E  X

PAGE

Opening Statement on behalf of
Plaintiffs by Ms. Stanyar                3

Opening Statement on behalf of
Defendants, Richard Snyder
by Ms Heyse                             38

Opening Statement on behalf of
Defendant Lisa Brown
by Mr. Pitt                             50


W  I  T  N  E  S  S  E  S


David Brodzinsky, Ph.D.

Direct Examination by Ms. Stanyar        56


E  X  H  I  B  I  T  S

RECEIVED

Plaintiff's Exhibit No. 100             106

BENCH TRIAL - VOLUME 1 PART A                                   3
TUESDAY, FEBRUARY 25TH, 2014

1              Detroit, Michigan

2              Tuesday, February 25th, 2014

3              (At or about 9:15 a.m.)

4              (Excerpt of Proceedings.)

5      _                  -- --- --

6              THE COURT: With everyone here, we'll start with

7      the plaintiffs' Opening Statement, please.

8              MS. STANYAR: Good morning, your Honor.

9              THE COURT: Good morning.

10             MS. STANYAR: This case is about marriage

11     equality, and it's also about the well being of children.

12     We have a rare opportunity in this case to rid ourselves of

13     two laws that hurt so many people so deeply. And we have an

14     opportunity to help children, a lot of children, some of

15     the most vulnerable children in our society. I know that I

16     speak on behalf of my co-counsel that this is a privilege

17     and a honor to be standing here trying this case before you

18     today.

19             The Supreme Court recognized over 40 years ago

20     that the freedom to marry is one of the vital personal

21     rights essential to the orderly pursuit of happiness by

22     free men. Marriage is a coming together for better or

23     worse, hopefully enduring, and intimate to the degree to

24     being sacred.

25             We're going to show you in this case through the

                12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    4
TUESDAY, FEBRUARY 25TH, 2014

1    testimony that marriage is central to life in America. It

2    promotes mental, physical and emotional health. It provides

3    economic strength and security. And most important,

4    marriage brings stability to families. It helps children

5    immensely.

6            The adult plaintiffs are a loving couple, deeply

7    committed to each other. By all accounts they are wonderful

8    and caring parents, parents who have made unbelievable

9    sacrifices to bring these ailing, abandoned special-needs

10   children into their home.

11           Your Honor by now is very familiar with April and

12   Jayne and the children. The parties have actually entered

13   into a stipulation which respect to the facts. Their

14   character, their history is not in dispute. I'll talk a

15   little bit more about them later.

16           Your Honor has framed the issues for us. We are

17   to focus on the rationales offered by State defendants, the

18   justifications advanced for these laws. Providing children

19   with biologically connected role models of both genders

20   that are necessary to foster healthy psychological

21   development; forestalling the unintended consequences that

22   would result from the redefinition of marriage, tradition

23   or morality; and promoting the transition of naturally

24   procreated relationships into stable unions.

25           We'll be addressing numbers two, three, and four

                12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

1    with our marriage historian witness, Professor Nancy Cott.

2    Her qualifications, she is a leading expert in the country

3    on the history of marriage. Her book, "Public Vows" is a

4    textbook reading in any college or graduate school on the

5    history of marriage. She testified in the <u>Perry</u> trial in

6    California. She was qualified as an expert. Her testimony

7    was credited.

8         First, she'll explain that marriage is a civil

9    institution. She will testify that in the United States

10   marriage is created, authorized and regulated by the

11   government. While different faiths have their own religious

12   rights of marriage, and religious figures can officiate

13   civil ceremonies it is the civil law that determines the

14   legal validity of marriage.

15        Even today marriage is tied to citizenship. You

16   are not married under the law without a government marriage

17   license. She'll talk about the underlying purposes of

18   marriage over the course of history. Historically, marriage

19   was used as a vehicle to govern the population. It provided

20   more or less a chain of command for the government to

21   control the population. The husband was the head of the

22   household, followed by his wife, the children, their

23   relatives, all the way down in olden times to the slaves.

24        A related historical purpose, the economic public

25   order rationale: marriage created economic financial

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                                6
TUESDAY, FEBRUARY 25TH, 2014

1    obligations between the spouses. It obligates the husband

2    and later the wife to support their dependence in each

3    other.

4           The State defendants offer rationale number four

5    to justify the Michigan Marriage Amendment but Professor

6    Cott will explain that marriage has never required the

7    ability or willingness to procreate. And here she'll tell

8    you about an important distinction: an inability to engage

9    in sexual intimacy can be a reason to annul marriage in

10   some states. But the ability to procreate has not been a

11   prerequisite to marriage in any state. People well beyond

12   child-bearing years can enter into marriages. People in

13   prison for life can marry.

14          She will describe the evolution of marriage in

15   this country. She will explain that there is no single

16   definition of marriage across history. There's no single

17   tradition of marriage across history.

18          In the area of gender, historically laws were

19   based upon a legal fiction that marriage was a legal unit.

20   The husband was the sole legal, economic and political

21   representative. A wife's identity was absorbed into or

22   covered by the husband, hence, the word "coverture."

23          The wife was kind of irrelevant. Legally, there

24   was no such thing as no-fault divorce. Men were legally

25   prohibited from abandoning wives because wives were

     12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    7
TUESDAY, FEBRUARY 25TH, 2014

1    dependent and subordinate to husbands.

2              Also in the area of race, there's been an

3    evolving tradition. Slavery. African Americans were seen as

4    the property of the slave owner. They could be bought and

5    sold and their marriage got in the way of that. So slaves

6    historically were not allowed to marry. African Americans,

7    therefore, were excluded from the definition of marriage in

8    this country.

9              Interracial marriage. In the past, laws

10   prohibited the blending of races based upon notions of

11   white supremacy. A black man could not marry a

12   Caucasian woman. Other laws prevented interracial marriages

13   between Chinese people, Indian people, and Caucasian

14   people.

15             Professor Cott will explain that marriage

16   evolved. Traditions changed. Discriminatory practices were

17   struck down at times by federal courts most often under the

18   Equal Protection Clause. Women became equal to their

19   husbands in the eyes of the law. Coverture laws were

20   repealed. Along came no-fault divorce. Women entered the

21   work force, became financially independent. Marriage is now

22   an equal gender neutral partnership with each party having

23   the same rights and obligations to each other and to

24   society.

25             The definition of marriage changed again once

              12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

2:12-cv-10285-BAF-MJH   Doc # 143   Filed 03/13/14   Pg 8 of 149   Pg ID 3123

                    BENCH TRIAL - VOLUME 1 PART A                8
                    TUESDAY, FEBRUARY 25TH, 2014

 1     slavery was abolished. <u>Loving versus Virginia</u> did away with

 2     the ban on interracial marriages.

 3            We will be responding to the State's rationales

 4     in this case for the two laws that we challenge. In past

 5     briefing we've already shown you that based upon Supreme

 6     Court precedent that tradition and morality cannot be used

 7     as justifications for the disparate treatment of United

 8     States citizens.

 9            Laws can be based upon notions of morality, for

10     example, there can be no liquor sales before noon on a

11     Sunday, but they cannot under the Constitution have a

12     disparate impact on a disfavored minority.

13            As to rationale number -- that would be two,

14     throughout history in a series of Supreme Court cases the

15     state threatened that dire, quote, "unintended consequences

16     would result from the redefinition of marriage."

17            That didn't happen. The laws were struck down as

18     discriminatory. <u>Loving versus Virginia</u> the Supreme Court

19     struck down the interracial marriage ban not just based on

20     race but because marriage is a fundamental right. <u>Loving</u>

21     brought us more freedom to marry the person we love. It

22     brought us beautiful blended babies. The institution of

23     marriage did not suffer one bit.

24            We will be refuting the State's other arguments

25     in this case, that is, that only a heterosexual marriage

          12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

1    will promote the transition of naturally procreative

2    relationships into stable unions, and that the marriage ban

3    promotes the ideal -- what the State calls the ideal

4    mother-father intact family.

5              First of all, we're going to show you in this

6    case that same-sex marriage in other states has had no

7    affect whatsoever on heterosexual marriage. Secondly, these

8    marriage bans are not having any affect on heterosexual

9    procreating decision-making.

10             Straight people are doing what they've always

11   done. They're getting married or not. They're having

12   children, or not. Their behavior is not affected by what

13   gay people are doing. There's no correlation, there's no

14   link here.

15             Even more importantly, not allowing marriage is

16   not preventing same-sex couples from having and raising

17   children. Evidence from the United States census -- we're

18   going to introduce through Gary Gates -- shows that same-

19   sex couples are having families with children in all states

20   whether or not they're allowed to be married in those

21   states.

22             The children are there. The families are there.

23   The laws aren't deterring the parents, they're hurting the

24   families. So these rationales don't make sense and they

25   don't pass rational basis.

          12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    10
TUESDAY, FEBRUARY 25TH, 2014

1           In response to our briefing on marriage law, in
2      response to the testimony of Professor Cott the State
3      offers the testimony of Sherif Girgis. Mr. Girgis hopes to
4      be a lawyer some day. He has never testified as an expert
5      before. He has no advanced degree in any field that matters
6      in this case, psychology, sociology, demography, history.
7      He is a philosopher. He's testifying apparently because he
8      has an opinion.
9           According to Mr. Girgis, the purpose of marriage
10     is procreation and procreation only. All that language from
11     the Supreme Court that I quoted earlier, a sacred intimate
12     bond, marriage as a means of emotional security, physical
13     well being, economic stability, none of that matters to Mr.
14     Girgis, only procreation.
15          From our pretrial briefing the Court is already
16     aware of our concerns about the admissibility of his
17     testimony. We also contend that little weight should be
18     afforded his testimony. We believe that Professor Cott is
19     the far more credible and qualified witness in this case.
20          The child outcome rationales: The bulk of the
21     trial testimony will address these rationales: Primarily
22     providing children with a biologically connected role
23     models of both genders that are necessary to foster
24     healthy, psychological development. And to a lesser extent
25     this will also touch on number two, forestalling the

        12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    11
TUESDAY, FEBRUARY 25TH, 2014

1     unintended consequences that would result from the

2     redefinition of marriage.

3              We will be introducing you or re-introducing you

4     to the families headed by same-sex couples in America.

5     They're demographics, who they are, where they are. We'll

6     look at the parents. We'll look at the children. And we'll

7     talk about the large percentage of children adopted from

8     the foster care system by lesbians and gay men because this

9     is a crucial fact it this case. Foster care prior to

10    adoption has a big affect on child outcomes. We'll bring

11    you some of the leading experts in the country in areas of

12    psychology, sociology, statistics, demography. Expert

13    testimony and adoption, same-sex parenting, child

14    development.

15             We're going to try to come at this from all

16    angles. This is an important discussion. This Court wanted

17    a trial to look at this rationale in particular I believe.

18    You told us you wanted and needed to assess the credibility

19    of these expert witnesses. We really hope that here in this

20    courtroom we can resolve once and for all the question of

21    whether or not gay and lesbian people can make good

22    parents. Not just for the sake of April and Jayne and the

23    children but for same-sex parents and their children across

24    Michigan, across the country. We want to be thorough. We

25    would like this to be the last trial in America where same-

          12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    12
TUESDAY, FEBRUARY 25TH, 2014

1     sex parents will have to defend themselves this way.

2                 We'll look at things that affect child outcomes.

3     What makes a good parent? When do children thrive?

4                 The answer to that question comes from 50 years

5     of social science research. That research crosses the

6     social science field. There is a broad consensus about the

7     factors that predict positive adjustment in children.

8     Family processes, family resources. The quality of the

9     relationship between the parents. The quality of the

10    parent-child attachment, the parent-child relationship,

11    parenting characteristics, warmth, empathy, sensitivity to

12    the child's needs, educational opportunities for the child,

13    resources and support available to the family, and the good

14    mental health of the parents.

15                These factors are all well-known within the

16    social science community. These families have been -- these

17    factors have been studied as to all family forum. Single

18    parent families, adopted families, divorced parent families

19    and the same-sex couple families. We know very well what

20    makes a good parent and what makes for good child outcomes.

21                The State defendants claim here that a child

22    needs a parent of both genders in order to thrive. This is

23    an odd argument because Michigan allows single parents to

24    adopt. Nevertheless, we're going to present expert

25    testimony in this case from psychologist, David Brodzinsky.

        12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                              13
TUESDAY, FEBRUARY 25TH, 2014

1      He's a leading expert in the country in the areas of child
2      development, adoption and child outcomes, parenting by gay
3      and lesbian couples. He's a professor, a researcher, a
4      clinician and almost most importantly he has counseled
5      thousands of families including families headed by same-sex
6      couples and he's counseled their children as well. He's
7      also an author. He's written the leading book on parenting
8      by gay and lesbian couples. He's conducted studies through
9      his institute, the Donaldson Adoption Institute.
10             He's also testified in marriage and adoption
11     cases in other states. He'll explain that while it may be a
12     popular belief that children must have both a mother and a
13     father in order to function well children actually thrive
14     equally well when they have two moms, when they have two
15     dads.
16             Doctor Brodzinsky is going to explain that in
17     heterosexual families, for example, mothers and fathers do
18     sometimes adopt different parenting styles. But he'll
19     explain there's lots of variations in all families. He's
20     going to explain that parenting style is most often more a
21     function of whether the parent is the primary as oppose to
22     the secondary parent. A stay-at-home dad is going to look
23     different than an Ozzie Harriet dad in terms of gender role
24     modeling, and there's no one single correct gender modeling
25     style. Children do generally well no matter what style

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

1    their parents adopt.

2          Doctor Brodzinsky is going to explain that moms

3    and dads are both important to children, but they're

4    important as parents. Two parents bring double the resource

5    to the family. He will explain that this all goes back to

6    the factors we talked about earlier, family process and

7    especially family resource. Two parents bring more

8    resources to the family.

9          The State defendants really take two positions on

10   whether or not the children of gay and lesbian parents have

11   worse outcomes than the children of heterosexual parents.

12   The first position and expounded by Dr. Loren Marks. His

13   position is that we just don't know enough yet. According

14   to Dr. Marks same-sex parenting is too new, the research is

15   too nascent. According to Dr. Marks -- he says the studies

16   aren't the right type of studies.

17         The second position is a little different. The

18   State defendants' experts Mark Regnerus, Douglas Allen and

19   Joseph Price is that academic and various other outcomes

20   for the children of same-sex parents are worse. They claim

21   that the research demonstrates that these outcomes are

22   worse.

23         What you're going to see in this case is that

24   neither of these positions are correct. The evidence in

25   this case is going to show that there are now 30 years of

         12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                              15
TUESDAY, FEBRUARY 25TH, 2014

1    research, well over a hundred studies, nearly 150 studies,

2    and a broad base consensus across the social science

3    community that children raised by same-sex couples do every

4    bit as well as children raised by heterosexual parents.

5         These families have been researched from every

6    angle. We've researched the parents. There's an abundance

7    of research and studies regarding parents looking at their

8    parenting ability, their commitment to children, how they

9    parent. There's research, an abundance of research and

10   studies evaluating children, showing their adjustment,

11   their psychological well being, behavioral issues, peer

12   relationship, and their educational attainment. These

13   studies have found that gay and lesbian parents are equally

14   capable, equally committed to their children in comparison

15   with heterosexual counterparts. And the children of same-

16   sex parents fair no differently than their peers.

17        We're going to look a lot at methodology in this

18   case. The studies first used different methodologies to

19   recruit their subject. Many you're going to hear of these

20   100 -- 150 studies use convenient samples. This is very,

21   very typical of psychological research. You take a smaller

22   study group. You measure them and assess them more deeply.

23   Other studies have used representative samples. You take a

24   large data set like the U.S. Census. You look across the

25   population and then you pull out your sample subjects.

     12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                                16
TUESDAY, FEBRUARY 25TH, 2014

 1          These studies also use different methods of
 2     assessment: observing the children, observing the parents,
 3     talking to their teachers, standardized testing. The
 4     studies are diverse in terms of the length of the study
 5     period. There have been some longitudinal studies which are
 6     studies obviously over time and there have been cross-
 7     sectional studies.
 8          For example, research will take seventh graders
 9     all across the country at one fixed point in time and
10     measure a specific outcome. That's a cross-sectional study.
11          The evidence is going to show that the research
12     has been conducted primarily by psychologists. That's
13     because psychologists study child development. The State
14     defendants in this case are not going to be introducing an
15     expert psychologist in this case.
16          On the question of methodology the defendants'
17     expert, Loren Marks, will basically be criticizing the
18     standard bread and butter methodology of psychology. It's
19     an indictment of the field of psychology. His view is that
20     we can't know definitely about the outcomes of children, of
21     same-sex parents unless we have a large representative
22     randomly sample longitudinal study that will span,
23     according to him, some 20, 30, 40 years before we can
24     answer this question and move on. But there have already
25     been over 100 studies over the course of 30 years. And we

          12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    17
TUESDAY, FEBRUARY 25TH, 2014

1    have research at all ages. We have research on young

2    children. We have research on adolescents. We have research

3    on young adults.

4           Doctor Brodzinsky will explain that the

5    replication of results over time in different studies using

6    different methods assure us of reliability particularly

7    where the studies come to a near universal conclusion that

8    there's no difference between the outcomes for children of

9    same-sex parents and the outcomes for heterosexual parents.

10   That finding is sometimes referred to as the "No Difference

11   Conclusion."

12          Secondly, psychologists and social science

13   researchers know the predictors of good and bad outcomes

14   for all children. Psychologists have been studying known

15   predictors of children for 50 years. Children are children.

16   If they are going to have problems they don't just start to

17   have problems in their 20s and 30s. There are certain known

18   predictors earlier in childhood that will tell us whether

19   or not there's a tendency or a correlation to worse

20   outcomes later on.

21          The standard predictors of child behavior all

22   look good for the children of same-sex parents. Beyond that

23   there is a consensus across the social science community.

24   This "No Difference Conclusion" is supported by a

25   consensus. It's recognized by every major group in this

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

1    country dedicated to children's health and well being. The

2    American Psychological Association, the American Academy of

3    Pediatrics, the American Psychiatric Association, the

4    American Medical Association, the American Academy of Child

5    and Adolescence Psychiatry, and the National Association of

6    Social Workers, and the Child Welfare League of America.

7    All of these professional organizations in various forms

8    using various languages have issued policy statements on

9    the subject of same-sex parents and the well being of their

10   children. And they all say essentially the same thing.

11        Here's the language from the American

12   Psychological Association. This was passed back in -- we've

13   known this since 2004, I believe, or 2005.

14        "There's no scientific basis for concluding that

15   lesbian mothers and gay fathers are unfit parents on the

16   basis of their sexual orientation. Overall, the results of

17   the research suggest that development, adjustment, and well

18   being of children with lesbian and gay parents do not

19   differ markedly than that of children raised by

20   heterosexual parents."

21        The State also contends that children need a

22   biological mother and father in order to thrive. This is

23   another odd argument because Michigan does not require a

24   biological tie between parent and child. Like every other

25   state Michigan has a very robust policy in favor of

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

 1    adoption.

 2            In any event, this argument is going to lead us

 3    in this trial to a little more detailed discussion that is

 4    necessary in this case about the affects of adoption, the

 5    affects of foster care placement prior to adoption, the

 6    affects of artificial reproductive technologies on the

 7    outcome of children.

 8            Professor Brodzinsky is going to explain that

 9    when you're talking about adoption whether it be by

10    heterosexuals or by same-sex couples most children do fine.

11    Adoption has been a tremendously successful social policy.

12    We're rescuing children from parents who abandon, abuse and

13    neglect them, helping children of deceased parents, and we

14    give them to competent caring parents who want them like

15    Jayne and April. It's been an enormous success, far

16    superior to what we were using in the past, the orphanages.

17    And there's been a huge cost savings to the State on top of

18    that.

19            But Dr. Brodzinsky will explain however that

20    there is a statistically significant percentage of these

21    children who will have some problems with adjustment, all

22    adoptive children. He says most do very well, but some have

23    problems and some of those problems will pass over time.

24    You might see children have problems in elementary school

25    that are gone by high school. Some of the problems persist.

         12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    20
TUESDAY, FEBRUARY 25TH, 2014

1          Doctor Brodzinsky is going to explain that we

2     know what causes poor outcomes on children, on average in

3     adoptive children. There's two categories.

4          Prenatal experience. Under this category you may

5     see the lack of prenatal care that comes with poverty, poor

6     nutrition for the birth mothers, drug exposure, substance

7     abuse. These are high stress pregnancies. We know that at

8     the end of the pregnancy the mother is giving up her child

9     so there's a lot of stress associated with the pregnancies

10    of these women turning their children over to adoption.

11         Postnatal experience. That's the time obviously

12    post birth but before they're placed with their adoptive

13    parents. They may have problems again with their birth

14    parents. There might be abuse and neglect. They might have

15    a failure to thrive. There might be nutrition problems.

16    Many have problems related to their stay depending on how

17    long it is they are in foster care. Many children have a

18    series of foster placement. With those children you will

19    have a higher percentage of problems having to do with

20    attachment, for example.

21         Our witnesses in this case are going to make a

22    very important point here. Same-sex couples are more likely

23    to adopt these harder children, special needs children than

24    straight couples. Same-sex couples are more likely to adopt

25    from the foster care system that straight couples. If you

          12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    21
TUESDAY, FEBRUARY 25TH, 2014

1    put all this together we know that the children most at

2    risk for these pre-adoption risk factors they are the

3    children that gay and lesbian people are more likely to

4    adopt.

5              On the flip side, if you take children adopted at

6    birth by all families, heterosexual families, same-sex

7    families, children raised from birth to age 18 by same-sex

8    parents, the intact family, the adjustments are very

9    similar to what the state is touting as the ideal

10   biological mother-father family. Adoptive parents are every

11   bit as good as biological parents.

12             There are studies that show they have some real

13   advantages over even birth parents. They tend to be more

14   educated, they have higher incomes. These are planned

15   families. The children are fairly all wanted.

16             So Dr. Brodzinsky is going to conclude that

17   biology is not the controlling factor here. To the extent

18   there is some difference in maladjustment in adoptive

19   children it is caused by other factors not by their

20   parenting, not by the orientation of the parents.

21             He's going to define some concepts for us that I

22   have -- many of us were not aware of. But maladjustment

23   obviously usually means adjustment that requires

24   therapeutic intervention. Doctor Brodzinsky is going to

25   distinguish that from a normative challenge and he's going

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    22
TUESDAY, FEBRUARY 25TH, 2014

1    to distinguish that from a difference that doesn't qualify

2    as maladjustment.

3           An example of a normative challenge in adoptive

4    children. They may have challenges relating to questions of

5    identity, who are my parents, who is my father, a sense of

6    loss why didn't my parents keep me. And bi-racial adoptions

7    as well where the parents are white and the children are

8    African American or vice-versa. You may have normative

9    challenges associated with that. None of these factors are

10   considered maladjustment in the field of psychology.

11   They're considered normative challenge. Good parents

12   address those issues. They help the children through it.

13   They don't lead to adjustment problems.

14          An example of a difference that's not

15   maladjustment. The children of same-sex couples and there's

16   been studies on this, are more tolerant of difference.

17   Differences in race, differences in ethnicity, culture.

18   You're not going to see the kids on the playground hurling

19   racial slurs at each other. They're less likely to be

20   bigoted people. These children also typically don't hold

21   rigid views of gender modeling that a wife has to do "X" or

22   a husband has to do "Y." This isn't maladjustment, it's

23   just difference, and it's differences that the researches

24   that you see in the children of same-sex parents.

25          In this case I think all of the experts are going

12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    23
TUESDAY, FEBRUARY 25TH, 2014

1    to talk about others types of families that on average

2    don't do as well. The experts on both sides are going to

3    talk about step-families. The step-family experience is

4    correlated with worse outcomes for children.

5             Coming from divorce families. This is well-known

6    that some children of divorce families struggle more often.

7    We don't mean all children of divorce, but there is a

8    statistically significant percentage. These factors are

9    relevant here and they come into play when you're talking

10   about the studies, when you're talking about the research

11   and what it really shows because the experts are going to

12   be attacking the consensus that we talked about earlier.

13            For example, the State defendants offered the

14   testimony of Mark Regneris. He's a sociology professor

15   regarding his study from a large data set called the New

16   Family Structure Survey, the NFSS.

17            The most important thing you can say about Dr.

18   Regneris' study is that it didn't really evaluate the

19   adjustment outcomes for children raised by same-sex

20   parents. He didn't do an apples-to-apples comparison. In

21   one comparison group Mark Regneris puts what the State

22   considers the ideal family. Biological mother-father,

23   raising the child from birth to 18, the intact family.

24   That's the first category. There's no step families in

25   there. There's no children of single parent families in

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

1    there, no divorce families in there.

2           In the other group we don't have same-sex couples

3    raising children from birth to 18. Instead we have a miss-

4    match category that includes basically any child who

5    reports that one of their parents at some time had a same-

6    sex relationship at some point during the respondent's

7    childhood. So they're not same-sex couples, this category

8    based upon this definition.

9           So he's comparing the ideal category with this

10   other category that includes children of divorced parents,

11   the children of step families. It's not an apples-to-apples

12   comparison. It's not a fair comparison. And it's not good

13   science.

14          Including children of divorce, children of step

15   families in the same-sex parents group skews the research.

16   Our experts are going to call this the failure to control

17   for family instability. There are many other studies --

18   many other problems with that study which we're going to

19   lay out through another one of our witnesses.

20          You're going to be hearing from Professor Michael

21   Rosenfeld, from Stanford University. He's our witness. He's

22   a sociologist -- experts from both sides will acknowledge

23   he's a highly regarded, highly respected social scientist

24   and scholar. Doctor Loren Marks who is there expert has

25   said that Michael Rosenfeld has produced one of the gold

BENCH TRIAL - VOLUME 1 PART A                    25
TUESDAY, FEBRUARY 25TH, 2014

1    standard studies in the field.

2           Rosenfeld generated the study regarding academic

3    achievement based upon the United States Census. His study

4    is a large representative study which finds that children

5    of same-sex parents fair just as well. In addition,

6    Professor Rosenfeld takes the same NFSS data set that Mark

7    Regnerus is using and when he controls for family stability

8    he finds that the children in the other group, that is, the

9    children who reported that they had a parent who had

10   engaged in a same-sex relationship they didn't fair any

11   worse than the children of heterosexual couples.

12          In other words, when you take out a factor known

13   to cause worst outcome: instability. When you're left with

14   same-sex parents actually raising children together the

15   adjustment problems are no different for the two groups.

16          Mark Regnerus has acknowledged that when his NFSS

17   study came out it was widely condemned in the social

18   science community. He admits -- or he admitted during his

19   deposition that he was pretty stunned by the negative

20   outcry. You'll see that there is a consensus going in the

21   other direction away from Mark Regnerus. His professional

22   peers don't agree with him at all. In fact, the same

23   journals, social science research, which published his

24   study in the first place immediately turned around and

25   published an audit of his findings that was highly

         12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

critical. We contend this is relevant to his credibility. It's relevant to the weight that this Court if it admits it should afford his testimony, and it's relevant under the Daubert analysis that is ongoing because we're running the two together.

Two other experts I'll talk about briefly. The State will present Douglas Allen and Joseph Price, both sociologists. I put them in the same group because they both wrote an article together, but in addition Douglas Allen did a study based upon data from the Canadian Census.

Allen claims that his study shows poorer graduation rates by kids in same-sex couple families. But here we don't even know if the children were raised in same-sex couple families for the bulk of their lives.

Doctor Rosenfeld, our expert, will explain and rebut his findings. He will tell you that this is another case of not isolating for the factor that you're trying to study. It's another case of not having the apples-to-apples comparison.

When Rosenfeld used the same data as Douglas Allen, when he controls for the factor of family instability again the differences in outcome disappears for the children of same-sex couples. For most of the subjects in Allen's study you don't know where the children lived for most of their school years. So he took them -- I think

BENCH TRIAL - VOLUME 1 PART A                          27
TUESDAY, FEBRUARY 25TH, 2014

1    it was 2006, but for a 17 year old you don't know where the

2    child lived from birth to age 12. For a 22 year old, that's

3    the age span he measured, 17 to 22 year olds, you don't

4    know where that child lived from birth to 17. So basically

5    it's a whole childhood.

6              There's a third study that the State defendants

7    will be relying on. There's an Australian researcher named

8    Sarantakos. His study is being relied on by Loren Marks so

9    I will address that.

10             Sarantakos, like the other defendants' experts,

11   claims that he saw poor primary school performance and

12   other social outcomes among children of same-sex couples

13   compared to children of heterosexual couples. Again, we see

14   the same problems, not an apples-to-apples comparison. And

15   what you see in Sarantakos' study is that all of the

16   children in the study were the product of a prior

17   relationship, and most often that was a prior heterosexual

18   relationship that failed. Therefore, the parents had

19   experienced -- the children had experienced a breakup of

20   their parents or they experienced single parenthood, also a

21   risk factor, or both. And we know that these circumstances

22   are associated with poor outcomes.

23             Now, there's an analogy that works for me and I

24   hope it will help you as you listen to this kind of complex

25   testimony. And my apologies in advance, this is coming from

         12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    28
TUESDAY, FEBRUARY 25TH, 2014

1    a person who has attended way too many child sporting

2    events.

3        Let's say we're a track meet. We'll put eight

4    kids on the starting line of a 100-meter dash. Now, we'll

5    take one of those kids and we're going to start him 20

6    yards back from the starting line. We'll take that same

7    child and we'll have just him carry the juice boxes and the

8    oranges and maybe the First Aid kit, and then we'll let

9    them all race. And we're wondering why they don't all

10   finish at the same time. It's not that complicated. It's a

11   not a fair competition. These children, the foster kids,

12   the children raised by single parents, the children of

13   divorce, the step children, they're not playing on a level

14   playing field, and yet we're faulting them for not

15   thriving, and we're blaming their parents.

16       I think this underscores we're going to show in

17   this case a fundamental flaw in the State's ostrich

18   approach to the research.

19       Assessing based upon outcomes alone especially

20   under the Allen study, for example, where he just zones in

21   on high school graduation rates has real limitations. The

22   State witnesses are also preoccupied with what we would

23   consider a minuscule portion of this board based research.

24   All of the State studies suffer from huge flaws in

25   methodology which we're going to point out. And all of them

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                              29
TUESDAY, FEBRUARY 25TH, 2014

1    conflict with the broad body of research. We have 100 to
2    150 studies spanning 30 years measuring everything to tell
3    us more. It tells us what we need to know here. It tells
4    you everything that you need to know to decide this case,
5    Judge. That's the research I think that will be most
6    helpful to you.
7              At this point I want to do a little detour out of
8    the child outcome research to the history of discrimination
9    before I turn back to some final points about same-sex
10   parents.
11             We have presented a stipulation which admits into
12   evidence the expert witness report of Professor George
13   Chauncey. He talks about the history of discrimination, the
14   history of disparate treatment of gay and lesbian people in
15   this country. He explains that gay and lesbian people have
16   been classified in this nation as degenerates. They have
17   been the victims of hate crimes. They were targeted by
18   police, harassed in the workplace, censored, demised,
19   barred from government jobs, fired from government jobs,
20   excluded from our armed forces. And up until 2003, they
21   could be arrested in this country for their private,
22   intimate sexual conduct up until Lawrence versus Texas was
23   decided by the Supreme Court.
24             Professor Chauncey will tell us that lesbian and
25   gay people live the legacy of discrimination even today.

         12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    30
TUESDAY, FEBRUARY 25TH, 2014

1    They have been repeatedly stripped of their fundamental

2    rights by popular vote. Forty states have enacted marriage

3    bans.

4          The State defendants defend these laws saying

5    they just reflect the traditional definition of marriage.

6    This is the way we've always done it, therefore, it's

7    justified. But Professor Chauncey explains in his report

8    that this, quote "tradition is nothing more than an

9    extension of the pattern of discrimination against same-sex

10   couples." He will explain that there has been some progress

11   and we have seen it mostly in states other than Michigan.

12   But even then with the progress there's been backlash.

13         Over the course of history, Dr. Chauncey

14   explains, "anti-gay laws often were passed or enacted in

15   response to periods of relative growth in the visibility or

16   tolerance of gay people."

17         He'll explain that in November of 2003, the

18   Supreme Court of Massachusetts was the first to uphold

19   marital rights for same-sex couples. In the very next

20   election cycle in Michigan came the backlash. November of

21   2004, was when the Michigan Marriage Amendment was passed.

22         Through Professor Chauncey, we will show that the

23   passage of the marriage ban here has to be viewed on the

24   context of a larger, pervasive, relentless history of

25   discrimination against gay and lesbian people in this

         12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                          31
TUESDAY, FEBRUARY 25TH, 2014

1    country. Our marriage ban did not happen in a vacuum. This

2    Court said in its order "when there is a history of

3    disparate treatment against an unpopular minority a more

4    exacting forum of scrutiny is required."  Well, if it looks

5    like a duck, and walks like a duck it's probably a duck.

6              We will be asking you to conclude at the end of

7    this case that the proponents of the marriage ban fully

8    intended to exclude this politically unpopular group from

9    the rights and benefits of marriage.

10             THE COURT: His testimony will be by his report,

11   he will not be testifying?

12             MS. STANYAR: That's correct, Judge.

13             THE COURT: Okay. And what exhibit is that, just

14   so -- if you know. We can get it later.

15             MS. STANYAR: It's 51, but we'll get you that.

16             The language of our ban is identical to the

17   federal DOMA statute struck down in <u>Windsor</u>. The intent was

18   the same. This is discrimination.

19             We're going to be asking you in this case to look

20   at how the history of discrimination interacts with the

21   research, how it interacts with the history of these

22   families generally and child outcomes more specifically.

23   How all of this comes together.

24             Thirty years ago, your Honor, very few people in

25   America were living openly out of the closet as gay or

                    12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

1   lesbian. In the 1907s, 1980s, most people including gay
2   people still believed that orientation, sexual orientation
3   was a choice. And very few people back then would choose to
4   be a, quote, "homosexual." In the face of that kind of
5   discrimination, that kind of stigma, that kind of abuse,
6   gay and lesbian people were not living openly with
7   partners, and far fewer were participating in planned same-
8   sex families 30 years ago.
9        Adoption by same-sex couples. There were some,
10  but they weren't happening much. Most states didn't allow
11  them. Artificial reproductive technologies for lesbians and
12  gay men really weren't happening back then either.
13       We'll hear testimony in this case there certainly
14  were gay and lesbian people. They were always there. Gary
15  Gates is going explain the demographics. A predicable
16  consistent percentage of the population both then and now.
17  But back then in the face of that kind of discrimination
18  most lesbians and some gay men were trying to live straight
19  lives. Like a lot other people they were inspiring. They
20  wanted the State's ideal family, too. They wanted the
21  picket fence, the children. They wanted an intact family.
22  Many lesbians and gay men were trying to function in
23  heterosexual marriages. Predictably it didn't work. You
24  can't choose your orientation. Now we know that, didn't
25  then.

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    33
TUESDAY, FEBRUARY 25TH, 2014

1          We'll be showing you how this unique history

2     relates to the child outcome research. Those marriages

3     failed. They were doomed to fail. The children of those

4     marriages would struggle the way of the children of divorce

5     may struggle as well. That means that the children of gay

6     men and lesbians born initially into mother-father families

7     during that particular time period, '70s, '80s some of the

8     '90s will be associated with the predictably higher

9     percentage of adjustment problems. Those men and women

10    eventually did come out of the closet, most of them. They

11    are the men and women in these studies that you're going to

12    hearing about.

13         But we'll show you how -- we have to look at that

14    and how it impacts the child outcome research. We'll show

15    in this case unless we're careful that history that I just

16    talked about will skew the research. With the passage of

17    time and this is the good news fewer and fewer lesbian and

18    gay men were trying those starter marriages and far fewer

19    today.

20         But the discrimination was still there. It is

21    still here, but with each passing year there was a growing

22    awareness by these men and women that sexual orientation is

23    not a choice.

24         We're going to ask the Court to peel back the

25    layers, the layers of history, the layers of

          12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

1    discrimination, the layers of the research. And at the end,

2    we'll ask you to find that the best way to know how

3    children will fair, if they are raised by same-sex couples,

4    is to look at the children actually raised by same-sex

5    couples. Look at their parenting. Look at the children and

6    judge them fairly.

7         One last point on the child outcome rationale,

8    we've mentioned before, I'd like to mention it again

9    because it is important. No other group in society has to

10   pass a parenting competency test before they're allowed to

11   marry, before they're allowed legal status as second

12   adoptive parents.

13        You'll hear testimony that there are groups of

14   parents in society that we know have children with poor

15   outcomes on average. Parents who have low incomes. Parents

16   with lower educational levels. Parents who marry, have

17   children, get divorced and want to marry again. There's no

18   competency tests for these parents. But we don't bar them

19   from marriage. We don't bar them adopting as second

20   parents. So that's an additional reason that these laws are

21   affirmatively irrational.

22        Briefly on injury under 1983, through a

23   combination of briefing and testimony we will demonstrate

24   to the Court the injuries cognizable under Section 1983.

25   Over the past two years we have briefed for this Court the

BENCH TRIAL - VOLUME 1 PART A                    35
TUESDAY, FEBRUARY 25TH, 2014

1    loss of important economic resources, the loss of health

2    insurance, social security and disability benefits, the

3    loss of survivors' benefits, inheritance rights, many

4    others associated with the marriage ban. So part of the

5    injury here is clearly economic and we know that already.

6             We know from the family resource factors that we

7    talked about at the beginning at adequate resources, family

8    resources are necessary for children to thrive. A lack of

9    resources hurts children.

10            Doctor Brodzinsky will also talk about the

11   psychological injury to children caused by both of these

12   laws. Marriage ban, the same-sex --  the second parent

13   adoption ban. He will explain that no matter how competent,

14   how loving, how devoted, how caring that second parent is

15   from the child's perspective some children will suffer from

16   what he calls an ambiguous socially unrecognized seemingly

17   non-permanent relationship with that second parent. He'll

18   tell us that such an arrangement can deprive the child of

19   emotional security, societal affirmations, a sense of

20   normality, identity, and social stability that becomes a

21   full legal relationship with that second parent. They can

22   suffer unnecessary fear, anxiety, insecurity relating to

23   possible separation from the second parent in the event of

24   the parent separation or the death of the biological or

25   adoptive parent.

         12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    36
TUESDAY, FEBRUARY 25TH, 2014

1        We offer this evidence because, first of all,
2    it's clearly relevant to injury, and we're entitled to show
3    this. We offer it also because it interconnects with the
4    State's child outcome rationale.
5            All the experts will tell you that families
6    benefit by the stability that marriage brings. Children
7    thrive when there's stability.
8            Another generation of Michigan's children should
9    not have to await the perfect longitudinal study before
10   they have rights, before they can enjoy stability, before
11   they can really count on that second parent.
12           These two laws in tandem perpetuate
13   discrimination. The marriage ban singles out gay and
14   lesbian people alone for the exclusion from the institution
15   of marriage even though they are and have always been fully
16   contributing members of our society. It is hard to imagine
17   how the adult plaintiffs in this case could be contributing
18   any more than they are. April Deboer in a nicu nurse. She
19   cares for sick and dying infants every day. Jayne Rowse is
20   an emergency room nurse. She's taking care of all of us.
21           Together they took in the babies that were left
22   behind, special needs children, an incu baby on a
23   respirator struggling to live. Harder to place children.
24   Children of color. They nurse them back to health. They
25   loved all of them. They gave the children what they needed.

         12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

1    And I'm happy to report all these children are thriving

2    now.

3              Yes, this case is about marriage equality. It's

4    also about the health and well being of children. It's

5    about bringing stability. Bringing dignity to children.

6              These two women have been taking care of

7    Michigan's children day in and day out for years. These two

8    women are heros.

9              Thousands of others of same-sex couples in this

10   state are heros, too, raising children, rescuing children,

11   adopting them from the foster care system. These parents,

12   all these children, all these families should be embraced.

13   They should be supported and they should be celebrated.

14             At the end of this case, we'll ask you to strike

15   down both of these laws and to reaffirm once and for all

16   that there are no second-class citizens in this country.

17             THE COURT: Thank you, very much.

18             State defendants, you may proceed.

19             MS. HEYSE: Thank you.

20                      OPENING STATEMENT

21             MS. HEYSE: Good morning, your Honor.

22             Assistant Attorney General Kristin Heyse, on

23   behalf of State defendants.

24             Nice to see you again.

25             THE COURT: Nice to see you always.

BENCH TRIAL - VOLUME 1 PART A                    38
TUESDAY, FEBRUARY 25TH, 2014

1          MS. HEYSE: A pleasure to be before you today.

2          THE COURT: Thank you.

3          MS. HEYSE: I just want to take a brief moment

4     before I get started, your Honor, to thank you and your

5     staff for the courtesies that you have extended to the

6     parties in this case. You've all certainly gone out of your

7     way to make this easier on us and we do appreciate that.

8          THE COURT: Thank you.

9          MS. HEYSE: I also want to take just a brief

10    moment to thank opposing counsel for their cooperation and

11    collegiality throughout these proceedings.

12          As you can imagine preparing for a trial in a 120

13    days is no easy feat, but we've all made it through. We're

14    adversaries. We're not enemies. I think that says a lot

15    about counsel on both sides of the aisle.

16          THE COURT: I agree with you. The civility between

17    the attorneys is textbook as it should operate all the

18    time.

19          MS. HEYSE: Thank you, your Honor.

20          But turning now, your Honor, to the reason we're

21    all here today is to determine the constitutionality of

22    Michigan's Marriage Amendment. I'm going to address five

23    points with you this morning, your Honor, and I'd like to

24    just outline them for you quickly.

25          First, I'm going to discuss the standard of

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    39
TUESDAY, FEBRUARY 25TH, 2014

1    review for this case.

2           Second, I'm going to discuss the implications

3    this case has for the democratic process.

4           Third, I'm going to discuss the valid reasons

5    that voters might have had for supporting the amendment,

6    such as, encouraging the ideal environment for raising

7    children, where kids are raised by both a mom and a dad.

8           Fourth, I'm going to tell you what the

9    plaintiffs' experts in their studies will say.

10          Fifth, I'm going to tell you what our experts

11   will say.

12          Again, at the outset, your Honor, I think it's

13   important to point out that plaintiffs have the burden

14   here. It is their job to negate every conceivable reason

15   for the Marriage Amendment. Therefore, questions like why

16   not allow same-sex marriage and what will it hurt are not

17   appropriate because those are not the issues before this

18   Court.

19          The people do not have the legal burden in this

20   case. Rather, it's plaintiffs who must show that the

21   people's decision to retain the definition of marriage as

22   between a man and a woman is irrational.

23          I think it's important, your Honor, to clarify

24   what this case is about because it's very easy to get

25   caught up in the emotion and sentiment that surrounds it.

     12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    40
TUESDAY, FEBRUARY 25TH, 2014

1          This case is about one thing, your Honor, the

2     will of the people. The people of the State of Michigan

3     have decided to retain the definition of marriage that

4     encourages what's best of children being raised by both a

5     mom and a dad. They have both the authority to address

6     policy questions like this, and they have rational reasons

7     for doing so. Thus, that decision must govern.

8          After Windsor there can be no doubt that defining

9     marriage is within the exclusive province of the state. And

10    the people of the State of Michigan have defined marriage

11    as between one man and one woman. This was not the whim of

12    a few but rather the choice of a majority.

13         Indeed, nearly 2.7 million voters chose to

14    reaffirm Michigan's definition of marriage. This was not a

15    vote against same-sex couples. It  was not based on animus

16    or bigotry. But this was rather a vote to maintain a

17    definition of marriage that's been in existence since the

18    inception of this state. A vote to recognize and celebrate

19    the fact that both moms and dads are important.

20         Now, plaintiffs here ask this Court to wholly

21    redefine marriage for the State of Michigan, and the change

22    they are seeking is not at all similar to the Loving case

23    that Ms. Stanyar mentioned. In Loving, race was improperly

24    injected in Virginia's definition of marriage as between a

25    man and a woman. Here, Michigan's definition of marriage

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

1    has never changed and has always been understood as being

2    between one man and a woman.

3              While plaintiffs will claim that Michigan voters

4    were somehow ignorant or irrational when they passed the

5    Marriage Amendment that's simply not the case. This Court

6    has already recognized that the people of Michigan have

7    articulated justifications for adopting the Marriage

8    Amendment. And while plaintiffs do have the burden here the

9    fact of the matter is the evidence will show that these

10   justifications are rational for three basic reasons.

11             First, it was rational for the people of the

12   State of Michigan to want to encourage the raising of

13   children by a mom and a dad recognizing that gender

14   diversity in parenting is what's best for kids.

15             This is a modest point, your Honor, not an

16   unreasonable or irrational one. There was a broad body of

17   research that supports that being raised by both a mom and

18   a dad is ideal. The fact of the matter is men and women are

19   different. They're not interchangeable. In fact, the United

20   States Supreme Court has acknowledged this in Taylor versus

21   Louisiana and I quote,

22             "The truth is that the two sexes are not

23   fungible; a community made up exclusively of one is

24   different from a community composed of both; The subtle

25   interplay of influence one on the other is among the

        12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

1      imponderables."

2              To insulate the courtroom from either may not

3      either in a given case make an iota of difference, yet a

4      flavor. A distinct quality is lost if either sex is

5      excluded. Likewise, a distinct quality is lost in a family

6      if either of the sexes is not present.

7              Michigan's definition of marriage guarantees that

8      each of the sexes is represented in the family and in the

9      raising of children.

10             Now, we recognize that not all children can be

11     raised by a mom and dad, but that does not make the

12     people's desire to promote the ideal environment or in

13     other words, your Honor, the best case scenario any less

14     rational.

15             Second, it was rational for the people of the

16     State of Michigan to want to encourage marriage between a

17     man and a woman for the simple biological fact that that's

18     the only union that can actually produce children.

19             Third, it was rational for the people of the

20     State of Michigan to want to proceed with caution when

21     considering a change in this fundamental institution of

22     marriage. An institution that's been existence since time

23     and armorial and has served our society well.

24             This is especially true when we're dealing with

25     such a new and emerging area of social science. Same-sex

1    marriage has only been in existence in the United States

2    since 2004. A decade, your Honor, is not enough time to

3    determine with any certainty the affects that same-sex

4    marriage will have.

5              Therefore, it was not irrational for the people

6    of the State of Michigan to want to take their time with

7    this unsettled area of social science.

8              Now, as Ms. Stanyar noted you're going to hear a

9    lot of expert testimony in this case. In fact, for this

10   whole first week you're going to hear from plaintiffs'

11   experts. And they're going to try to convince you that the

12   people's decision to retain the definition of marriage was

13   irrational because there is no ideal setting for raising

14   children, and because there are no differences in outcomes

15   for the children being raised by same-sex couples. They're

16   going to tell you that there are reasons -- no other reason

17   beside animus for the marriage amendment.

18             But wait to hear from our experts, your Honor,

19   because they're going to explain to you why plaintiffs'

20   experts are wrong and why the people's decision to retain

21   the definition of marriage was not only rational but it was

22   prudent.

23             Our experts are going to tell you that there are

24   reasons for defining marriage as between one man and one

25   woman that have nothing to do with animus. Our experts are

             12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    44
TUESDAY, FEBRUARY 25TH, 2014

1    going to explain to you why the "No Difference Consensus"
2    that plaintiffs rely on is flawed. They will tell you that
3    the studies relied on to come to this so-called "No
4    Difference Consensus" suffer from three major deficiencies.
5              First, they're not representative of the same-sex
6    parenting community as a whole. These studies can tell you
7    a lot about the people that are being sampled and studied
8    but very little, if anything, about the general population.
9    They are what we call small convenient sample studies.
10             One study in fact, your Honor, has a sample group
11   as small as five individuals with 30 being the average
12   number of individuals being studied.
13             I just want to repeat that fact for you, your
14   Honor, because it's a very telling point about the strength
15   of the social science that plaintiffs rely on. The average
16   number of participants in these studies is just 30
17   individuals. That's not enough to be statistically sound.
18             In addition, participation in these studies is
19   not random. Participants often are either recruited or
20   they're self-selected volunteers. This results most often
21   in only the most affluent lesbian couples being studied.
22   That's a problem, your Honor, because the same-sex
23   community is diverse, and there is no diversity within
24   these study groups. This is not acceptable for generalized
25   research. Our experts will tell you that such results

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                                45
TUESDAY, FEBRUARY 25TH, 2014

1    cannot be generalized to a community let alone to the
2    nation as a whole.
3            Second, these studies call what we call soft
4    variables which are unreliable because they're subjective
5    in nature and they generally cannot be verified by an
6    independent third party.
7            And, third, these studies use improper comparison
8    groups. In other words -- for example, in the 59 published
9    studies that are relied on by the American Psychological
10   Association or the APA almost half of them did not even
11   include an opposite sex comparison group. So they weren't
12   comparing same-sex couples to opposite sex couples in those
13   studies.
14           Our experts will tell you that these small
15   convenient sample studies are preliminary in nature. So
16   they're a good start, but they are in no way conclusive of
17   the outcomes for children raised by same-sex couples across
18   the nation.
19           Our experts will tell you that they have
20   conducted large random representative studies which do show
21   a difference in outcomes for the children being raised by
22   same-sex couples and directly refute the APA studies.
23           These large studies have sample sizes in the
24   hundreds so they are representative of same-sex couples as
25   a whole.

         12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    46
TUESDAY, FEBRUARY 25TH, 2014

1        These studies use hard variables such as progress

2    in school which is reliable and verifiable. And these

3    studies use heterosexual couple comparison groups.

4    Our expert studies are objective, methodologically sound

5    and nationally representative.

6        But more importantly, your Honor, our experts are

7    going to tell you that the research in this area is

8    unsettled. It's just too new to know with any certainty

9    whether the children of same-sex couples fair just as well

10   as other families.

11       Likewise, it's too early to the know the affects

12   that redefining marriage will have on the institution

13   itself. Everyone agrees this is a new area. And everyone

14   agrees that same-sex couples are a difficult group to study

15   because they constitute such a small population of our -- a

16   small portion of our overall population.

17       Our experts will tell you that what is needed to

18   make a definitive conclusion about whether there are, in

19   fact, no difference in the outcomes for children raised by

20   same-sex couples is a large nationally representative,

21   long-term study. Children being studied from birth to

22   adulthood. And right now, your Honor, no such study exists.

23       But in addition to waiting to hear what our

24   experts are going to say I also ask that you pay close

25   attention over the next few days to what plaintiffs'

        12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                 47
TUESDAY, FEBRUARY 25TH, 2014

1    experts will not say. They will not say that the people of

2    the State of Michigan do not have the authority to define

3    marriage because they clearly do. And they will not say

4    that marriage has ever been defined any other way here in

5    the State of Michigan because it hasn't.

6                 Plaintiffs' experts will not tell you that moms

7    and dads aren't important because they are. And they won't

8    tell you that moms and dads raising their children together

9    is a bad thing because clearly your Honor it's not. They

10   won't tell you there's absolutely no benefit to a

11   biological connection between a mom, a dad and a child

12   because there is. And they will not say that there's a

13   large scale, long-term nationally representative study on

14   the outcomes for children raised by same-sex couples

15   because there's not.

16                Now once you've heard from all the experts and

17   gone through the mountain of information that you're

18   inevitably going to be provided, you'll see, your Honor,

19   that the plaintiffs cannot meet their burden in this case

20   because again if there is any conceivable rational basis

21   for the people of the State of Michigan's decision to

22   retain the definition of marriage as between a man and a

23   woman then that decision must govern. In other words,

24   plaintiffs must show that all possible reasons for the

25   people's decision are irrational and that's a very high

           12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

1    bar, your Honor, and one the plaintiffs' in this case can't

2    meet.

3            Now, your Honor, I'm sure you're thinking,

4    counsel, what about the recent decisions in Utah and

5    Virginia and Oklahoma, why shouldn't this case turn out any

6    different? My response to you, your Honor, is unfortunately

7    those courts lost sight of the proper standard. They forgot

8    who should define marriage.

9            As I'm sure you're very aware in the last two

10   years five district courts have examined the reasonableness

11   of a state law defining marriage as between a man and a

12   woman. Two of those decisions actually upheld the laws,

13   while three others all decided after <u>Windsor</u> have found

14   them irrational. Again, <u>Windsor</u> recognized that the

15   definition of marriage is the foundation of the State's

16   broader authority to regulate the subject of domestic

17   relations. These three later decisions finding that state

18   laws were irrational failed to give effect to the Supreme

19   Court's emphasis in <u>Windsor</u> that marriage is for the people

20   of the state to determine.

21           But even more notable is that none of these three

22   decisions challenged the premise that it's beneficial for a

23   child to have both a mom and a dad. Instead, in those cases

24   the courts claim that point would not justify excluding

25   same-sex couples. That improperly inverts the standard of

        12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    49
TUESDAY, FEBRUARY 25TH, 2014

1    analysis, your Honor. Here, the amendment that the people
2    of Michigan passed need only be relationally related to its
3    end and it is. It enables every child to have a mom and a
4    dad which benefits every child. To overturn the will of the
5    people, the Court must conclude that being born and raised
6    by a biological mother and father is inconsequential.
7            Michigan agrees there can be many kinds of
8    effective parents and parenting structures, but social
9    science has not yet proven that there is zero value in the
10   diversity of a child being raised by both a mom and a dad.
11   This Court should not race to embrace a position that
12   mothers and fathers are interchangeable or even
13   dispensable.
14           Finally, your Honor, I'd like to return to the
15   fact that the Marriage Amendment was a product of the
16   political process, a process that's at the very core of our
17   constitution. Again, this was not a whim of a few, but a
18   vote of a majority, the will of the people.
19           The Supreme Court has counseled against judicial
20   intervention of the political process especially when we're
21   dealing with such novel social issues recognizing that
22   courts should allow states themselves to be the
23   laboratories for social change. The fact of the matter is,
24   your Honor, no society anywhere has had even a single
25   generation's worth of experience with same-sex marriage.

        12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    50
TUESDAY, FEBRUARY 25TH, 2014

1    And there is a rich and robust debate going on throughout

2    the nation including Michigan. This Court should not end

3    that debate by deciding the social issue that is both -- as

4    both unique as it is new. Indeed, decisions reached through

5    the democratic process are more likely to be regarded as

6    legitimate and be widely accepted.

7            Same-sex marriage will likely be on the ballot in

8    2016. The people of the State of Michigan should be allowed

9    to decide if it is the time to redefine marriage.

10           Thank you, your Honor.

11           THE COURT: Thank you, very much.

12           Mr. Pitt, would you like some time, please, to

13   argue on behalf of your client, Lisa Brown?

14                        OPENING STATEMENT

15           MR. PITT:  Good morning, your Honor.

16           Michael Pitt, on behalf of defendant Lisa Brown,

17   Oakland County Clerk.

18           Defendant Brown stands before the Court as a

19   defendant in this case but her role here is greater than

20   that of just a defendant. She's here as the voice of all

21   the county clerks of the State of Michigan, all the county

22   clerks who have taken the same oath of office to uphold the

23   Michigan and federal constitutions. All the county clerks

24   are eager for the Court's decision on this important issue

25   and to get a final resolution of the important legal issue

            12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

1      that this case presents.

2              The clerk of every county in this state has taken

3      the same oath. This oath of office does not permit any of

4      the county clerks to discriminate against any couple

5      wishing to marry because of their race, because of their

6      religion, national origin, political viewpoint, disability

7      status, or any other intimate personal relationship which

8      is otherwise constitutionally protected. Of course, what we

9      have here today is this otherwise constitutionally

10     protected issue are same-sex couples entitled to the

11     protection of the law, do they have a intimate personal

12     relationship that the Constitution of the United States

13     would recognize as protected.

14              Make no mistake that when the county clerk issues

15     a marriage license a very important legal right between

16     those two people is created, and the only way that legal

17     right can be disturbed is through the death of one of the

18     partners or by divorce. Otherwise, that legal right is

19     invaluable, that legal right is a bedrock of our society

20     and those two people can go through life knowing that they

21     are secure and that they have a legal right that nobody can

22     ever take away from them unless they voluntarily relinquish

23     it or because of death.

24              In carrying out the duties of her oath of office,

25     the clerk is not required to listen to the Governor of the

1   State of Michigan. She's not required to listen to Mr.

2   Schuette, the Attorney General of the State of Michigan.

3   She is not required to listen to the Governor's view of

4   what he thinks a traditional marriage is, and she's not

5   required to listen to the view of the Attorney General

6   as to what he may think constitutes a traditional marriage

7   relationship and whether or not a traditional marriage

8   relationship between a man and a woman is good or bad for

9   children. In carrying out her duties of her oath of office

10  she's not required to listen to the opinions of the AG, and

11  also she's not entitled to or required to listen to the

12  opinions of the voters in 2004 who voted to ban same-sex

13  marriage and to redefine what marriage is in the State of

14  Michigan. Those are views that are expressed by a majority

15  of people in the State of Michigan, but those views as

16  expressed in 2004 do not create a constitutional right that

17  she has to follow. What she is required to do is to follow

18  what the courts have said is the constitutional protection

19  that a particular type of intimate personal relationship is

20  entitled to regardless of what the majority of the people

21  of the State of Michigan may think. If the people of the

22  State of Michigan had voted in 2004 to ban interracial

23  marriages I don't think we would be here today. I think

24  there would have been a finding that that vote even though

25  by the majority of the people was an unconstitutional act

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

1     and that those types of relationships could not be subject

2     to the whims of the majority vote.

3           The same applies here, and at the end of the day

4     that analysis that would be used for interracial marriages

5     is going to be applied I believe to same-sex marriage

6     equality issues.

7           More importantly, she will not even listen to her

8     own judgments about what is good or bad when it comes to a

9     traditional marriage. As clerk that's not her role. She may

10    see and she has told me that she has seen couples come

11    through the County Clerk's Office where the relationship

12    probably would be better not being formed. It's not her job

13    to form those judgments. Although she may think that it's a

14    bad idea for a woman to marry a man who has been convicted

15    ten times of aggravated spousal abuse she -- that woman is

16    entitled to a license. She's entitled to enter what people

17    in this courtroom have referred to as a traditional

18    marriage relationship even though marrying that particular

19    individual may end up costing her life or causing her

20    injury. Clerk Brown cannot prevent that woman from entering

21    into that relationship even though she thinks it's a bad

22    idea. It's not her job. Her job is to issue a marriage

23    license based on legal status and she's here today to

24    participate in the process so that there is a clear

25    understanding of what the legal status is when same-sex

         12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

1    couples come to her counter asking for a marriage license.

2         She's going to testify also about implementation

3    and remedy. If the Court were to determine that the ban on

4    same-sex marriage in Michigan is unconstitutional then

5    there's going to be a time in this process where

6    implementation is going to be required. And she has

7    testified in deposition and she will testify here in court

8    that she has taken extraordinary steps already in

9    developing a protocol that will facilitate immediate,

10   immediate implementation of the Court's order so she has

11   worked with the State Registrar. Under the Michigan statute

12   the State Registrar is required to approve all of the

13   marriage license applications and the marriage license

14   forms. She and other clerks around the state have been

15   working with the State Registrar to devise gender neutral

16   forms that could be used to facilitate immediate

17   implementation of any court order may arise. She's prepared

18   to move forward swiftly and is looking forward to the time

19   when that may occur in the very near future. She is going

20   to follow the Court's order. She has indicated that she is

21   not going to obey any other public official other than this

22   Court and this Court's orders. If the Governor says she

23   shall not issue licenses after this Court has made its

24   ruling, she's going to obey this Court. If the AG says she

25   shall not issue licenses, she's going to obey the judicial

BENCH TRIAL - VOLUME 1 PART A                          55
TUESDAY, FEBRUARY 25TH, 2014

1      determination. She's going to follow the law as the

2      judicial department issues its instructions and its orders,

3      and not other public officials no matter what they may

4      think about the particular issue. She's prepared to do

5      that. I believe there are many other clerks in the State of

6      Michigan who have expressed a similar view that they're

7      going to be ready to move forward with the issuance of

8      licenses to same-sex couples just as soon as the courts

9      resolve this issue.

10             I thank you for your attention, your Honor.

11             THE COURT: Thank you.

12             I appreciate it, Mr. Pitt.

13             THE COURT: Okay. Plaintiffs call your first

14     witness.

15             MS. STANYAR: Your Honor, the plaintiffs call Dr.

16     David Brodzinsky.

17             THE COURT: Very well.

18             Please step forward.  Please raise your right

19     hand.

20             Do you solemnly swear or affirm to tell the truth

21     in the matter now pending before this Court?

22             THE WITNESS: I do.

23             THE COURT: Thank you.  Please have a seat.

24             Please state your full name and spell your last

25     name for the record.

        12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    56
TUESDAY, FEBRUARY 25TH, 2014

1          THE WITNESS: My name is David Brodzinsky. Last

2    name is B-r-o-d-z-i-n-s-k-y.

3          THE COURT: Thank you.

4      D A V I D    M.    B R O D Z I N S K Y , P h . D . ,

5          (being duly sworn, testified as follows:)

6                    DIRECT EXAMINATION

7    BY MS. STANYAR:

8    Q    Good morning, Dr. Brodzinksy.

9    A    Good morning.

10   Q    What is your occupation?

11   A    I'm a developmental clinical and forensic

12   psychologist.

13   Q    Within the field of psychology do you have speciality

14   areas?

15   A    I have several speciality areas, the primary one is

16   adoption and foster care.

17   Q    How about other areas of speciality?

18   A    Child development, non traditional family life,

19   parenting by same-sex couples and individual, gay and

20   lesbian individuals.

21   Q    Let's focus on your teaching experience, have you had

22   any academic affiliations and for how long?

23   A    Yes, I was professor of psychology at Rutgers from

24   1974 to 2006 when I took early retirement. I've had adjunct

25   professor affiliations at the Rutgers Medical School and at

          12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    57
TUESDAY, FEBRUARY 25TH, 2014

1    the Graduate School of Applied and Professional Psychology

2    at Rutgers as well.

3    Q    Focusing first on your teaching experience in a

4    university have you taught in the area of child

5    development?

6    A    Yes.

7    Q    Have you taught in the area of clinical psychology?

8    A    Yes.

9    Q    Have you taught in the area of adoption?

10   A    Yes.

11   Q    Have you taught on the topic of same-sex -- have you

12   included the topic of same-sex parenting in any courses

13   that you've taught?

14   A    Yes.

15   Q    Did you teach at Rutgers University in the Department

16   of Psychology?

17   A    I did, yes.

18   Q    I think you've already told us over what period of

19   time?

20   A    '74 to 2006.

21   Q    Did you run any clinical programs there?

22   A    From 1989, to 2006, I ran what was the Rutgers Foster

23   Care Counseling Project. It was a state-funded counseling

24   and training program servicing the foster families and

25   foster children in two- or three-county area around New

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                              58
TUESDAY, FEBRUARY 25TH, 2014

1    Brunswick, New Jersey.

2    Q    How many children were seen by the project?

3    A    Roughly around 700 during the years that I was there.

4    Q    Do you conduct research in the field of psychology?

5    A    I do, yes.

6    Q    Over what period of time?

7    A    Well, I started as an undergraduate and certainly as I

8    entered graduate school, but most of my research was once I

9    became an academic at Rutgers from '74, and -- through

10   2006, and I continue to do research through the Donaldson

11   Adoption Institute.

12   Q    We'll talk about that in a moment.

13        What are your primary areas of research?

14   A    My primary area of research is in adoption or foster

15   care. I focus on many different areas of adoption.

16   Q    Have you done any research related to adoption by gay

17   and lesbian parents?

18   A    I have, yes.

19   Q    Can you describe that?

20   A    Well, we have two national surveys of adoption agency

21   policies and practices related to working with gay and

22   lesbian individuals. I've done a large scale of study of

23   gay and lesbian adopters or adoptive families looking at

24   their needs, their experiences, the type of adoptions they

25   engage in, the extent of openness of those adoptions and a

          12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                          59
TUESDAY, FEBRUARY 25TH, 2014

1    variety of other factors. That wasn't a comparative study.
2    We've just collected data on about 1600 families, adoptive
3    families around the country which include about 250 to 260
4    of gay and lesbian families, and will be doing an analysis
5    of that. But that study is not just on differences or
6    similarities between gay and lesbian families. It's called
7    the Adoption Diversity Study. It's looking at all different
8    kinds of adoptive families.
9    Q     Okay. Have you ever authored any publications?
10   A     Yes.
11   Q     Can you give us an estimate of the total number of
12   publications that you've authored?
13   A     Roughly 100, yes.
14   Q     Were the publications peer reviewed?
15   A     About 50 percent of them were. Those are the journal
16   articles. They're in peer journals. The rest are book
17   chapters or books, including textbooks and six books and
18   adoption.
19   Q     Are books typically peer reviewed or is there some
20   other review process with respect to books?
21   A      It is a peer review process. It's different than
22   journals. It's not a blind review. When I'm asked to review
23   books, you know, I know who the authors are and I review it
24   for its integrity, its validity and so forth. The same
25   happens when I submit a prospectus to a publication house.

       12-10285    DEBOER, ET. AL -V- SNYDER, ET. AL.

1    They'll send out that prospectus for review by, you know,

2    other people in the field and then later on once the book

3    is complete they'll have other people look at it more

4    completely. Same with book chapters, too.

5    Q    Okay. Can you tell us of some of your more important

6    works in this area?

7    A    Well, probably the first book on adoption, "Psychology

8    of Adoption" was the first edited book in the field

9    focusing on mental health issues in adoption.

10         My second book "Being Adopted" is one of the best

11    selling books in the adoption field. That focused on the --

12    kind of the internal experience of adoptive individuals

13    from -- you know, young childhood through the adult years.

14         And then the most recent book is an edited book

15    on "Adoption by Gay and Lesbians" and that's been very

16    received in the field.

17    Q    That's been published and is in circulation?

18    A    Yes, it's published by Oxford University Press.

19    Q    All right. If you look at Exhibit 1. Is that a copy of

20    your curriculum vitae?

21    A    Yes, it is.

22    Q    Does that document also list your educational degrees,

23    your employment and your publications?

24    A    It does.

25         MS. STANYAR: I move it's admission.

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL - VOLUME 1 PART A                    61
TUESDAY, FEBRUARY 25TH, 2014

1            MR. POTCHEN: No objection, your Honor.

2            THE COURT: It will be received, Exhibit 100.

3            MS. STANYAR: Exhibit 100.

4            (Plaintiffs' Exhibit No. 100 received into

5    evidence)

6    BY MS. STANYAR:

7    Q    Do you serve on the editorial board of any academic

8    journals?

9    A    I currently serve on the board of Adoption Quarterly

10   which is one of the better known journals in the child

11   welfare field. I was on the editorial board of the "Journal

12   of Applied Developmental Psychology" and "Youth in

13   Society."  I've been a reviewer, a regular reviewer for all

14   the top tier developmental and child clinical journals

15   throughout my academic career and to the present, too.

16   Q    So you were just talking about when you peered

17   reviewed others.

18   A    Exactly, yes.

19   Q    Okay.  Over the course of your career how many would

20   you guestimate that you've reviewed?

21   A    It's hard to say. I regularly review probably two or

22   maybe three a month. So if we multiple that by 12 and then

23   multiple that by 40 years since 1974, it's a large number.

24   Q    All right.  Do you have a private clinical practice as

25   well?

         12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

1    A    I do.

2    Q    Tell us about your private clinical practice as a

3    psychologist.

4    A    I'm in partnership with my wife who is also a

5    psychologist. The trade name is Family Mental Health

6    Consultants. I've been practicing since 1985, first in New

7    Jersey where I lived until 2006, and currently in

8    California where I currently live and practice.

9         Since I've been an academic it's never been a

10   full time, you know, five days a week, eight hours a day

11   kind of practice. It's usually anywhere between 10 and 20

12   clients a week. At this point it's probably between 10 and

13   12 clients a week.

14        (End of Part A)

15             -- -- --

16

17

18

19

20

21

22

23

24

25

12-10285   DEBOER, ET. AL -V- SNYDER, ET. AL.

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1  Q.  And has that been steady over the course of that time

2  period?

3  A.  It picked up in the late '80s.  As I started doing research

4  in the area of adoption, I started getting a lot of referrals

5  from adoptive families that I work with to help them around

6  some of the normative issues, that I assume we'll talk about

7  later on around adoption.

8  Q.  All right.  During the entire, the entire span of your

9  clinical practice, how many families do you think you've

10 counseled?

11 A.  I'm going to guess somewhere around 2,000.

12 Q.  How many children?

13 A.  Well, that's hard to estimate.  Sometimes those families, I

14 only worked with the parents doing parent coaching.  Sometimes

15 I work with multiple children in a family, and family

16 therapists.  So even if we average one child per family, it

17 would be roughly 2,000.

18 Q.  Do you counsel any families headed by same-sex parents?

19 A.  I have, yes.

20 Q.  Approximately how many?  Give us a rough estimate.

21 A.  Maybe a hundred.

22 Q.  Okay.  Have you counseled gay and lesbian parents who have

23 adopted or fostered children?

24 A.  Yes.

25 Q.  What types of issues do you address when you counsel

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1    families with gay or lesbian parents?

2    A.  Most of the same kind of issues that other families, you

3    know, encounter.  Around adoption issues, it often has to do

4    with how do we talk to a child about adoption, particularly how

5    do we help them, how do we explain some of the more difficult

6    background issues that the child has faced:  Abuse, neglect, a

7    birth parent who might have been a drug -- drug addicted or had

8    other kinds of problems.

9         So we help them to, to figure out how to talk to those

10   children about those issues in a way that doesn't unduly demean

11   the child's heritage.

12   Q.  Do you counsel families who have experienced the, the

13   experience of divorce?

14   A.  Yes, very often.  I do a lot of custody work for the

15   courts.  And I work with those families both sometimes -- not

16   the same families.  I can't be an evaluator and a counselor in

17   the same case.  But I often work with families after the

18   divorce or sometimes before counseling.

19   Q.  Have you counseled children who have experienced divorce?

20   A.  Many times, yes.

21   Q.  Is that a significant percentage of your caseload?

22   A.  It's a significant percentage, yes.

23   Q.  Have you done any work evaluating children for court

24   proceedings?

25   A.  Quite often; continue to do.

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

63

1   Q.  Have you ever been qualified to testify, testify as an

2   expert witness in cases involving adoption issues?

3   A.  Many times.

4   Q.  How many times, approximately?

5   A.  Qualified, that means I was testifying.  Probably 40, 50

6   times.

7   Q.  Have you ever been qualified to testify as an expert

8   witness in cases involving the well-being of children in -- of

9   same-sex parents?

10  A.  Yes.

11  Q.  How many times?

12  A.  About ten times.

13  Q.  Have you ever been involved in a marriage equality case?

14  A.  Yes.  I was one of the experts in the Hawaii same-sex

15  marriage case in the mid '90s.

16  Q.  Your CV lists the Donaldson Institute.  I think you've

17  touched upon that a little bit.  Can you describe your work

18  there?

19  A.  Sure.  The Donaldson Adoption Institute, which is located

20  in New York City, is a nonprofit think tank.  It's arguably the

21  preeminent think tank on adoption issues in the country.

22       Our primary mission is to foster the well-being of

23  children who are adopted to promote ethical adoption practice.

24  We do a lot of research in the area of adoption, training of

25  professionals.  We are advocates, an advocates organization for

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

64

1    children in need of families, particularly kids coming out of

2    the foster system.

3    Q.  Have you ever consulted with any government agencies?

4    A.  I have.  Pretty regularly, child welfare agencies in the

5    states here.  And I've also counseled various ministries of

6    child welfare in England and Spain, and Italy, and Sweden.

7    Q.  What sort of issues are you called upon to address with

8    state child welfare agencies?

9    A.  A lot of it has to do with best practice issues in dealing

10   with adoption, training their professionals around -- you know,

11   establishing, you know, an appropriate atmosphere for doing

12   home studies.

13           Often times, it deals with helping them to set up or

14   to understand the need for post-adoption services.  One of the

15   big emphases in adoption today is the need for ongoing

16   post-adoption services.  And agencies are looking to figure out

17   how to do that in a timely and affordable manner.

18   Q.  Have you ever received any honors in these areas?

19   A.  I've received the U.S. Congressional Adoption Award.  It's

20   called an Angel in Adoption Award.

21           MS. STANYAR:  I move to qualify Dr. Brodzinsky as an

22   expert in the areas of child development, parenting by same-sex

23   couples and the well-being of their children, adoption and

24   fostering, including same-sex couples, and child and family

25   clinical psychology.

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014
65

1          THE COURT:  Counsel, would you like to voir dire or do

2    you have any objections?  Other than your standing

3    objections --

4          MR. POTCHEN:  Okay.

5          THE COURT:  -- to the issue.

6          MR. POTCHEN:  Other than the standing objection

7    regarding adoption, we have no objection.

8          THE COURT:  Very well.  He may be qualified.

9    BY MS. STANYAR:

10   Q.  What is meant in the field of psychology by the term "child

11   adjustment"?

12         THE COURT:  You know what?  Why don't we take our

13   morning recess now.  Then we won't have to interrupt his

14   testimony.

15         We'll take 15 minutes.  That clock and mine are a

16   little bit off, but we'll start at ten after.  Thank you.

17      (Recess taken, 10:50 a.m. - 11:08 a.m.)

18         THE CLERK:  All rise.

19         THE COURT:  Okay.  You may be seated.  Thank you.

20         You may proceed with your direct examination.

21         I understand that some people can't hear in the back.

22   We're going to try to get as close to the microphones as we

23   can.  If you can't hear, raise your hand, let us know.  Can you

24   hear now?

25         It's not better?  Okay.  We'll have to get I.T. in

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014
66

1    here to find out why you can't hear back there.

2            Oh, you're instant messaging?  Not I.T., though.

3            THE CLERK:  I have to get it from them first, in order

4    to --

5            THE COURT:  Okay.  Can you ask, please.  Thanks, Adam.

6            If you could ask them to call IT, tell them, and tell

7    them that they can interrupt us, because it's important; that

8    people can't hear in the back.  We'll get it, we'll get it

9    taken care of, ASAP.  So we'll get the people in here.

10           We're going to proceed.  And, Ms. Stanyar, if you can

11   talk a little bit louder.

12           MS. STANYAR:  Okay.

13           THE COURT:  I know that's not your fault.  It's the

14   mic. system.

15           MS. STANYAR:  I pushed it away.

16           THE COURT:  Great.

17           MS. STANYAR:  It was scaring me.

18           THE COURT:  That's fine.  No.  You have to be close

19   because it's also picking it up.

20           MS. STANYAR:  Okay.

21           THE COURT:  Not that close.  I think you're fine.

22   They'll tell us.  Because these microphones apparently they,

23   they took off the sound system and put it into the, the piping

24   into the other room.  But we'll figure it out, we'll make sure.

25   It's important.  This is a public courtroom, it's important

1    that everybody see, everybody hear.  If you can't see and you

2    can't hear, let us know.  I know you can't right now, but

3    they're getting someone in here right away.  Okay.

4             MS. STANYAR:  Can I have the last question read back?

5             THE COURT:  Well, I don't think there's the last

6    question.  You were starting to go into your, to your --

7             MS. STANYAR:  What was the one before my question that

8    I didn't ask?  Do you, are you able to go back?  Or no?  I'm

9    sorry.

10            (Brief pause.)

11            I moved to qualify him as an expert.

12            THE COURT:  Yes.  And I agreed.

13   BY MS. STANYAR:

14   Q.  What is the meant in the field of psychology by the term

15   "child adjustment"?

16   A.  Child adjustment has to do with the ability of a child to

17   function in one or more areas of their life.  So, for example,

18   the ability to function well --

19            THE COURT:  Excuse me.  One more second.  I see our

20   I.T.

21            Hey, Bob, here's what's happening.  The people in the

22   back -- you can't hear either?  The people in the back can't

23   hear.  Are these microphones on or what's causing the problem?

24            (Brief pause.)

25            THE COURT:  Not only can they not hear mine, but they

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1    can't hear everything.

2          MR. GRATHOFF:  Sounds pretty good across the hall.

3          THE COURT:  Yeah, across the hall, I'm sure it's good,

4    but the people back here can't hear.

5          Can you hear better?  Can everybody hear better?  Yes?

6    Okay.  Good.

7          Carole, if you don't mind trying that mic, too.

8          MS. STANYAR:  Testing 1.

9          THE COURT:  How is that?  Everybody hear better?

10   Perfect.  I hope they can hear it in the other room, too.  I

11   won't -- okay.  Great.  I'm glad you said something.  So if you

12   can't hear or see, either this room or the other room, let us

13   know.

14         Okay.  Let's go.

15   BY MS. STANYAR:

16   Q.  I believe that you were talking about the term "child

17   adjustment."

18   A.  Yes.  It has to do with the child's ability to function

19   well within the normal range in one or more areas of life.  For

20   example, is the child progressing normally, motorically.  Is

21   the child developing normal attachments with parents and with

22   others.  Is the child progressing through school, doing well in

23   reading, math, etc., etc., forming appropriate peer

24   relationships, developing positive self-esteem and, you know,

25   integrating sense of self in terms of identity appropriately.

1   So there are many areas of development that we look at in terms

2   of adjustment.

3   Q.  In the field of psychology, has there been research

4   conducted to learn what family circumstances promote positive

5   child adjustment?

6   A.  Yes.  There's a tremendous amount of research.

7   Q.  How is child adjustment measured?

8   A.  Well, it's measured in a variety of ways.  We, we look at

9   quality of parent-child relationships, we look at

10  symptomatology of a child, the behavior of the child, whether

11  the child shows any evidence of any type of problematic

12  behavior, progress in school, peer relationships and so forth.

13  And we do so with, we do so with, in a variety of ways, too,

14  different methods they used.

15  Q.  All right.  Has researched identified any factors relating

16  to family circumstances that predict positive adjustment?

17  A.  Yes.

18  Q.  I'm going to ask you to look at the demonstrative here.

19  Can you tell us, are these the factors?

20  A.  These are the primary factors that have been, time and

21  again, shown to be the key predictors of children's adjustment.

22       They are quality of parent-child relationships;

23  quality of the relationships between the parents.  Harmonious

24  parents produce better adjusted children.  Warmer parent-child

25  relationships produce better adjustment in children.

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

70

1          The characteristics of the parent, the styles that

2     they adopt, parental warmth and nurturance, emotional

3     sensitivity.  The ability to employ age appropriate rules and

4     structure for the child.

5          And the kinds of educational opportunities that

6     children are afforded is important, as well as the resources

7     that are provided for the child, not only in the family itself,

8     but the resources that, from the outside, that impact the

9     family and the child in particular.  And of course, the mental

10    health of, of the parents.

11          THE COURT:  Excuse me.  Bob, is everything working

12    good?

13          MR. GRATHOFF:  Yes, it is.

14          THE COURT:  Thank you, very much.  We appreciate it.

15          Okay.  I'm sorry.  He was standing there.  I wanted to

16    make sure everything was cool.

17    BY MS. STANYAR:

18    Q.  Have studies looked at whether these factors predict

19    positive outcomes or positive child adjustment in families

20    other than married mother/father biological-parent families?

21    A.  Yes.  These are the predictors that, the key predictors

22    that predict child outcome regardless of the family form,

23    whether it's a two-parent married family, heterosexual, gay or

24    lesbian families, single parents, divorced families, families

25    of color, families from low SES status, that's socioeconomic

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

71

1    status or, you know, middle or upper socioeconomic status.  All

2    families, these are the key predictors.

3    Q.  Have they all been studied?

4    A.  They've all been studied, yes.

5    Q.  How well established in the field of psychology is it that

6    these factors that you listed are the factors that predict

7    positive child adjustment, regardless of family types?

8    A.  It's very well established.  The consensus in the child

9    development and family psychology literature is that these are

10   the factors that predict, you can open up any journal that's

11   studying this, and you'll see one or more of these represented.

12          MS. STANYAR:  All right.  I'm going to ask him to look

13   at Tab A of his binder.  And here's where we're getting into

14   the point at which I'm going to lay a foundation for the

15   articles.  And I think there's going to be an objection here,

16   but.

17          THE COURT:  Okay.

18   BY MS. STANYAR:

19   Q.  All right.  Look at Tab A of your binder.  Tab A.

20   A.  I've got it.

21   Q.  Yeah.

22   A.  This is Tab A.

23   Q.  First of all, could you identify the studies?

24   A.  These are two articles.  They are not empirical studies,

25   they are review articles, one by Michael Lamb that is entitled,

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1    "Mothers, Fathers, Families and Circumstances:   Factors

2   Affecting Children's Adjustment."   It's a recent publication.

3          And the second is a chapter by Susan Golombok and

4   Fiona Tasker, which reviews social emotional development in

5   different types of families, particularly non-traditional

6   family forms.

7   Q.   Do these articles summarize the body of research on the

8   factors that affect child adjustment?

9   A.   Yes, they do.

10  Q.   Are they representative of similar reviews of this nature?

11  A.   They are.

12         MS. STANYAR:   At this time, I would move to admit the

13  literature, these two.

14         THE COURT:   Counsel?

15         MR. POTCHEN:   Yes, your Honor.   We're going to object

16  to, we'll start with these that we're objecting to.

17         This, apparently these are summary articles done by

18  people other than this witness.   So these are summaries of the

19  research conducted by other people.   That's hearsay on top of

20  hearsay.   So this is not a summary even done by this witness.

21  And it is not a summary of even the people who are writing the

22  article.

23         So to the extent they are seeking to admit this, there

24  is no hearsay objection that would follow that this would be

25  admissible.

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1          THE COURT:  Counsel?

2          MS. STANYAR:  Your Honor, we're in a unique situation

3    where we are proceeding both with our *Daubert* hearing, as to

4    all the witnesses that we objected to, and we're proceeding

5    with trial.  So this is relevant for a number of different

6    reasons.

7          First of all, as to many of these articles that we're,

8    we're going to be talking about, Dr. Brodzinsky relied on them,

9    at least the ones that preceded his report of December 20th of

10   last year.

11         In addition, we don't intend on calling Dr. Brodzinsky

12   back.  And so we are, we are, you know, trying to introduce the

13   rebuttal to the State's experts.  They will -- they are going

14   to be talking about, for example, Loren Marks is going to be

15   talking about the research, but he stops at 2005 for some

16   reason.  And so, you know, we want to, we want to talk about

17   that.

18         THE COURT:  Well, I think the articles are not

19   admissible because they are hearsay, at least if not hearsay on

20   top of hearsay.  However, Dr. Brodzinsky has been qualified as

21   an expert under *Daubert*, and all other standards, and he is

22   testifying as an expert.  And he can certainly rely, if that's

23   what he did, on articles and studies and that he's done, and

24   others have done, because he's going to -- you've asked him --

25   you're going to ask him to render opinions.  And so there's no,

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

74

1   there's no dispute at this point that he is an expert and he

2   may render opinions in the areas that you have indicated

3   before.

4          But the articles themselves would not be admissible

5   through this particular witness.  And that doesn't mean that he

6   can't rely on them and talk about them in terms of putting his

7   opinion together.  But I don't think the articles themselves,

8   not think, I know they aren't and, therefore, I'll sustain the

9   objection.

10         MS. STANYAR:  I understand, your Honor.  As I often

11  do, I may be trying to give you additional argument and legal

12  authority.

13         THE COURT:  As you always do.  I have no problem with

14  that.

15         MS. STANYAR:  Okay.

16         THE COURT:  But as I say, this one is going to be --

17         MS. STANYAR:  I understand.

18         THE COURT:  -- a very uphill battle.  As I say, he may

19  use them in his testimony, and I suspect that he will because

20  he's an expert.  And as an expert, he is allowed to do that.

21  But the articles themselves are not admissible under many

22  rules, the most important of which is hearsay.

23         MS. STANYAR:  All right.  Fine, your Honor.

24  BY MS. STANYAR:

25  Q.  Is there research on the ways in which men and women parent

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

75

1    children in heterosexual couple families?

2    A.  Yes, there are.

3    Q.  What does the research indicate?

4    A.  The research indicate there's a wide range of variability

5    between, for men and women, in how they parent.  There's

6    variability.  There's more overlap than difference.  There's

7    variability from family-to-family.  There's variability even

8    within the same family, depending upon whether you're parenting

9    a baby versus parenting a teenager.  You would certainly,

10   either gender would parent the child differently.  And there's

11   variability in how men and women parent from culture to

12   culture, as well.

13   Q.  Does, does the research show any average differences in the

14   ways that mothers and fathers interact with their children?

15   A.  Yes, it does, on average.

16   Q.  Can you describe that?

17   A.  Sure.  Mothers tend to be more emotion focused.  They tend

18   to be more calming and soothing with their children, with more

19   physical affection offered.  They are more linguistically

20   oriented.

21        Fathers, in turn, are more playful, more boisterous in

22   their, in their interactions.  They are a little bit more

23   task-oriented in their interactions.

24        But I would say that both men and women do the same

25   kinds of things; in other words, they can engage in the same

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

76

1    kind of behavior.  It's a matter of distribution of different

2    behavior at different times, depending upon children's needs

3    and who is available for the child.

4    Q.  Does the study of psychology consider these differences in

5    competency?

6    A.  No.  They are differences in style, not at competence.

7    Q.  Are women more likely to be more skilled at parenting?

8    A.  On average they probably are, because they spend more time.

9    And the more experience you have, the more skilled you become

10   in particular areas.

11       So women are, on average, more likely to be the

12   primary child care provider, more likely to feed and bathe the

13   child, more likely to take the child to different places, spend

14   more time with the child, and with time comes competence.

15       We know that when men spend more time, such as we're

16   finding a trend, you know, in terms of societal trends, men

17   spending more time being parents, and in some cases, men being

18   the primary care provider, we find that the same level of

19   competence occurs generally in men who are spending more time.

20   They look very much like what we see when women are spending

21   primary time.

22   Q.  What is the reason for these stylistic differences?

23   A.  Well, there's a couple of reasons.  One is that it depends

24   on what role the person is playing.  If you are feeding the

25   child or bathing the child, you're more directly involved with

1    the child.  You're engaging more soothing behavior.  You're

2    engaging more face-to-face interactions with the child.  The

3    role elicits certain kinds of behavior.  So the role that

4    people play, that they choose to play, that they negotiate

5    between themselves in terms of playing often elicits different

6    kinds of behavior.

7         But also, men and women socialize differently.  We

8    socialize women, in general, in society to be more

9    emotion-focused.  We promote emotion in women and we tend to

10   downplay the expression of emotion in men, on average of

11   course.  And men are socialized, you know, to be more physical,

12   to be more, you know, more stoic in their emotions and so

13   forth.

14        So sometimes the socialization that men and women

15   experience growing up is brought into a family, and it impacts

16   on the kind of styles that they, they enact.

17   Q.  Are you saying that only fathers engage in playful

18   activities with their children and the mothers don't do that?

19   A.  No, of course not.  In fact, probably, in an absolute

20   sense, probably mothers spend more time playing with their

21   children because they spend more time with their children,

22   period.

23        But in a relative distribution of time versus what

24   activities you're engaged in, men are more playful rather than

25   let's say in a soothing, calming sense, and women tend to spend

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

78

1   more time soothing and calming children relative to their

2   husbands.

3   Q.  Are these differences in parenting style uniform across

4   couples?

5   A.  No, they are not.  There's quite, quite a difference from

6   couple to couple in distribution of, of the roles that people

7   play, of the kinds of interactions that they take -- that take

8   place and the kinds of behaviors that, that they manifest in

9   doing the same role, for example.

10  Q.  Does the research suggest that children are better off if

11  their mothers adopt a typical maternal style and their fathers

12  adopt a typical paternal style?

13  A.  No.  There's no research that supports that.

14  Q.  So, for example, if in, in a particular heterosexual parent

15  family, if the father happens to be more nurturing and soothing

16  and is less physically playful with the children, is it at all

17  harmful to the child?

18  A.  No, it would not be.

19  Q.  Is there any evidence that children need a male and female

20  parent for positive child development?

21  A.  I assume you mean male and female in the same household?

22  Q.  Yes.

23  A.  The answer is no.  It's not the gender of the parent that's

24  the key.  It's the quality of parenting that's being offered by

25  whoever is there, husband or wife, two women, two men, a single

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

79

1    parent, as long as the factors that we listed up there are

2    present:  Good mental health, good parent-child relationships,

3    what we call an authoritative parenting style, which is warmth,

4    stimulation, structure, and the availability of resources.

5    Then we're going to have a child who is much more likely to be

6    healthy.

7    Q.  Do children in single-parent families, on average, do as

8    well as children in two-parent families?

9    A.  No, they don't.  On -- well, let me start by saying they

10   don't, but most children in single-parent families actually do

11   well.  It's just on an on-average comparison.  The reason --

12   Q.  What does that mean?  Because maybe you used this is a lot.

13   A.  Oh.

14   Q.  But what is an on-average comparison?

15   A.  Well, when you take a group of single parents and a group

16   of two-parent families, we get a mean or an average of what

17   they are doing, and how the outcome is.  And there's often an

18   overlap, there's always an overlap.  And the difference between

19   the means is what we call the on-average difference.  The means

20   could be very similar, but still statistically significant.

21        And most of the behaviors or the adjustments of

22   children in single parents would look like the behaviors and

23   adjustment of children in two-parent families.  But on, excuse

24   me, on average, the, the children in two-parent families would

25   be doing a little bit better.

1    Q.  What accounts for the higher rate of adjustment problems,

2    to the extent there are, in single-parent families?

3    A.  There are a couple of reasons.  First, let's talk about the

4    pathway to single parenthood.  Many parents become single

5    parents following the break-up of a previous relationship.

6           Children who are the product of a previous failed

7    relationship experience, you know, the disruption of that

8    relationship.  They frequently will experience the conflict

9    between the parents that preceded, unfortunately too often,

10   follows the break-up as well.  So there's a lot of turmoil in

11   the child's life that leads the child ultimately to be raised

12   by that single parent.

13          Other times, parents become single parents, you know,

14   without the active involvement of the father.  So the child is

15   born, but the father is just not involved in the child's life.

16          Both of those groups also have less resources.  We

17   know that single parents are much less likely to, to be

18   economically as advantaged as two-parent families.

19          And anyone who is a single parent knows, or knows a

20   single parent, it's just more stressful.  You are doing

21   everything by yourself.  So you don't have someone else to help

22   in that regard.

23   Q.  Would you say that most children raised in single-parent

24   families have adjustment problems?

25   A.  No, they don't.

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1  Q.  Most?

2  A.  Most are doing very well.  You know, it's a matter of the

3  fact that many of these, most of these single parents end up

4  being described in very similar ways that we're talking about

5  the factors here, there.  They are mentally healthy.  They have

6  good parent relationships, they provide resources, and you

7  know, it works well for the child.

8  Q.  When you say children don't need a male and female parent

9  to develop well, are you saying that moms and dads are not both

10  important to children?

11  A.  Of course not.  Moms and dads are important.  They are

12  important as parents, though.  They are not important as males

13  or females, women and men.  It's what they bring to the, to the

14  parenting process are certain parenting qualities that we've

15  talked about up here, again.  And it's those factors, not the

16  gender of the parent, that predicts to better outcomes.

17  Q.  Is there a body of scientific research on same-sex parents

18  and their children?

19  A.  There is, quite a bit.

20  Q.  Is that research published in peer review journals?

21  A.  Yes, it is.

22  Q.  Have any of the studies appeared in top tier journals?

23  A.  Yes, they have.

24  Q.  What is the purpose of peer review?

25  A.  Peer review ensures, or at least it protects against a

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

82

1    study being published that has poor methodology, that is using

2    inappropriate measures, that is doing inappropriate analyses or

3    drawing inappropriate conclusions from those analyses, or is

4    not integrating the findings into the body of literature in a

5    way that makes sense.

6    Q.  Over what period of time has this research on gay and

7    lesbian parenting been accumulating?

8    A.  Over 30 years now.

9    Q.  In total, approximately how many peer reviewed articles are

10   there addressing parent -- are there addressing parenting by

11   same-sex couples or on the adjustment of children raised by gay

12   and lesbian parents?

13   A.  Well over a hundred, probably getting close to 150 now.

14   Q.  Can you say anything about the reputations of the

15   researchers working in this area?

16   A.  Well, there's a large number of researchers working it.

17   But some of the top people are like Susan Golombok from

18   Cambridge University in England, and her colleague Michael Lamb

19   is also at Cambridge.  Charlotte Patterson, at the University

20   of Virginia, very distinguished professor.  Abbie Goldberg, a

21   younger, but very distinguished researcher at Clark University.

22   Nanette Gartrell, who is in San Francisco, a distinguished

23   researcher in this area.  There are quite a few very

24   distinguished people who are working in this area.

25   Q.  I'm going to ask you to turn to Tab B.

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

83

1           All right.  Are these some samples of studies that

2    evaluated children raised in same -- in same-sex parent

3    families?

4    A.  Yes, they are.

5    Q.  Okay.

6    A.  Samples.

7    Q.  I'm going to have you identify them.  We're not admitting

8    them, but we're identifying these studies.

9    A.  Do you want --

10   Q.  Yes.

11   A.  One by one?

12   Q.  Yes.

13   A.  Okay.  The first one is by Henny --

14           THE COURT:  The microphone, just move it a little

15   closer.

16           THE WITNESS:  Oh, I'm sorry.

17           THE COURT:  Because they are in another room

18   listening.

19           THE WITNESS:  Okay.  The first one is by Henny Bos and

20   his colleagues.  Do you want me to read the title?

21   BY MS. STANYAR:

22   Q.  I'm sorry.  Read the title.

23   A.  Yes.  "Lesbian and Heterosexual Two-Parent Families:

24   Adolescent-Parent Relationship Quality and Adolescent

25   Well-Being."

1    Q.  Excuse me.  Is Henny Bos a male or female?

2    A.  Female.

3    Q.  Okay.  All right.

4    A.  The second one is also by Henny Bos and her colleagues.

5    It's entitled, "Child Adjustment in Parenting and Planned

6    Lesbian-Parent Families."

7    Q.  What year is that?

8    A.  The first one is 2014.  The second one is 2007.

9         The third article is by Raymond Chan and colleagues,

10   including Charlotte Patterson.  Raymond Chan was a student or a

11   junior colleague of Charlotte Patterson.  And it's entitled,

12   "Psychosocial Adjustment Among Children Conceived via Donor

13   Insemination by Lesbian and Heterosexual Mothers."  And that

14   was published in 1998.

15        The fourth article is by Rachel Farr and colleagues.

16   And again that's Rachel Farr was -- is now a professor but was

17   a student at Charlotte Patterson.  Charlotte Patterson is a

18   third author on this.

19   Q.  Let me ask you, did you touch upon the Golombok/Mellish

20   2013 article?

21   A.  Did I miss that one?

22   Q.  Is that the one right before it?

23   A.  I skipped him.  I'm sorry.

24        So the, I guess the third article then is by Susan

25   Golombok and colleagues, including Michael Lamb, who is also

1    probably three, third or fourth distinguished professor of

2    child development in the world.  And this is published in Child

3    Development.  It's entitled, "Gay Adoptive Father Families:

4    Parent-Child Relationships and Children Psychological

5    Adjustment," 2013.

6          The fourth is Rachel Farr, Stephen Forssell and

7    Charlotte Patterson, published in Applied Development Science

8    in 2010 entitled, Parenting and Child Development in Adoptive

9    Families:  Does Parental Sexual Orientation Matter?

10         And the fifth is Michael Rosenfeld, Nontraditional

11   Families and Childhood Progress Through School, published in

12   Demography in 2010.

13   Q.  Are these examples of studies that evaluated children

14   raised in same-sex families?

15   A.  Excuse me.  Yes, they are.

16   Q.  Have you, have you -- are you familiar with this

17   literature?

18   A.  Yes, I am.

19   Q.  Have you reviewed all of these?

20   A.  I've reviewed these and, and many, many others.

21   Q.  All right.  And are these representative of the body of

22   research on same-sex parents and their children?

23   A.  Yes, they are.

24   Q.  With the exception of, I believe it's the Bos article from

25   2014, and that would have been February of 2014, with the

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1    exception of that article, would you have relied on these

2    articles in forming, forming your opinions that you're going to

3    testify to today?

4    A.  Yes, and obviously many other studies as well.

5    Q.  Can you describe what this body of literature evaluated in

6    terms of parents and in terms of children?

7    A.  The body of literature in this area evaluates both the

8    quality of parenting afforded children who were raised by

9    same-sex couples, versus heterosexual couples, as well as the

10   quality of the relationships of those parents, too.

11          And they also measured child outcome in a variety of

12   different ways.  Child outcome will be measured probably

13   differently from one study to another, using different

14   measures.  But generally, we're looking at psychosocial

15   adjustment.  We're looking at gender role behavior.  We're

16   looking at peer relationships.  We're looking at school

17   functioning, school progress.  We're looking at behavior and

18   symptomatology in some cases.  We're looking at victimization

19   in other cases.  We're looking at conduct problems and, and

20   related issues like illicit substance use and delinquency and

21   so forth.

22          There's a wide range of variables that are measured.

23   And these are all measured -- measures -- excuse me.  These are

24   all variables that are known to predict long-term adjustment

25   difficulties.

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

87

1   Q.  Let me ask you, and you may have touched on this with the

2   psychosocial thing.  But did any studies assess children's

3   psychological well-being?

4   A.  Yes.  Many studies do.

5   Q.  Did any of these studies have comparison groups of

6   heterosexual couples?

7   A.  Yes.  Most do.

8   Q.  Did any of the studies evaluate children raised in planned

9   same-sex parent families, in other words, families created by

10  same-sex couples?

11  A.  Yes, they, they do.

12  Q.  Can you identify the studies that did that?

13  A.  Well, there are the studies of planned lesbian families

14  that have conceived through donor insemination.  So, Charlotte

15  Patterson's work is in this area, Henny Bos's work is in this

16  area, Susan Golombok is in this area, and there are others.

17  Q.  We had mentioned a Farr -- Farr and Forssell?

18  A.  Yes.

19  Q.  Was that -- would that be one that involved planned

20  same-sex families or not?

21  A.  I'm blocking on that.  I'd have to go back and look.

22  Q.  Did any of them involve families formed by assisted

23  reproductive technology or the use of donor sperm?

24  A.  Yes.  The ones that I've talked about generally are, are

25  studies of D.I. families, donor --

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

88

1   Q.  Donor insemination?

2   A.  Donor insemination, yes.

3   Q.  Did any of the studies evaluate children adopted by

4   same-sex couples?

5   A.  Yes.  The Golombok, Mellish, including Michael Lamb does.

6   The Rachel Farr and Charlotte Patterson does, and other people

7   do as well.

8   Q.  Do any of the studies on same-sex parents assess the

9   well-being of adolescents or young adults?

10  A.  Yes.  Charlotte Patterson and Wainwright do.  Susan

11  Golombok does in some of her longitudinal work.  Henny Bos does

12  in the 2014 article.  There are a number of studies that look

13  at adolescents, and bordering on the adolescent/young adult

14  period.

15  Q.  Do we have a study assessed on children raised by gay

16  fathers?

17  A.  Yes.

18  Q.  Can you identify some of the studies that evaluated gay

19  fathers?

20  A.  Well, the study on adoption by Susan Golombok and Mellish

21  and Michael Lamb does, Rachel Farr and her colleagues do.  Gay

22  fathers are included in other studies as well.

23  Q.  What are the conclusions of the body of research on

24  same-sex parent families?

25  A.  The conclusions are the --

1          MR. POTCHEN:  That I'll object to on hearsay, your

2    Honor, the conclusions themselves.  He can testify about the

3    studies, but he's bringing in what their conclusions are and

4    their opinions.  Basically he's being used as a --

5          THE COURT:  Sustained.  He can testify as to what his

6    conclusions are based upon his research and based upon his

7    study and so forth, but not necessarily what somebody else's

8    conclusion was, because they are not here for cross.  They are

9    not here for cross-examination.

10         MS. STANYAR:  I'll have him answer your question.

11         THE COURT:  No.  It's your question, not mine.

12   BY MS. STANYAR:

13   Q.  What is your opinion?

14         THE COURT:  I made a ruling.  My ruling is that he

15   can't testify as to their conclusions.  He can testify as to

16   his conclusions that he reached as an expert, using all these

17   documents.

18   BY MS. STANYAR:

19   Q.  What are your conclusions based upon the research that

20   you've reviewed?

21   A.  My conclusions about the outcomes for children, based upon

22   this research, is that children of gay and lesbian individuals

23   show no discernable differences in outcomes and in general

24   characteristics, developmental characteristics, compared to

25   children of heterosexuals.

1          And the other conclusion that I reach is that the

2    parenting qualities of gays and lesbians are no different than

3    the parenting qualities of heterosexual individuals.  And the

4    couple relationships of those who are parenting children are no

5    different in heterosexual families and gay and lesbian

6    families.

7    Q.  All right.  So are your, are your conclusions consistent

8    with the findings that we talked about?

9    A.  Yes, they are.

10   Q.  All right.  Did the studies reach any conclusion about --

11   and it was kind of a longish answer, so we're going to make

12   sure we hit everything.  Did the studies reach any -- or no.

13         Is your opinion -- what is your opinion about the

14   psychological well-being of children of same-sex parents?

15   A.  My opinion is that their adjustment is, is the same as

16   children raised by heterosexuals.

17   Q.  What is your opinion as to the educational development of

18   children of same-sex parents?

19   A.  That it's the same as those raised by heterosexuals.

20   Q.  What is your opinion as to whether or not children of

21   same-sex parents are able to form healthy peer relationships?

22   A.  My opinion is that they form just as healthy peer

23   relationships as those raised by heterosexuals.

24   Q.  Were the factors that predicted good child adjustment of

25   same-sex parent families any different than the factors that

1   predict adjustment in heterosexual families?

2   A.  No.  They are the same.  When those -- there are studies

3   that not only address the issue of family structure, gay and

4   lesbian versus heterosexual, but they also incorporate family

5   process and resource variables of the sort that we're talking

6   about here.

7           And to a study, every one of those studies shows that

8   it's the family process and resource variables that predict

9   adjustment, not family structure.

10  Q.  And are the findings consistent?

11  A.  They are very consistent.

12  Q.  What methodologies have researchers employed in their

13  studies of the adjustment of children raised by same-sex

14  parents, in terms of, first of all, talk about recruiting

15  samples.

16  A.  Okay.  We recruit samples in different ways.  The majority

17  of the studies are used what are called convenience samples.

18  We, we take from the communities people who are readily, more

19  readily available.  So if I wanted to do a study on children's

20  academic achievement, I might go to a school in a community,

21  get permission to work with that school and the families in

22  that, and pull from, the data from those children.

23          Similar kind of things are done, you know, in this

24  area.  We recruit gay and lesbian families from various sources

25  that, without the assumption being that they are representative

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1   per se of the broader population of gays and lesbians.

2   Q.  We'll come back to that.  But are there different methods

3   of assessment within this body of research?

4   A.  Yes.  We assess in a variety of ways.  We do intensive

5   interviewing.  We use structured --

6   Q.  Interviewing of who?

7   A.  Oh, I'm sorry.  We do interviewing of, of parents, we do

8   interviewing of children, depending upon their age of course.

9   We do interviewing sometimes of teachers, and others that are,

10  you know, are part of the family system.

11          We use structured interviews filled out by parents, by

12  teachers sometimes, by the youth themselves, particularly in

13  the adolescent studies that focus on adolescents.

14          We do observations of parents and children interacting

15  with one another, usually around some kind of structured tasks.

16  Some studied, Henny Bos, for example uses daily diaries that

17  provide information about what's going on in the family.

18  Q.  Do any use standardized testing?

19  A.  Yes.  Some use standardize testing, too.

20  Q.  Okay.  Do the studies look at subjects at one moment in

21  time or do they look at the subjects over time?

22  A.  Both.  The first is called a cross-sectional study where

23  you take a, a group of individuals at one point in the life,

24  kind of a slice-of-life look at them.  Studies have looked at

25  children, you know, from very early childhood all the way

1   through adolescence that way.  And there are other studies that

2   are longitudinal that follow a child or follow families,

3   children and their parents, from a particular point in time, to

4   a second or a third point in time.

5          Some studies have gone all the way through basically

6   the transition to, to young adulthood now, several studies

7   have.

8   Q.  Are all of these methods accepted methods in the field of

9   psychology?

10  A.  Absolutely.  Over, I was going to say you can open any top

11  tier journal, Child Development, or Developmental Psychology,

12  or Journal of Family Psychology, you will find all of these

13  recruitment methods and methodologies and assessment techniques

14  represented in one or more studies in these journals.

15  Q.  Is convenience sampling rare in the field of psychology?

16  A.  No.  It's the bread and butter of psychology.

17  Q.  What are the sizes of samples in those studies that use

18  convenience samples to study children of same-sex couples?

19  A.  It varies.  It can be from a few dozen to over a hundred.

20  Q.  How can you be confident in the results of studies that use

21  smaller samples like convenience samples?

22  A.  Well, it depends on what you're trying to do.  If you're

23  looking at a question of, of what is the relationship between a

24  variable such as family structure, what you do is you take a

25  group of individuals.  You try to control for extraneous

1    factors like, let's say, income.  We know that you want to

2    match for income, because income correlates with child

3    adjustment.  So compare one group with another, and then you

4    replicate.  You replicate it again and again.  Not the exact

5    same study.  You replicate the general question.  Do -- does

6    sexual orientation, in this case, does sexual orientation, does

7    family structure make a difference in child lives.

8              We have now well over a hundred studies that have

9    replicated that question, again and again, using different

10   populations, different, in different areas of the country, in

11   different countries.

12             And so the assumption is when you get a pattern, a

13   consistent pattern over time, then the question -- then the

14   findings are valid and, and relate -- that relate to the

15   question of interest.

16   Q.  Are you familiar with the term "statistical power"?

17   A.  Yes.

18   Q.  What is that?

19   A.  Statistical power is the ability to detect a difference

20   between two groups that represent a true difference, you know,

21   as opposed to some random difference.

22   Q.  And can you get sufficient statistical power with small

23   samples in the literature?

24   A.  Statistical power is related to sample size.  And when you

25   use small samples, sometimes you're not able to detect small

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1    differences between two groups.

2           I would point out that even though, where we have

3    small samples in this, in this literature, but we are regularly

4    finding differences between groups, just not the differences

5    perhaps that the opponents of marriage equality are looking

6    for.  We certainly find differences in parenting styles.  So we

7    can detect, at least medium and large scale differences.

8    Sometimes we can detect small differences.

9    Q.  Are you able to detect differences in maladjustment?

10   A.  Generally, we can.  Because the differences that were

11   generally -- the range of scores in these studies are generally

12   all within the normal range.  So that if the difference is

13   small, they are really differences about normality, so to

14   speak, ranges, whether a person tends to be a little bit more

15   this way, or a little bit more this way.  They are not -- we're

16   not talking about differences that are, that are failing to

17   detect gross maladjustment.

18   Q.  When you're talking about this, this group of, this body of

19   research, the convenience sample, is there anything about that

20   body of research, considered as a whole, that makes you think

21   that it's unreliable in any way?

22   A.  No.

23   Q.  What is a representative sample?

24   A.  A representative sample is a group of individuals that are

25   drawn from a larger group that we have reason to believe that

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

96

1    they are -- that they represent that larger group.

2    Q.  What is a population study?

3    A.  A population study is studying everyone in, you know, in a

4    particular population, a census.  Studies that have used census

5    data or population studies because they pull from -- data from

6    everyone.

7    Q.  Are representative or population studies commonly used by

8    psychologist?

9    A.  No, they are not commonly used.  We do use them

10   occasionally, but the bread and butter of developmental science

11   and family science is, in psychology, is convenience samples.

12   Q.  Why not use representative or these broad brush population

13   studies?

14   A.  Well, although there are some benefits, of course, to large

15   samples, the problem is that the small samples allow us to look

16   inside the family.  We, when we're working with a smaller group

17   of individuals, we observe them.  We intensively interview

18   them.  It allows us to know what's going on.

19         Census data asks a few questions.  It doesn't tell us

20   what's going on in a family.  Large scale studies seldom

21   provide the ability, occasionally they do, but they seldom

22   allow the ability to look intensely inside the family.

23         And as a developmental scientist, what we're

24   interested in is what makes a difference in the family for the

25   child.  What are the resources that parents bring into the

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

97

1    family, in terms of parenting styles, in terms of the

2    relationship that they have with children, in terms of their

3    relationship if there's a couple, that makes a difference in a

4    child's life.  The only way to study that, really, is to get

5    actively involved with the families and get up close and

6    personal, so to speak.

7    Q.  Is a representative or population-based standard essential

8    to assess the well-being of either children, of children raised

9    by same-sex parents?

10   A.  In my opinion, no.

11   Q.  Why not?

12   A.  Because it doesn't ask -- population studies, like census

13   simply don't ask the questions that will allow us to assess the

14   critical factors that are, are relevant.  Census data actually

15   doesn't even ask the very specific question of whether you're a

16   gay or lesbian, and so we have to infer from that, from what

17   information is available.

18   Q.  What sort of variables do studies on gay-parent families

19   need to control for?

20   A.  You need to control for a wide range of factors.  You need

21   to control for the resources available.  Usually, the proxy

22   variables are parent income or parent education.  You need to

23   control for family stability.

24   Q.  Let me stop you there.  What, what does it mean to "control

25   for" a factor?

1    A.  You either match the sample, so that children in the gay

2    and lesbian families are matched with children in heterosexual

3    families in terms of, so that the groups are, are the same in

4    terms of average parent income, or average parent education,

5    or, or the racial composition of the two groups.

6         We also are very concerned about family instability

7    and family transitions, particularly in this area, but in

8    general.  We know that children who have experienced family

9    disruption through divorce --

10   Q.  We're going to get to that.

11   A.  Oh, I'm sorry.

12   Q.  Let me just try to get you back over here.

13   A.  Okay.

14   Q.  Are there types of research for which a representative or

15   population-based sample is necessary?

16   A.  Yes.  If you want to know the rate of something, for

17   example, if you want to know the rate of children who are being

18   raised by gays and lesbians in the country, you need a

19   representative sample so that you can generalize to the general

20   population.

21   Q.  You mention that there were some studies of children or

22   lesbian -- children of lesbian or gay parents that did use

23   population-based or representatives samples.  Can you identify

24   a study that used a representative sample?

25   A.  Wainwright and Patterson studies, they, they published

1    three articles, same sample set, but so it's not different

2    samples, but they used a national survey of adolescent health.

3    I may occasionally refer to it as the ADD health survey, A-D-D.

4    But it's an adolescent health survey.  It's a survey of I think

5    12,000 or more representative teenagers.

6            This was an unusual study because they not only

7    collected survey data, but they actually interviewed the

8    adolescents as well, which is very unusual in large-scale data

9    sets.

10           So that's, those -- there are three publications from

11   them.  Rosenfeld is a, is a population study, because he used

12   the census data.

13   Q.  Is that Michael Rosenfeld?

14   A.  I'm sorry.  Yes.  Michael Rosenfeld.

15   Q.  Stanford University?

16   A.  No.  Yes, I'm sorry.  Stanford University.  I'm sorry.  So

17   those are two examples of representatives -- representative

18   samples.

19   Q.  All right.  So if you're looking at the findings of

20   representative population-based or representative samples and

21   the findings from convenience samples, are the findings showing

22   up different?

23   A.  They are not.

24   Q.  Some of the defendants' experts the State defendants are

25   expected to testify that only long term, large-scale

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1   representative samples provide reliable data on the well-being

2   of children of same-sex couples.  What's your reaction to that?

3   A.  I disagree completely.  First of all, it makes the

4   assumption that, that somehow, knowledge about adults only

5   emerges in adulthood.

6        When you would have maladjustment in young adults or

7   middle-aged adults, it almost always is preceded by

8   maladjustment earlier in life.  An example would be, you know,

9   delinquency behavior in the young adult, conduct problems.

10  Antisocial behavior is almost always preceded by problems in

11  childhood.

12        The literature in development science mostly focuses

13  on children and adolescents.  We don't have studies going into

14  adulthood or middle-age, that's true, not in this area at

15  least.  But we have really solid, reliable data on the

16  predictors of long-term adjustment.  And there is --

17  Q.  All children?  You have solid research as to the predictors

18  of maladjustment as to all children?

19  A.  All children.  Exactly.  And not just in, in the gay and

20  lesbian literature.  But, you know, the kinds of measures that

21  are used in the, in this same-sex couple literature are the

22  ones that are used in other developmental science and ones that

23  we know do predict to maladjustment in young adulthood and

24  beyond.

25        So we have a lot of confidence in saying if we're not

1    seeing problems in early childhood, in middle childhood, in

2    adolescence in this group compared to heterosexuals, there is

3    absolutely no theoretical or empirical reason to expect that we

4    would suddenly see problems emerging when they are, you know,

5    in their late 20's or into their 30's and so forth.  Just no --

6    it doesn't make any sense from both our theories and our data.

7    Q.  How do you define adolescents?  Up to what age?

8    A.  Up to 18, let's say.

9    Q.  All right.  Let's go back.  I don't know if you defined a

10   longitudinal study.  Have you defined it yet?

11   A.  I think I have, but.

12   Q.  Are any of the studies of children of lesbian and gay

13   parents longitudinal?

14   A.  Yes.

15   Q.  Can you identify those?

16   A.  Susan Golombok and Fiona Tasker followed a group of

17   individuals from failed -- who were recruited from failed

18   heterosexual marriages.  They went into the young adult period,

19   early young adult period.  Susan Golombok, in her fatherless

20   families studies have followed children, it's a separate study,

21   all the way now into, I think they are 17 or so, into the late

22   adolescent years, maybe approaching young adulthood, some of

23   them.  Excuse me.

24        Henny Bos and his studies of D.I. families, donor

25   insemination families, have followed the children into roughly

102

1    I think they are 18, 19 years of age right now.

2         So we have at least three or four studies that have

3    followed children from earlier in life, in same-sex families,

4    in comparing them to heterosexual families through the

5    developing years into at least adolescence, if not into young

6    adulthood, early part of young adulthood.

7    Q.  If you take the findings of the longitudinal studies that

8    you just talked about, and you take the findings of the other

9    studies, the convenience sample, the representative sample

10   studies, are the findings showing up consistent?

11   A.  Yes, they are.

12   Q.  Experts for the State are expected to testify that the

13   research methods used in the studies on same-sex families are

14   flawed, and thus, the studies are not reliable.  What's your

15   reaction to that?

16   A.  I completely disagree.  That, that conclusion essentially

17   dismisses all of developmental, or most of developmental

18   science and most of psychology, since most of psychology uses

19   convenience samples.

20   Q.  Experts for the State are expected to testify that we don't

21   yet have sufficient research to establish policy about same-sex

22   parents, because it's a nascent body of research.  What's your

23   reaction to that?

24   A.  It's hardly nascent.  It's 30 years or more maybe, you

25   know, in its development with a hundred or more, maybe closing

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1    in on 150 studies right now.

2    Q.  One of the State's expert witnesses, Loren Marks, he's a

3    family studies professor, he did a review of the research on

4    gay parent families up until 2005.  Has there been any research

5    in this area since 2005?

6    A.  A lot of research.  At least a couple of dozen studies that

7    have made direct comparisons between gay and/or lesbian

8    families and heterosexual families, as well as other studies

9    that have looked only at gay and lesbian families and looked at

10   the family process variables that predict adjustment within

11   those families.

12   Q.  The research from 2005 to 2014, is it using all the

13   different methodologies we've just discussed?

14   A.  It is.

15   Q.  We've been talking about studies.  I'd like to switch gears

16   for a moment to talk about your clinical experience with real

17   families.

18        You mentioned that you have clinical experience

19   working with families headed by same-sex couples.  Is there

20   anything about your experience working with these families that

21   is inconsistent with the research findings that children's

22   adjustment is not affected by their parents' sexual

23   orientation?

24   A.  Nothing.  I mean, I've been working with gay and lesbian

25   families from probably the late '80s, 1980's to the present.

2:12-cv-10285-BAF-MJH   Doc # 143   Filed 03/13/14   Pg 106 of 149   Pg ID 3221
BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

104

1   At any one time now in my clinical practice in California, a

2   third to 50 percent of the families I'm seeing are gay and

3   lesbian, usually adoptive families, but not always.  And they,

4   they form families and parent their children in the same way,

5   just as in a healthy way as do heterosexual families.

6   Q.  You've already testified as to your opinion on the impact

7   of parent sexual orientation on parenting ability and the

8   well-being of children.

9          Is there any basis for the assertion that children

10  raised by same-sex parents are at a greater risk of adjustment

11  problems?

12  A.  In my opinion, no.

13  Q.  How well established is it within the professional fields,

14  focused on children's well-being, that children raised by

15  same-sex couples fare as well as those raised by heterosexual

16  couples?

17  A.  Very well.  There is a consensus among all the major

18  professional organizations that focus on the physical and

19  mental health and welfare of children.

20  Q.  What are those organizations?

21  A.  You've got listed up there some of them, not all of them.

22  But certainly the American Psychological Association, the

23  American Psychiatric Association, the American Academy of

24  Pediatrics, the American Academy of Child and Adolescent

25  Psychiatry, the National Association of Social Workers, Child

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014
105

1    Welfare League of America.  And there are others.

2    Q.  To your knowledge, have all of these professional

3    organizations issued policy statements that are supportive of

4    same-sex parenting?

5    A.  Yes, they have.

6    Q.  Could you turn to the next tab?

7    A.  "C"?

8    Q.  Yes.  All right.  This is a policy statement from the

9    American Psychological Association.  Are you familiar with it?

10   A.  I am, yes.

11            MS. STANYAR:  I move for its admission.

12            MR. POTCHEN:  I'm sorry.  What exhibit number is this?

13            THE COURT:  It's not, it's not "C" in mine.  But any

14   objection?  It's on there.

15            MR. POTCHEN:  What exhibit number would that be?

16            THE COURT:  It would be 100 --

17            MS. STANYAR:  111.

18            MR. POTCHEN:  111 is not --

19            THE COURT:  It's not in the book, but that's okay.  I

20   mean, any objection?

21            MR. POTCHEN:  Oh, 112.  Here it is, 112.

22            MS. STANYAR:  112.

23            MR. POTCHEN:  No objection, your Honor.

24            THE COURT:  Very well.  It will be received.

25            (Exhibit #112 received, 12:01 p.m.)

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1          MS. STANYAR:  And we also move to admit the list of

2    organizations, which is exhibit number?

3          MR. POTCHEN:  That's a demonstrative exhibit?

4          MS. STANYAR:  Yes.

5          MR. POTCHEN:  Well, you wouldn't admit a demonstrative

6    exhibit.

7          THE COURT:  110 will be admitted as a demonstrative.

8          MR. POTCHEN:  Okay.

9          (Exhibit #110 received, 12:01 p.m.)

10          THE COURT:  Is there -- while we're thinking about it,

11    all the demonstratives, do you have them?

12          MS. STANYAR:  They are all in your book.

13          THE COURT:  Okay.  But in separate sections?  Not all

14    at once.  That's okay.

15          MS. STANYAR:  They are just as they kind of come up.

16          THE COURT:  I didn't see the other one.  What's the

17    exhibit number for the one that the doctor testified to the

18    factors?  They may be in here, but let's --

19          MS. STANYAR:  One moment, Judge.

20          THE COURT:  That's okay.  Just because I'm trying to

21    keep track.  I can look.

22          MS. STANYAR:  Oh, the exhibit list identifies -- the

23    exhibit list that's in the front of your bench book.

24          THE COURT:  Oh, okay.

25          MS. STANYAR:  Identifies which exhibit.  This would

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1    be -- okay.  So the exhibit that would --

2              THE COURT:  Oh, I see.  It would be 101.

3              MS. STANYAR:  Yes.

4              THE COURT:  That's fine.  Good.  I didn't see the list

5    and I didn't see 101.

6              Perfect.  Thank you.  You may proceed.

7              MS. STANYAR:  All right.

8    BY MS. STANYAR:

9    Q.  What is the policy statement with respect to same-sex

10   parenting and the outcomes for children of the American

11   Psychological Association?

12   A.  Do you wish me to read this?

13   Q.  Yes.

14   A.  Okay.

15             THE COURT:  You don't have to read it, because it's an

16   exhibit already.

17             THE WITNESS:  I'm sorry.  There is no scientific basis

18   for concluding that lesbian mothers and gay fathers are unfit

19   parents on the basis of their sexual orientation.  Overall, the

20   results of research suggest that development, adjustment and

21   well-being of children of lesbian and gay parents do not differ

22   markedly than that of children raised by heterosexual parents.

23   BY MS. STANYAR:

24   Q.  Do you believe this policy statement, which you just read,

25   accurately summarizes the state of the social science research

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1   on the effect of gay and lesbian parenting on child adjustment?

2   A.  I do.

3   Q.  Is it consistent, not identical, but is it consistent with

4   the policy statements with some of the other organizations that

5   we talked about?

6   A.  Yes, it is.

7   Q.  You mentioned the Child Welfare League of America.  Can you

8   describe that organization?

9   A.  The Child Welfare League of America is an organizing body

10  that sets best practice standards for adoption and foster care.

11  It's a governing body for adoption agencies.

12  Q.  Have you heard of a group called the American College of

13  Pediatrics?

14  A.  I've heard of them, yes.

15  Q.  What do you, do you know about this group?

16  A.  I don't know much about them, except that I know that they,

17  they oppose marriage equality and parenting in adoption by gays

18  and lesbians.  I've seen them referenced in articles by

19  opponents of gay and lesbian adoption in parenting.

20  Q.  Is the American College of Pediatricians the mainstream

21  recognized professional group within the field of pediatrics?

22  A.  In my view, yes.

23  Q.  Okay.  And that's distinct from this other group, the

24  American College of Pediatrics?

25  A.  Yes.

1   Q.   All right.  Does the American College of Pediatrics publish

2   a journal, a peer review journal?

3   A.   I don't know of any.  The premier Journal of Pediatrics is

4   published by the American Academy of Pediatrics.

5   Q.   Experts for the State are expected to offer the opinion

6   that a basis for limiting marriage -- okay.  I may have

7   confused those two.

8        Which of those two is the mainstream group?

9   A.   The American Academy of Pediatrics.

10  Q.   Experts for the State are expected to offer the opinion

11  that a basis for limiting marriage to heterosexual couples is

12  that children are better off if raised by two biological

13  parents.  What is your reaction to that?

14  A.   Well, I would disagree.  First of all, I would point out

15  that the vast majority of individuals who are raising

16  non-biological children are heterosexual individuals.  Most

17  individuals who adopt children are heterosexual individuals.

18  Most children who conceive through donor insemination, other

19  artificial reproductive techniques, are heterosexuals.  So the

20  vast majority of individuals are, of children who are being

21  raised by non-biological kin are being raised in heterosexual

22  families.

23        Secondly, from the perspective of adoption, we know

24  that the vast majority of adopted children are in the normal

25  range, and that they, they function generally the same,

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

110

1   particularly those who were placed as babies.  It's the same as

2   children in -- raised by biological kin.

3   Q.  Can children develop well, whether raised by biological or

4   non-biological parents?

5   A.  Absolutely.

6   Q.  The experts for the State are expected to testify that the

7   importance of a biological parent-child relationship to

8   children's positive adjustment is evidenced by studies showing

9   poorer outcomes among adopted children and children in

10   stepfamilies.  I have some questions related to this.

11          First of all, starting out with adoptive families.

12   And to be clear, in this section, I'm talking about adoption

13   from -- adoption of children from outside the family, as

14   opposed to stepparent or second-parent adoption.

15          Is it correct that adopted children have poorer

16   adjustment on average than non-adopted children?

17   A.  Yes.  On average, they do show poorer adjustment.  It has

18   less to do with being adopted, though, than the factors that

19   correlate with adoption.

20   Q.  Do you know what causes more adopted children to have

21   adjustment problems?

22   A.  Yes, I do.  Shall I --

23   Q.  Yes.

24   A.  -- enumerate them?  Okay.  First, there is genetic risk.

25   Adopted children are more likely to come from families that are

1   more at risk for genetically-based problems.  We see that

2   especially in children who are being adopted from the child

3   welfare system, which is the predominant type of adoption in

4   the U.S.

5          Parents who have had -- who have their rights

6   terminated, those rights are terminated for a reason, often

7   based in behavior or character --

8   Q.  Let me just ask you, let's go back to the genetic risk.

9   What do you mean by more -- adopted children are -- have

10  genetic risk?  What do you mean by -- give us an example.

11  A.  What I mean --

12  Q.  Real world.

13  A.  Real world, they are more likely to come from families who

14  have conduct problems, or come from families who are drug

15  addicted or alcoholic.  These characteristics, conduct

16  problems, antisocial behavior, substance abuse, have a strong

17  genetic component to it so that they inherit the susceptibility

18  for, not just for those particular problems, but for problems

19  in general.  So there's genetic risk.

20         There's also prenatal risk.  Again, adopted kids are

21  more likely to come from birth parents who use substances

22  during the prenatal period, particularly from the, children

23  from the foster care system.

24         Also, adopted children come from birth parents who

25  experience a high-stress pregnancy.  It's almost by definition

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

112

1    a high-stress pregnancy.  And we know that prenatal stress is

2    linked to the, the exposure to prenatal hormones that can alter

3    brain development and impact on children, not just immediately,

4    but long term, so that there is prenatal risk involved.

5           And then the more serious issues is what happens to

6    the child after the child is born, but before they enter the

7    adoptive family.  So some children are adopted because of a

8    history of neglect.  Not because they're -- but they are free

9    for adoption because a history of neglect.

10   Q.  What do you mean by free for adoption?

11   A.  Oh, parental rights from the biological parents are

12   terminated by the state for cause.  And then that frees the

13   adoption, the child to be adopted by either kin or non-kin.

14   And we're talking about non-kin adoptions now, I think.

15   Q.  Okay.  So you're just talking about post birth experiences.

16   You talked about abuse and neglect history.  Is there anything

17   else?

18   A.  Multiple foster placements.  Children in foster care,

19   unfortunately, are not in stable placements.  The average child

20   is in multiple foster placement.  Each change creates trauma

21   for the child.

22          And what we see is that as children move from home, to

23   home, to home, it increases their risk for adjustment

24   difficulties.  And so by the time these children enter the

25   adoptive family, they are already disadvantaged for these

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

113

1   reasons.

2   Q.  Is there a difference in outcomes between children adopted

3   during infancy versus those adopted at older ages?

4   A.  Yes.  There's a big difference.  There's relative -- even

5   though there's genetic risk and prenatal risk, on average, also

6   for the kids placed as babies, for the most part, the

7   differences between those children placed as babies and

8   non-adopted kids is very small.

9        I find it in my research, my older research, because I

10  worked with early placed kids, but there's been a recent meta

11  analysis which has looked at hundreds of studies.  And it does

12  find significance difference, but very tiny differences between

13  infant-placed and, and -- children and non-adopted children.

14  The difference is much larger for older-placed children.  And

15  these are the kids who are coming from the foster care system,

16  and some of them who are adopted from abroad as well.

17  Q.  Is there any basis for the suggestion that adoptive parents

18  are less committed to their children than biological parents?

19  A.  None.  I mean, for anyone who works in the area of

20  adoption, you know how absolutely motivated and committed they

21  are.  They are extremely committed, extremely motivated

22  individuals.

23       There was also a recent representative study -- a

24  study by Hamilton and his colleagues that looked at a

25  representative sample from the early childhood, longitudinal

1    study looking at the degree of investment or commitment of

2    adopted and non-adopted children.  We find -- he found no

3    differences.

4    Q.  You explained that it's factors other than the lack of

5    biological relationships that account for the higher rates of

6    maladjustment in adopted children.

7         Are there any unique issues that adopted children may

8    experience related to being adopted?

9    A.  Yes.  I've written a lot about this.  A loss.  Adoption is

10   built on experience of loss.  The separation of the child from

11   the birth family creates a sense of loss.

12        Early placed children don't recognize it until they

13   are old enough to understand what adoption means.  But the

14   issue of loss itself is not pathology.  It doesn't lead to

15   pathology automatically.  In fact, it seldom leads to

16   pathology.  The critical --

17   Q.  When you talk about pathology, are you talking about

18   maladjustment?

19   A.  Yes.  I'm sorry, sometimes use those words interchangeably.

20   It usually doesn't lead to maladjustment.  The critical factor

21   is how parents manage that issue with their child.

22        So the big focus in adoption for the last 20 or 30

23   years is preparing parents to help their children to understand

24   the unique circumstances of their family life.  To be able to

25   talk about the birth family in a respectful way.  To build a

1    bridge for the child, a psychological bridge in some cases, an

2    actual literal bridge in other cases, for the child and the

3    birth family so that the child, you know, comes to experience

4    adoption in a positive way, and most certainly do.

5    Q.  Is there a term used in your field to describe this kind of

6    challenges in adoption?

7    A.  It's called a normative challenge.  And many families

8    experience normative challenges.  Families of color, for

9    example, have to help their children negotiate the

10   institutionalized discrimination that they are inevitably going

11   to encounter.  And families, where there are disabled children

12   or disabled adults, have to help their children to deal with

13   that, that normative challenge of other people's reactions to

14   the characteristic in the family that sets them slightly apart

15   from, from other families.

16          So all families experience some levels of challenge in

17   one or more areas.  And it's how it's managed in the family

18   that differentiates those who are maladjusted from those who

19   are not.

20   Q.  Let's talk about stepfamilies.  Is it true children living

21   in stepfamilies have poorer adjustments on average than

22   children living with both of their parents?

23   A.  That is correct.  Although, most children in stepfamilies

24   end up doing well, but there is a significant group difference.

25   Q.  Why is that?

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1   A.  Well, stepfamilies are formed following a failed previous

2   relationship.  So that example of a mother and father are

3   married.  They have children.  The parents divorce.

4        At some point in time later on, assuming the usual

5   circumstances where the child is primarily being raised with

6   the mother, mother may enter into a new relationship.  Children

7   may be four, six, ten, whenever that new parent comes into the

8   family.  We have not only that new family created, but we have

9   a non-visiting, excuse me, a non-residential, in this case, a

10  father with the child is also relating to as well.  That's the

11  traditional notion of what family -- a stepfamily is about.

12  Q.  Is it true there's a higher risk of abuse in stepfamilies?

13  A.  That's correct.

14       MR. POTCHEN:  Your Honor, I'm just going to have a

15  standing objection, I guess, to the issues of stepfamilies.

16       THE COURT:  Yeah.  I think we're getting a little off

17  of -- I'll sustain that objection.

18       MR. POTCHEN:  Thank you.

19       MS. STANYAR:  The reason this comes up is this was

20  something in their, in their report had to do.

21       THE COURT:  Oh, I see.  You don't intend to get into

22  it with your experts; is that correct?  Because I think they

23  are kind of covering it so they don't have to recall.  If you

24  intend to get into that with your experts, then we'll let her

25  continue.

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014
117

1        MR. POTCHEN:  I'll withdraw the objection, your Honor,

2   because apparently one of our experts is going to be.

3        THE COURT:  That's fine.  I understand.  You may

4   proceed.

5   BY MS. STANYAR:

6   Q.  Is it true that there's a higher risk of abuse in

7   stepfamilies?

8   A.  Yes, there is.

9   Q.  Why?

10  A.  Although, although obviously most stepparents don't abuse

11  their children, but there's a higher level of risk for abuse.

12  Q.  How much higher?

13  A.  I don't, I don't have the statistics readily available.

14  Significantly higher, though.

15  Q.  Why is that?

16  A.  Well, there's an ambiguous relationship between the

17  stepparent and the child.  The stepparent comes in and often

18  times is exerting authority, maybe too soon, or in ways that

19  the child may not expect or want.

20        That often leads to what we call a pattern of coercion

21  and control where a stepparent might set down a rule.  The

22  child resists it.  That creates frustration in the parent,

23  which leads often to a more rigid pattern of parenting, which

24  leads to more resistance.  It escalates.  And all of a sudden,

25  we have a scenario where abuse occurs, a child gets hit or

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014                                    118

1    something like that.

2    Q.  Is your testimony about this based upon your research or

3    based upon your own clinical experiences?

4    A.  Oh, it's both.

5    Q.  Experts for the State are expected to testify that when

6    same-sex couples create families with children through assisted

7    reproduction, one adult is not biologically related to the

8    child, so they are really just like stepfamilies.

9           Are such families created this way considered

10   stepfamilies in the research literature?

11   A.  No, they are not.  I have never seen in the donor

12   insemination literature the term "stepfamily" applied to the

13   nonbiological parent.  The term second-parent is used.

14   Co-parent is used.  Non-legal parent is used.  Maybe

15   non-biological parent is used.

16          I've never heard that term "stepparent" used with

17   regard to that.  And the reason is the step-parenting term is,

18   is used, almost always used when a family is formed later in

19   the child's life and a new person comes in, a person who is not

20   part of the planning of that family, even through donor

21   insemination or through adoption.

22   Q.  Are you familiar with the family make-up of the plaintiffs

23   in this case?

24   A.  I am.

25   Q.  Would a family like theirs be considered a stepfamily in

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1    the literature?

2    A.  Not in the literature, no.

3    Q.  Is there a base -- any basis to expect that outcomes for

4    children in families formed by same-sex partners through

5    assisted reproduction would be comparable to the outcomes of

6    children raised in stepfamilies?

7    A.  It would be --

8                THE COURT:  One more time.

9                MS. STANYAR:  Is there any basis --

10               THE COURT:  I'm not sure exactly what you asked.

11               Doctor, you may, but I'm not sure.

12               MS. STANYAR:  Let me try it again.

13               THE WITNESS:  Yeah.  I got a little confused myself.

14               MS. STANYAR:  I was heading this way and I jagged this

15    way.

16    BY MS. STANYAR:

17    Q.  Is there any basis to expect that outcomes for children in

18    families formed by same-sex partners through assisted

19    reproduction would be comparable to the outcomes for children

20    raised in stepfamilies?

21    A.  If you mean by stepfamilies, what we traditionally call

22    stepfamilies?

23    Q.  Yes.

24    A.  The answer would be no.  We would expect children from D.I.

25    families to be doing better because they had not experienced

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

120

1   the family disruption and the introduction of an unfamiliar

2   adult later in their life.

3   Q.  Do the children born to lesbian couples through donor

4   insemination have that experience of the prior family

5   dissolution?

6   A.  No.

7   Q.  Is there any research on children conceived through donor,

8   sperm or ova?

9   A.  Yes.

10  Q.  Can you describe that research?

11  A.  Well, there's a good body of research.  It's Susan

12  Golombok's research, Henny Bos's research, Charlotte

13  Patterson's research.  Some of it is cross-sectional, but Henny

14  Bos's and Susan Golombok's is longitudinal.  And it follows

15  these families from the childhood areas, the longitudinal ones,

16  into adolescence, and that border between adolescence and young

17  adulthood, measuring the kinds of things that we -- that other

18  studies dealing with same-sex parenting usually measure.

19  Things like psychosocial adjustment or gender role behavior,

20  peer relationships.  Parent-child relationships is a big

21  factor.

22        So they measure comparable things.  And the results

23  basically follow what we've already been talking about, and

24  that is, that children of lesbian families that are created

25  through donor insemination show no differences compared to both

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1  heterosexual families created through donor insemination, as

2  well as heterosexual families that from natural conception.

3  Q.  So let me just understand this.  Does the research on

4  families formed by donor insemination compare outcomes of

5  donor-conceived children to children raised by two biological

6  parents?

7  A.  Yes.

8  Q.  And are you familiar with that research?

9  A.  I am.

10 Q.  What is your opinion about whether or not, the comparison

11 between those two groups?

12 A.  There is no differences.

13 Q.  What accounts for the fact, in your opinion, that children

14 conceived through donor insemination do just as well as

15 children in two biological parent families, but children in

16 stepfamilies don't do as well?

17 A.  They don't experience the previous family disruption or

18 dissolutionment.  They don't experience often the conflict that

19 preceded that dissolutionment.  There may be some selection

20 factors operating also in stepfamilies, where these are

21 individuals who are probably less healthy anyway.

22 Q.  Do the --

23 A.  Meaning the adults, not the children.

24 Q.  Do the studies of donor-conceived children involve

25 heterosexual couples or same-sex couples or both?

1   A.   Both.   Some of the research, yeah.

2   Q.   How do the outcomes of children conceived by donor

3   insemination to same-sex couples compare with those conceived

4   by donor insemination to opposite-sex couples?

5   A.   They are the same, and the parent qualities are the same

6   and the outcomes for the children are the same.

7   Q.   Does this body of research on donor insemination tell us

8   anything about whether biological relationship between parent

9   and child itself predicts children's well-being?

10   A.   It does.   It says that biology itself is, is less important

11   than the parenting qualities.   And these studies often measure

12   those family process factors that we talked about and that you

13   demonstrated before, and the predictors from parental warmth

14   and the harmony in the couple relationship, and the

15   parent-child relationship predict outcomes.   But the family

16   structure, donor insemination is -- I'm sorry.   Heterosexual

17   couples that are biologically related versus donor insemination

18   where you only have one biological parent and one

19   non-biological parent, the biology doesn't predict.

20   Q.   The defendants' experts are expected to testify about three

21   studies, one by Mark Regnerus, one by Douglas Allen, and one by

22   Sotirios Sarantakos.   I'm going to ask you some questions about

23   those.

24        Let's start with the Regnerus study.   Have you

25   reviewed his study, "How Different Are the Adult Children of

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

123

1   Parents Who Have Same-Sex Relationships?  Findings From the New

2   Family Structures Survey"?

3   A.  I have, yes.

4   Q.  Did Regnerus evaluate outcomes for individuals raised by

5   same-sex parents?

6   A.  He did not.

7   Q.  What did that study evaluate?

8   A.  He evaluated young adults who responded affirmatively to

9   the question, has one or your other, or both of your parents

10  had a same-sex relationship.  And those were the families who

11  were described as "gay and lesbian" headed households.

12        But the majority of those families identified in those

13  categories had experienced a previous failed heterosexual

14  unions.

15  Q.  We are going to talk about that in a second.

16  A.  Okay.

17  Q.  Why do you say that this isn't an evaluation of outcomes

18  for individuals raised by same-sex parents?

19  A.  Because --

20  Q.  Why is it not that?

21  A.  Because they weren't raised by same-sex parents.  They

22  lived with same-sex parents for, for very limited periods of

23  time, in some cases, never.  In some cases, as few as maybe a

24  few months.  In some cases, up to maybe a few years.  But the

25  majority of them had not lived with the parent and their

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

 1   same-sex partner.

 2   Q.  Where had they started the early part of their lives?

 3   A.  The majority started in heterosexual unions.

 4   Q.  Who is Regnerus's heterosexual comparison group?

 5   A.  The primary comparison group are young adults who were

 6   raised in intact marital families.  He stripped away from that

 7   group any family that had experienced divorce, step-parenting

 8   families, and so forth.

 9        So what he had was a group of individuals that

10   remained intact; they were heterosexual; they were married all

11   the way through the child's --

12   Q.  From birth to 18?

13   A.  From birth, you know, through when the measure was taken.

14   Q.  All right.  In the other group, did Regnerus control for

15   children's experience of parents divorcing and separated?

16   A.  I assume the other group, you mean the gay and lesbian --

17   Q.  Right.

18   A.  -- identified groups?

19   Q.  Well, no.  I'm sorry.  Let me back up.

20        So what did he do with the, in the intact family group

21   about the stepparents or the, or the divorce parent situation?

22   A.  He pulled them out of that group and made them separate

23   groups.

24   Q.  What about the lesbian mother, gay father group?

25   A.  He did not pull them out.  They, they included anyone who

1    had -- where the young adult had identified that at one point

2    in time, the parent had had a same-sex relationship, romantic

3    relationship.

4    Q.  Did Regnerus' study evaluate children reared in families

5    that had been actually created by lesbian or gay couples?

6    A.  No, he did not.

7    Q.  Does the Regnerus study allow for any conclusions to be

8    drawn about the impact being raised by same-sex parents?

9    A.  In my opinion, no.

10   Q.  Why is that?

11   A.  Because the young adults were not raised in same-sex

12   parents.  They were raised, first of all, in heterosexual

13   relationships that disrupted and they experienced the family

14   disruption and the transition.

15          At some point in time, later in their life, one of

16   their parents entered into a same-sex relationship.  Some of

17   those individuals never lived with those couples.  Some of them

18   lived for shorter, you know, maybe up to three years, and some,

19   some of them lived for only a few months, and some never lived

20   with them.

21   Q.  What is the significance of the fact that most of the

22   individuals in the lesbian mother and gay father groups had

23   been through divorce or separation of their parents, and that

24   none of the heterosexual comparison group had had that

25   experience?

 1   A.  Well, it's comparing apples and oranges as, you know, in

 2   one case, you have a group that is set up to create the very

 3   best possible outcome, the heterosexual families.

 4           In the other group, you've grouped together people who

 5   have experienced something in their life that is a known

 6   contributing factor to child maladjustment, and not just child

 7   maladjustment.  It predicts also into adulthood, and that is

 8   family disruption, family transitions.  And they allowed that,

 9   those people to remain in that group.

10           You couldn't have set it up, a study to more -- you

11   couldn't set up a study better to create differences.

12   Q.  I'm going to read you a passage from the Regnerus study.

13           "Child outcomes in stable "planned" gay, lesbian,

14   bisexual families, and those that are the product of previous

15   heterosexual unions are quite likely distinctive as previous

16   studies' conclusions would suggest."

17   A.  I agree.

18   Q.  Has there been any professional criticism of the Regnerus

19   study?

20   A.  A great deal of criticism.

21   Q.  Did the Social Science Research Journal publish any

22   response?

23   A.  They did.  They asked for an internal audit to be done to

24   assess that study and to write a report, which was subsequently

25   published.  And the report condemned the study and said it

1    shouldn't be published.

2           And I want to comment on that, because that process

3    that they went through is extremely rare.  No study is perfect.

4    All studies have some flaws.  And the researchers are always

5    obligated at the end of their article or end of discussion to

6    acknowledge whatever limitations.  And we do.

7           The way that's handled in, in the field is, you know,

8    if you know the study is flawed and you're working in that area

9    and you're doing a study, you will point out, well, such and

10   such study had a flaw, so I'm going to try to overcome that

11   flaw in my study.  And I will do a study that hopefully

12   overcomes that flaw to add, you know, more knowledge and more

13   valid knowledge to the field.  So that's the most common way

14   it's dealt with.

15          Occasionally what happens is that a study comes to a

16   conclusion that simply is not supported by the results or

17   misrepresents the field in such a way that someone decides they

18   want to write a rejoinder or a reply, if you will.

19          One of the experts wrote a reply, you know, to Michael

20   Rosenfeld's study.  In my own work, I've written a reply to

21   someone who wrote an article on adoption that I thought that

22   they misrepresented the field and their data didn't show what

23   they thought they showed.  So I wrote an article and it was

24   published.  Usually journals don't publish those things, but

25   sometimes they do.

1          What is extraordinarily rare is what happened here.

2     In fact, in my field, I've never seen it before.  It's

3     happened, and I know in areas that I don't work in.  But in my

4     field, this has never happened that a journal orders an

5     internal audit, publishes it and says this study should not

6     have been published.  Just didn't happen very often.

7     Q.  Do you agree with the audit?

8     A.  I do.  I agree with the conclusion it should not have been

9     published in the form that it was.

10    Q.  Let's turn to the Sarantakos study.  Are you familiar with

11    his 1996 article, "Children in Three Contexts:  Family,

12    Education, and Social Development," published in Children

13    Australia?

14    A.  Yes.

15    Q.  First of all, is Children Australia a known scientific

16    journal?

17    A.  Not to my knowledge.  I've looked at several, what we call

18    data -- databases that list the professional journals.  I've

19    never -- I didn't see it listed before.

20    Q.  What did Sarantakos's study purport to show?

21    A.  It purported to show that children who grow up in gay and

22    lesbian households do more poorly than children growing up in

23    heterosexual households.

24    Q.  Is that supported by the data in the study?

25    A.  It is not.

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

129

1   Q.  Why not?

2   A.  Because like the Regnerus study, all of his subjects came

3   from previous heterosexual unions, either failed marriages,

4   failed cohabiting situations, or women who were unmarried and

5   the father was not involved.

6   Q.  So this is the same issue, kind of, that you had with the

7   Regnerus study?

8   A.  Exactly.  And even the author acknowledges in the

9   discussion that the, the potential confounding variable might

10  influence the result.  He didn't have an ability to take it

11  into account, I guess.

12  Q.  And the potential confounding variable was what?

13  A.  Family disruption transitions.

14  Q.  All right.  And for the same reasons that you said that it

15  skewed the results in Regnerus, is that also true in the

16  Sarantakos?

17  A.  Yes.  It is a known, very, very well known predictor of

18  child and even adult maladjustment.

19  Q.  Let's turn to the study by Allen.  Are you familiar with

20  his study, Douglas Allen, based upon the Canadian census?

21  A.  Yes, I am.

22  Q.  What does the Allen study purports to show?

23  A.  It purports to show that young adults, his study he had 17

24  to 22-year-olds raised in heterosexual families have higher

25  graduation -- graduation rates from high school than comparable

2:12-cv-10285-BAF-MJH   Doc # 143   Filed 03/13/14   Pg 132 of 149   Pg ID 3247
BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

130

1    people raised in gay and lesbian families.

2    Q.  In your opinion, is that conclusion supported by the data

3    in his study?

4    A.  No, I don't believe it is.

5    Q.  Why not?

6    A.  Well, all he knows about is where the children lived for

7    the first -- for the last, excuse me, last five years.

8    Q.  So from the date of the study back five years?

9    A.  Right.  So the study was published in 2006.  I forget

10   exactly when the data was collected.  I think it was a 2006

11   census.  I'm sorry.  The study was published later.  It was a

12   2006 census.  So we know where the children lived from 2001 to

13   2006, roughly.  The children were 17 to 22 years of age.  That

14   means that they were born roughly in the mid '80s, to the end

15   of the '80s.

16          Given that time period, very few children in gay and

17   lesbian families are the product of planned D.I. or even

18   adoption during that period of time.

19          So the assumption that I think we can safely make is

20   that certainly many, and maybe a majority of the children of

21   gay and lesbian families, were also the product of failed

22   heterosexual unions and that the, the gay and lesbian families

23   were formed later on.  That being the case, the same problem

24   exists as in the Regnerus and Sarantakos studies.

25   Q.  With respect to family dissolution?

1    A.  With respect to the impact of family dissolutionment.

2    Q.  So for a 22-year-old in Allen's study, you wouldn't know

3    what kind of family the subject lived in before age 17?

4    A.  Yes.

5    Q.  And for a 17-year-old, you wouldn't know where he lived

6    before age 12?

7    A.  Yes.

8    Q.  Okay.

9    A.  And by the way, why that's important, high school

10   graduation or high school success, if you will, doesn't occur

11   in a vacuum.  If there are problems leading to the failure to

12   graduate, we're going to see those problems earlier on in

13   childhood, during elementary school, during middle childhood,

14   beginning of high school.

15         We don't know where these children were living.  We

16   don't know the circumstances.  And if the assumption that we

17   make, based upon the time when these children were born and is

18   accurate, these are children who experienced family disruption.

19   And it's likely to have undermined their academic progress,

20   even before they entered the gay and lesbian families.  He has

21   no way of knowing, because he doesn't know where these families

22   were living, where these children were living.  I'm sorry.

23   Q.  And for the same reasons that you talked about with the

24   prior studies, if there had been a lot of dissolution, does

25   that affect -- would you expect that to affect child outcomes?

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

132

1    A.  Absolutely.  I mean, we know that family dissolutionment

2    impacts academic progress.

3    Q.  Did Allen say anything about how many of the respondents in

4    the same-sex groups were adopted?

5    A.  Not how many, but he indicated that, you know, it's likely

6    a larger, a fairly large number would be, proportionately

7    anyway.

8    Q.  Would that be expected to affect the graduation --

9    A.  Yes.  When I saw that as an adoption expert, it jumped out

10   at me, because gays and lesbians, if they are adopting, are

11   more likely to be adopting children from the child welfare

12   system, including in Canada, older children, children in

13   special needs.  And we don't know anything about the early

14   adverse experience these children have.  It's not measured in

15   this study.  And as a result, we can't take it into account.

16   And it may well contribute to, at least in part, to some of the

17   differences that he found in, in graduation rates.

18   Q.  We've been talking about the Regnerus study, the Sarantakos

19   study and the Allen studies.  Do any of these studies allow for

20   conclusions about the impact of being raised in a same-sex

21   parent family?

22   A.  In my opinion, no.

23   Q.  Why not?

24   A.  Because none of them -- certainly, the first two, we know

25   by the author's own acknowledgment that these were children not

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

133

1    of planned lesbian or gay families being raised from birth, but

2    children who had experienced a previous heterosexual

3    disruptions, family transitions and so forth.  So we know that

4    that -- and I should say before they entered into the gay and

5    lesbian family.

6         And we can make, I think, a reasonable speculation

7    that's likely to have occurred also in Allen, giving the time

8    period for when these families were formed, and the fact that

9    planned lesbian families and planned gay families were not the

10   norm in the '80s.

11   Q.  Do these three studies tell you anything about the

12   well-being of children raised in families created by

13   same-sex --

14   A.  They do not.

15   Q.  Do we not know if they were created or they probably

16   weren't created by same-sex couples?

17   A.  Well, in the Regnerus, and the Sarantakos, we know that

18   they weren't created by same -- by two gay men or two lesbians,

19   you know, from birth onward.

20   Q.  You testified that the research evaluating children raised

21   by same-sex couples shows that children fare as well as

22   children raised by heterosexual parents.  And I understand that

23   that's your opinion.

24        Let me ask you this:  As an expert in children's

25   development, if there were research -- the State claims this,

1    this is the case and we disagree -- if there were research

2    finding poorer outcomes among children of same-sex parents, in

3    your opinion, given your expertise, your clinical experience,

4    would that be a reason to exclude same-sex couples from

5    marrying?

6    A.  Absolutely not.  If there were -- and of course, my opinion

7    and the consensus of the field is that there's no difference.

8    But if there were differences between gays and lesbians, in

9    their family, I'm sorry, the children of gays and lesbians, all

10   the more reason to stabilize these families through, through

11   marriage.  We know that marriage stabilizes families and it can

12   benefit children in many ways.

13          Also, there are many groups that have known

14   differences that we allow to marry.  Families from low economic

15   stratas.  The children of these families do much worse than

16   children from middle and upper class.  There's no prohibition

17   on marriage for that, even though we know that they are doing

18   more poorly.

19          Parent education, parent, you know, predicts to child

20   outcomes.  Parents who don't have a high school degree, for

21   example, or you know, have not gone very far in school do worse

22   than children -- in parents, you know, who have a high school

23   or college education and so forth.  Again, we don't put

24   prohibitions on marriage for that.  And we try to support as

25   best we can through all different kinds of means, including

1    legal means, such as marriage.

2    Q.  Do same-sex couples have children in states where they

3    can't marry?

4    A.  Of course they do.  Yes.

5    Q.  How do you know that?

6    A.  There's demographic data on that.  Gary Gates has published

7    demographic data showing that gays and lesbians are raising

8    children in every state in this country.

9    Q.  Does excluding same-sex couples from marrying prevent them

10   from forming families with children?

11   A.  Of course they don't.  They've been forming families for a

12   long time.

13   Q.  Does it matter to children's well-being whether or not they

14   have a legally recognized parent-child relationship with both

15   their parents?

16   A.  Yes.  Absolutely.

17   Q.  Why?

18   A.  Well, first of all, it affords them what sociologists and

19   social scientists, psychologists call social capital.  That

20   means recognition, legitimate -- legitimization in the eyes of

21   society.  This is a real family.  We're no different than

22   anyone else.  So it affords, you know, children that sense.

23        Now, young children aren't going to necessarily

24   recognize that.  They'll be too young for that.  But you get

25   older children into the teenage years, and they do recognize

1    that, that difference that others might -- how others might

2    view their families.  So there's social capital.

3    Q.  Are there any issues relating to psychological adjustment

4    relating to the absence of a relationship with a second parent?

5    A.  There could very well be.  For example, if -- there's an

6    ambiguity in the relationship.  Is this my mother or is it not

7    my mother?  Is this my father or is it not my father?  Again,

8    young children won't recognize the legality of the

9    relationship, but older children will.

10          And there's also that sense of potential uncertainty

11   about is this relationship everlasting or not.  If there's not

12   a legal relationship, and the couple breaks up, then the

13   guaranteed continuity of that relationship and the attachment

14   that has been formed between parent and child may suffer.

15          And we know an awful lot about disrupted attachments

16   and its impact, not just on children, but even predicting into

17   the adult years.

18   Q.  What are the harms of broken attachments?  How are they

19   manifested in young children?

20   A.  Okay.  Well, this is an area I work a lot in.  I do a lot

21   of assessments of children who experience broken attachments.

22   And there are a variety of, of symptoms that we -- behaviors

23   that we see, which might be different from one age to another.

24          But for example, younger children are likely to show

25   sleeping problems.  There will be nightmares, night terrors,

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

137

1   difficulty getting to sleep, calling out for parents because

2   they are afraid.  There may be disruptions in eating patterns.

3   They may overeat and gorge themselves.  They may under-eat.

4       There is often times disruption in their toileting

5   behavior.  In other words, children who have gained control,

6   you know, begin to lose it again, so they begin to soil

7   themselves or wet themselves.

8       We see it in terms of increased anxiety, in depressive

9   symptomatology.  We see it often times in the failure, in the

10  failure to progress normally in school.  We see it in

11  insecurity in relationships.  You know, once the secure

12  attachment has been broken, then the ability to trust in other

13  relationships gets compromised as well.  We see it in almost

14  every area of human functioning.

15  Q.  How about older children?

16  A.  Older children, it can, it can lead to oppositionalism and

17  conduct problems.  It predicts -- disrupted attachment predicts

18  to illicit substance use, to delinquency.  It predicts to

19  failure to progress in school, in school problems, troubles at

20  school.

21  Q.  And are these long-term effects?

22  A.  These are long-term effects, yes.

23  Q.  Can these harms from broken attachment occur even in cases

24  in which a parent does not have a biological or adoptive

25  parent-child relationship with the child?

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

138

1    A.  Yeah.  These are, these are outcomes that occur regardless

2    of whether the child is genetically related, or legally related

3    to the child.

4    Q.  All right.  Are there any economic implications from the

5    failure to have a legally recognized parent-child relationship

6    with the second parent?

7    A.  Yes.

8         MR. POTCHEN:  Objection, your Honor.  I'm just going

9    to be arguing about economic.  He's not an expert.

10        THE COURT:  Sustained.

11   BY MS. STANYAR:

12   Q.  Are there any studies having to do with the effect on a

13   child's access to health insurance?

14        MR. POTCHEN:  Again, objection, your Honor.  Access to

15   health insurance is beyond --

16        THE COURT:  Sustained.  Beyond.  The reason for, the

17   reason for sustaining it is it's beyond his expertise.

18   Although he may be an expert, that's not what he was qualified

19   at this point.

20        MS. STANYAR:  I understand.

21   BY MS. STANYAR:

22   Q.  What if a legal parent can establish a guardianship for the

23   partner, would that remove your concerns, the recurrent -- the

24   concerns that you raise about the absence of a second, a legal

25   relationship with the second parent, in terms of psychological

1   effects?

2   A.  In my opinion, it doesn't afford the child the same level

3   of permanency.  In my experience in doing work in this area,

4   particularly court-related work, guardianship can be challenged

5   by a biological parent.  So if the guardianship is challenged,

6   then the, the guarantee of continuity of relationship is

7   challenged then, too.

8   Q.  So from the child's perspective, is there that sense of

9   permanency in a guardianship situation, based upon your

10  experience?

11  A.  For young children, they don't know the difference.  But

12  older children do recognize the difference.  And no, it doesn't

13  afford the same level of permanency as a legal tie, either

14  through adoption or through birth.

15  Q.  When couples are married, does it afford social benefits to

16  their children?

17  A.  Absolutely.

18  Q.  What are those?

19  A.  Well, again, social capital.  Marriage brings a recognition

20  by society that, that this is a legitimate family; that you are

21  the same as any other family.  And children experience that.

22  And in the absence of it, they also experience the reverse.

23  They experience the sense that others view them as different,

24  and different can lead to feeling a stigma.

25  Q.  When couples are married, does it afford any, any benefits

1   concerning stability?

2   A.  Absolutely.  Marriage, married couples stay together longer

3   than cohabiting couples.  That benefits children.  It also,

4   married couples guarantees the child's, legally guarantees the

5   child's relationship with both couples, should the couple break

6   up.

7   Q.  You touched upon the economic resources of the family in

8   your report, is that right, as it relates to being married?

9   A.  I did.

10  Q.  You did touch on that.

11      Okay.  When couples are married, does it -- and does

12  your clinical experience allow you to say anything or talk

13  about the effect of the absence of marriage on economic

14  benefits?

15  A.  Yes.

16      MR. POTCHEN:  Well, I'll object to him getting into

17  these areas.  This is beyond --

18      THE COURT:  I sustain the objection.

19      MS. STANYAR:  Okay.

20  BY MS. STANYAR:

21  Q.  How many children in the foster care system in Michigan are

22  freed for adoption, but waiting for a family to come forward to

23  adopt them?

24  A.  About 3,500, a little bit more.

25  Q.  Where does that number come from?

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

141

1   A.  It comes from the federal government from the, what's

2   called AFCARS.  It's A-F -- I'll just say the name.  The

3   Adoption and Foster Care Analysis Reporting System.

4   Q.  You've already talked about, you've already told us what it

5   meant to be freed for adoption, that the parents' rights have

6   been terminated.

7           What are the characteristics of the children who are

8   waiting to be adopted?

9   A.  They tend to be older.  They tend to have what are called

10  special needs, which means possible medical problems, possible

11  psychological problems, developmental delays, academic

12  problems.  They are more often proportionately children of

13  color.  They are often sibling groups.

14  Q.  What happens to these children if there are no families

15  available to adopt them?

16  A.  They linger.  They linger, and unfortunately, as I said,

17  it's not necessarily lingering in a single home.  Too often,

18  they move from home to home for a variety of reasons.

19  Q.  Do any of these children reach adulthood without being

20  adopted?

21  A.  Yes.  Nationally about 26,000 a year age out, it's the

22  term.  They age out of the foster care system.

23  Q.  What are the future prospects for children who age out of

24  the foster care without getting adopted into a family?

25  A.  They are bleak.  We have increased evidence of

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

142

1    homelessness, increased evidence of criminality, increased

2    evidence of illicit drug use, alcoholism, increased likelihood

3    of entering into, into incarceration, mental health problems.

4    They have no family to rely on.  Their resources are extremely

5    limited.  The outcome is bleak for these, these young men and

6    women.

7    Q.  Based upon your work as related to adoption, based upon

8    your work with the Donaldson Institute, do you have an opinion

9    about whether the inability for a couple, same-sex couple to

10   adopt jointly would be a barrier to that couple adopting

11   children out of the foster care system?

12   A.  I do have an opinion.

13   Q.  What's your opinion?

14   A.  Well, after 30 years in this field, working with agencies

15   around the country, talking about the barriers, you know,

16   helping them to remove the barriers, and institute writing

17   about these barriers, we know that if we can remove barriers of

18   all sort, legal barriers, the atmosphere barriers that exist in

19   the agencies, in terms of lack of training or attitudes about

20   gays and lesbians and so forth, we were -- we will likely

21   increase the pool of suitable adoptive parents and decrease the

22   number of children who will continue to wait in foster care.

23   In other words, we'll get them into permanent homes.

24   Q.  Why would --

25              MR. POTCHEN:  Your Honor, based on that answer, he's

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1    made it very clear that the foster care system and the

2    adoption, second-parent adoption are not relevant to the issues

3    at this trial.  We again restate it.

4          THE COURT:  I'm not sure, but do you have many more

5    questions?

6          MS. STANYAR:  I don't.  I only have like four or five

7    more questions.

8          THE COURT:  This point has gone over.  Go on.

9          MS. STANYAR:  Okay.

10   BY MS. STANYAR:

11   Q.  Why would this particular thing, the refusal to have a

12   second parent adopt, why would that be something that

13   discourages?

14   A.  Well, one of the barriers has to do with the environment

15   that exists when people come to adopt.  I cannot think of

16   anything more disrespectful to the couple coming in, to be sit

17   down and to explore adoption, they are very motivated, they

18   want to adopt, and they are told, well, you can adopt, but you

19   can't.  You can be the legal parent, but you can't.  You can --

20   you have a guaranteed relationship with this child forever and

21   the child has a guaranteed relationship with you forever, but

22   we're not so sure about you.

23         That really undermines, you know, the whole adoption

24   process.  It has to create, in my experience, it creates

25   difficulties for the individuals.  And I suspect, and what

1    people have shared with me, as I've gone around consulting,

2    it's a barrier that sometimes people just don't know how to

3    overcome.

4    Q.  Does it discourage them from adopting?

5    A.  I think, in my experience, it can discourage some, some

6    people for adopting.

7    Q.  Has the Donaldson Institute published any documents

8    addressing barriers to adoption by same-sex couples?

9    A.  Yes.  We have three articles, two authored by Jean Howard,

10   and one authored by myself, all of which have recommended the

11   states to allow both joint and second-parent adoption so as to

12   remove legal barriers for permanency for children in foster

13   care.

14   Q.  Why has the Donaldson Institute advocated for removing

15   barriers to gay couples jointly adopting?

16   A.  We are a child advocacy organization.  We focus on the

17   needs of children, particularly the needs of children in care.

18   There are not enough families available nationwide, and clearly

19   also in Michigan, because we have children who are waiting.

20        We need a larger pool of interested, well trained,

21   capable individuals, including gays and lesbians.  Removing

22   these barriers will increase the pool.  When we don't have --

23   when we have these barriers in place, and historically there's

24   been a lot of barriers, we know the pool is much smaller.

25   Q.  You mentioned earlier that children awaiting adoption are

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

```
 1    often children of color, children of special needs.

 2              Is there any research on same-sex couples' openness to

 3    adopt interracially?

 4    A.  Yes, there is.  And they are more likely to adopt

 5    interracially than heterosexual couples.

 6    Q.  Is there any research on same-sex couples' general openness

 7    to adopting, at least in states where they are able to adopt as

 8    a couple?

 9    A.  I'm sorry.  Repeat that.

10    Q.  Is there any research on same-sex couples' openness to

11    adopt generally?

12    A.  Yes.  There, actually, the census data and other large

13    scale data sets published by Gary Gates indicates that gays and

14    lesbians are approximately four times more likely to adopt than

15    heterosexuals, and six times more likely to foster a child than

16    heterosexuals.

17    Q.  And lastly, in your opinion, how does Michigan's

18    prohibition against joint adoption by same-sex couples affect

19    children awaiting adoption out of foster care?

20    A.  It increases the potential risk for them, that they will

21    continue to linger longer and suffer the experiences of foster

22    care and, perhaps, even continue to linger in care to the point

23    where they age out.

24              MS. STANYAR:  Thank you, Doctor.

25              THE COURT:  Okay.  We will stand in recess until two,
```

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

1   at which time the Government -- the State, so used to the

2   Government -- the State will have an opportunity, as well as

3   Clerk Brown to cross-examine.

4            We stand in recess until two.

5            THE CLERK:  All rise.

6            (Recess taken at 12:55 p.m.)

7                         *       *       *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BENCH TRIAL, VOLUME 1, PART B
TUESDAY, FEBRUARY 25, 2014

147

1

2                     **CERTIFICATE OF REPORTER**

3             We, Joan L. Morgan and Christin E. Russell, as

4    official court reporters for the United States District Court,

5    appointed pursuant to provisions of Title 28, United States

6    Code, Section 753, I do hereby certify that the foregoing is a

7    correct transcript of the proceedings in the above-entitled

8    cause on the date hereinbefore set forth.

9

10                    s/ Joan L. Morgan, CSR

11                   s/ Christin E. Russell, CSR

12              Federal Official Court Reporters

13

14

15

16

17

18

19

20

21

22

23

24

25